**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| 45 JOHN LOFTS, LLC, | Case No. 16-12043 (SHL) |
|           Debtor. | (Jointly Administered) |

-------------------------------------------------------------x

45 JOHN LOFTS, LLC,

          Plaintiff

        v.                            Adv. No. 17-01179 (SHL)

MERIDIAN CAPITAL GROUP LLC,
CROWN MANSION LLC, BO JIN ZHU,
MEGA INTERNATIONAL COMMERCIAL
BANK, CONGREGATION KAHAL MINCHAS
CHINUCH, CHAIM SCHIYA BABAD,
RELIABLE ABSTRACT CO., LLC,
ABRAHAM MANDEL, TOBY MANDEL,
SILVER GOLD GROUP LLC,
JOSEPH BRUNNER, JOSEPH SEGEL,
DAVID JANKLOWICZ, MORRIS LOWY,
MITCHELL KIRSCHNER, JERRY LOWY,
ISAAC GREENFELD, AND
RENATUS PORTFOLIO COMPANY, LLC,

          Defendants.

-------------------------------------------------------------x

## <u>AMENDED MEMORANDUM OF DECISION</u>

**A P P E A R A N C E S :**

**WILK AUSLANDER LLP**
*Counsel for Plaintiff/Debtor*
1515 Broadway, 43rd Floor
New York, New York 10036
By:    Eric J. Snyder, Esq.
        Eloy A. Peral, Esq.

      -and-

**SILVERMAN SHIN & BYRNE PLLC**
*Special Counsel for Plaintiff*
Wall Street Plaza
88 Pine Street, 22nd Floor
New York, New York 10005
By:    Peter R. Silverman, Esq.
       Donald F. Schneider, Esq.

**BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP**
*Counsel for Defendants Bo Jin Zhu and Crown Mansion LLC*
299 Park Avenue, 16th Floor
New York, New York 10171
By:    Jordan E. Stern, Esq.
       Alec P. Ostrow, Esq.

**MORRISON COHEN LLP**
*Counsel for Defendant Meridian Capital Group LLC*
909 Third Avenue
New York, New York 10022
By:    Y. David Scharf, Esq.
       Robert K. Dakis, Esq.
       Jason Gottlieb, Esq.
       Brett Dockwell, Esq.

**CARTER LEDYARD & MILBURN LLP**
*Counsel for Defendant Reliable Abstract Co., LLC*
Two Wall Street
New York, New York 10005
By:    Jacob H. Nemon, Esq.
       Leonardo Trivigno, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are motions by various Defendants seeking dismissal of the complaint

in the above-captioned adversary proceeding (the "Complaint") [ECF. No. 1] filed by 45 John

Lofts LLC (the "Debtor" or "Plaintiff"). *See Memorandum of Law in Support of Motion of Bo*

*Jin Zhu and Crown Mansion LLC For Dismissal of the Adversary Proceeding* (the "Zhu

Motion") [ECF No. 17]; *Meridian Capital Group LLC's Motion to Dismiss Plaintiff's Complaint*

(the "Meridian Motion") [ECF No. 14]; *Defendant Reliable Abstract Co. LLC's Motion for*

2

*Judgment on the Pleadings* (the "Reliable Motion," and together with the Zhu Motion and the

Meridian Motion, the "Dismissal Motions") [ECF No. 32].  In addition, Defendants

Congregation Kahal Minchas Chinuch ("Congregation") and Chaim Schiya Babad seek to join in

the Dismissal Motions even though Congregation and Babad have already filed their answer to

the Complaint, while the other Defendants also filed a letter joining the Dismissal Motions.  *See*

*Letter to Judge Sean Lane re: Joining Motions to Dismiss, dated December 7, 2017* (notifying

the Court of joinder in both the Zhu Motion and the Meridian Motion under Fed. R. Civ. P.

12(g)(1)) [ECF No. 27]; *Letter to the Honorable Sean H. Lane: re Joining Motions to Dismiss,*

*dated December 18, 2017 [ECF. No. 38]* (stating that Defendants Abraham Mandel, Toby

Mandel, Silver Gold Group LLC, Joseph Brunner, Joseph Segel, David Janklowicz, Morris

Lowy, Mitchell Kirschner, Jerry Lowy, Issac Greenfeld, and Renatus Portfolio Company, LLC

join the Dismissal Motions); *see also Answer to Complaint of Congregation Kahal Minchas*

*Chinuch and Chaim Schiya Babad* [ECF No. 15].

For the reasons set forth below, the Court denies the Dismissal Motions other than to

grant the dismissal of certain counts seeking the disallowance of claims.

## BACKGROUND

As is the case for motions to dismiss, the Court takes the allegations of the Complaint as

true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Broadly speaking, the Complaint seeks the

return of a deposit of $14,330,000.00 received by Debtor as part of the sale of Debtor's property,

where the money was subsequently transferred to other parties as part of a series of complicated

transactions involving one of Debtor's members.  These subsequent transactions—unrelated to

the sale of Debtor's property—form the foundation of Plaintiff's avoidance claims, fraudulent transfer claims, and claims seeking disallowance of creditor proofs of claim.

## I.    **The Debtor**

Prior to Debtor filing for bankruptcy, Chaim Miller was one of Debtor's members. Complaint ¶ 1.  The only other member of Debtor was Chun Peter Dong, who was Debtor's managing member.  *Id*. ¶ 36.  However, Miller sometimes acted on behalf of Debtor with Samuel Sprei, his business partner.  *Id*. ¶¶ 34, 41-42, 48.

Debtor's sole asset was a vacant eighty-four unit condominium located at 45-49 John Street, New York, New York (the "Property").  *Id.* ¶ 30.  Debtor had purchased the Property in 2014 for the sum of $60,000,000.00.  *Id.* ¶ 31.  Debtor financed its purchase of the Property with three mortgage loans in the aggregate principal amount of $49,500,000.00 (the "Madison Mortgage Loans") from affiliates of Madison Realty Capital ("Madison"), a lender with which Miller had financed several other real estate transactions.  *Id.* ¶ 32.

## II.    **The Zhu Buy-Out and the Agreement to Sell the Property**

At the same time, Miller and Sprei also were involved in other real estate dealings unrelated to Debtor.  In 2014, Miller and Sprei contracted to complete a $31,000,000.00 buy-out of the membership interests of Miller's other partner, Defendant Bo Jin Zhu, in four limited liability companies unrelated to Debtor, each of which owned a separate commercial property. *Id.* ¶ 34.  In May 12, 2014, Miller and Sprei entered into a contract (the "Zhu Buy-Out Contract") with Zhu's assignee, Defendant Renatus Portfolio Company, LLC ("Renatus"), to buy-out Zhu's interests in limited liability companies that owned the following four real properties: 97 Grand Avenue, 203-205 North 8th Street, 32-34 Fifth Avenue, and 29 Ryerson Street (collectively, the "Buy-Out Properties").  *Id.* ¶ 35.

Under the Zhu Buy-Out Contract, Miller and Sprei paid an initial deposit of

$7,000,000.00 against a total buy-out price of $31,000,000.00; the balance was to be paid at a

closing scheduled for August 11, 2014. *Id.* ¶ 37. As this August closing date neared, counsel for

Miller and Sprei negotiated an extension of the closing date with Renatus to September 15, 2014

in consideration of an additional deposit of $1,500,000.00 (the "Extension Payment"). *Id.* ¶ 38.

While the extension was for the benefit of Miller and Sprei, the Extension Payment was

actually made by another individual—Defendant Joseph Brunner—using funds from two entities

controlled by Brunner: Defendant Silver Gold Group LLC ("SGG") and non-party Brooklyn

Realty Holdings, LLC. *Id.* ¶¶ 39, 77. By the end of August 2014, counsel for Miller and Sprei

were unable to raise the remainder of the purchase price needed to consummate the Zhu Buy-Out

Contract. *Id.* ¶ 40. Thereafter, Miller and Sprei attempted to obtain the necessary funds by,

among other things, contracting to sell the Property and refinancing three of the Zhu Buy-Out

Properties, as well as another property controlled by Miller. *Id.* ¶¶ 41-42.

Sprei and counsel for Debtor ultimately negotiated an Agreement of Purchase and Sale

("PSA") to sell the Property to HS 45 John LLC ("HS 45"). *Id.* ¶¶ 48-49. The PSA provided for

a down payment totaling $14,330,000.00 (the "PSA Down Payment"). *Id.* ¶ 50. However, the

PSA did not require that the PSA Down Payment be placed in escrow, a fact which was

unknown to Debtor's other members. *Id.*

On September 19, 2014 (the "Contract Date"), Miller executed the PSA with HS 45 on

behalf of Debtor. *Id.* ¶ 51. The total purchase price was $64,500,000.00, including the PSA

Down Payment and an amount equal to the unpaid outstanding mortgage indebtedness not to

exceed $47,000,000.00. *Id.* ¶¶ 52, 54. Miller executed the PSA without the knowledge or

consent of either Dong, Debtor's managing member, or Debtor's other investors who collectively

held a 41 percent membership interest in Debtor (the "41% Investors"). *Id.* ¶ 55. On the very same day the PSA was executed, Miller and Sprei took the PSA Down Payment and transferred all but $1,000,000.00 (the "Adjusted Down Payment") to Riverside Abstract Company ("Riverside") to fund the Zhu Buy-Out; the remaining $1,000,000.00 was previously transferred directly to Defendant Meridian Capital Group LLC ("Meridian"). *Id.* ¶¶ 49, 54, 60.

When Dong and the 41% Investors learned of the unauthorized PSA, Miller and Sprei provided Debtor's other members with a fabricated letter to conceal their theft of the PSA Down Payment. *Id.* ¶ 56. The letter (the "Quick Title Letter") was purportedly from Quick Title Search, LLC ("Quick Title"), signed by Abraham Teitelbaum, and addressed to Miller. *Id.* It stated that Quick Title "is still holding on behalf of Harry Miller the proceeds from a 1031 exchange in the amount of $12,453,980." *Id.* Sprei later testified that the Quick Title Letter was simply a hoax, as Quick Title never held any of the proceeds of the PSA Down Payment and never had any dealings with Miller or Sprei. *Id.* He also testified that the Quick Title Letter was created by a "friend" without the knowledge of any of Quick Title's employees or principals, including Mr. Teitelbaum. *Id.* Sprei further testified that he provided Dong and the 41% Investors with the Quick Title Letter to "soothe" the "Asian Group" (i.e., Debtor's other members) who were alarmed at the unauthorized sale of the Property and the prospect that Miller and Sprei might "run off" with the PSA Down Payment. *Id.*

To provide additional funds for the Zhu Buy-Out, Miller and Sprei also arranged for mezzanine financing from Madison on three of the Zhu Buy-Out Properties and a fourth property which Miller controlled (the "Collateral Properties Financing"). *Id.* ¶ 57. The Collateral Properties Financing netted Miller and Sprei the sum of $16,073,911.00 in addition to the PSA Down Payment. *Id.* ¶ 58.

6

### III.   Disbursement of the Adjusted Down Payment and Collateral Properties Financing to the Ultimate Beneficiaries

Central to the allegations of the Complaint is the disposition of the funds collected by Miller and Sprei for the Zhu Buy-Out, including the PSA Down Payment. In addition to the Adjusted Down Payment given to Riverside, $16,073,911.98 was also transferred to Riverside from the Collateral Properties Financing. *Id.* ¶ 60. In total, Riverside held $29,403,911.98 (the "Total Buy-Out Proceeds") in order to effectuate the Zhu Buy-Out. *Id.*[1]

Once received by Riverside, the funds were disbursed to a variety of individuals. The Total Buy-Out Proceeds were transferred by Riverside as follows:

> a)      $19,672,687.23 to Herrick Feinstein, LLP ("Herrick"), in its capacity as counsel for Renatus, under the Zhu Buy-Out Contract (the "Herrick Escrow");
> b)      $2,827,312.77 to Mega International Commercial Bank ("Mega Transfer" and the "Mega," respectively);
> c)      $2,850,000.00 back to GWFG, as HS 45's attorneys' fees.
> d)      $2,000,000.00 to the Congregation (the "Congregation Transfer");
> e)      $500,000.00 to Meridian;
> f)      $500,000.00 to Reliable Abstract Co., LLC ("Reliable");
> g)      $583,570.98 remained in escrow with Riverside;
> h)      $242,000.00 to Image Capital, LLC;
> i)      $227,341.00 to Riverside; and
> j)      $1,000.00 to the title closer.

*Id.* ¶ 62.

Once received by these parties, the funds were sometimes further disbursed to others. For example, an officer of Renatus directed Herrick to distribute the Herrick Escrow to: a) Treff & Lowy, PLLC ("T&L"), a law firm, in the amount of $5,600,000.00 (the "T&L Transfer"); b) $1,000,000.00 to Defendant Abraham Mandel; and c) $13,072,687.23 to SGG (the "SGG Transfer"). *Id.* ¶ 63. Herrick later wired the funds as instructed. *Id.* ¶ 64.

---

[1]      Riverside acted as clearing agent in both the Zhu Buy-Out and the PSA. *Id.* ¶ 54.

The T&L Transfer was a partial repayment by Defendant Brunner, who had an interest in Renatus, of a $7,000,000.00 loan made by T&L, on or about May 30, 2014, as a "nominee" of the T&L Transferees (defined below) to Anmuth Holdings, LLC (the "Anmuth Loan"). *Id.* ¶ 65. Anmuth Holdings, LLC is owned and controlled by Defendants Brunner and Abraham Mandel. *Id.* Defendants Brunner, Abraham Mandel, and his wife, Toby Mandel, personally guaranteed the Anmuth Loan. *Id.* Brunner used the proceeds of the Anmuth Loan to acquire real property located at 49 Dupont Street in Brooklyn, New York. *Id.* ¶ 66.

On or about the Contract Date, T&L in turn transferred $5,583,333.32 of the T&L Transfer as follows:

      a)     Defendant Joseph Segel, the sum of $300,000.00;
      b)     Defendant David Janklowicz, the sum of $150,000.00;
      c)     Defendant Morris Lowy, the sum of $666,666.66;
      d)     Defendant Mitchell Kirschner, the sum of $666,666.66;
      e)     Defendant Jerry Lowy the sum of $800,000.00; and
      f)     Defendant Isaac Greenfeld, the sum of $3,000,000.00.

*Id.* ¶ 67. T&L retained $16,666.68 of the $5,600,000.00 it received from Herrick. *Id.* ¶ 68.

Moreover, the SGG Transfer was allegedly made to benefit Brunner. *Id.* ¶ 77. The SGG Transfer repaid the funds loaned by Brunner, through SGG and Brooklyn Realty Holdings, LLC, to Miller and Sprei for the Extension Payment in connection with the Zhu Buy-Out Contract. *Id*. ¶ 77.

Additionally, Mega is alleged to have received a disbursement from Riverside to pay off Zhu's debts. *Id*. ¶ 62. Sprei understood "that part of the money of the proceeds [the $2,827,312.77] that Mr. Zhu got . . . we paid off Mega International for him. That was part of the disbursements from him." *Id.* ¶ 73. More specifically, Defendant Crown Mansion LLC ("Crown Mansion") had borrowed the principal sum of $2,700,000.00 from Mega prior to the Contract Date (the "Crown Mansion Loan"), which Zhu personally guaranteed. *Id.* ¶¶ 71, 74. A

letter from Mega dated the same date as the Contract Date, stated that the total amount due under the Crown Mansion Loan equaled $2,827,312.77, the exact amount of the Mega Transfer. *Id.* ¶ 72. Mega ultimately terminated a UCC-1 financing statement that was filed in its favor after receiving the Mega Transfer. *Id.* ¶ 74.

The Congregation also received a disbursement. *Id.* ¶ 75. Debtor alleges that the disbursement schedule prepared by Riverside indicates that Defendant Babad was the recipient of the Congregation Transfer and not the Congregation. *Id.* Counsel for Debtor in the PSA transaction understood that the Congregation Transfer was made to the Congregation rather than Babad, because "any time [Babad] has gotten wires, that's where the wire instructions have been sent." *Id.*

## IV.   **The Ensuing HS 45 Bankruptcy Litigation**

In February of 2015, Dong commenced an action, individually and derivatively on behalf of Debtor, in the New York Supreme Court, New York County, seeking, among other things, to enjoin the sale of the Property. *Id.* ¶ 83. After a temporary restraining order was issued enjoining the sale, the proposed buyer, HS 45, filed a Chapter 11 petition with this Court and commenced an adversary proceeding seeking specific performance of the PSA. *Id.*

As part of the confirmed plan of reorganization and related settlement in that bankruptcy case, the Property was eventually sold to a third-party purchaser for $73,000,000.00. *Id.* ¶ 84. After payment of administration expenses, most of the proceeds were used to satisfy the Madison Mortgage Loans of approximately $51,429,334.00 on the Contract Date, with $13,500,000.00 also going to HS 45. *Id.* ¶ 85. The remaining proceeds were paid to Dong and the 41% Investors in satisfaction of their claims against HS 45 and for payment of sale expenses in the bankruptcy. *Id.* ¶ 86.

## V.    This Adversary Proceeding and the Dismissal Motions

Based on all these events, Plaintiff's Complaint sets out 81 separate counts against the 17 Defendants.  *See* Complaint ¶¶ 87–519.  The Complaint requests avoidance of the numerous transfers that conveyed the Adjusted Down Payment from Debtor to the other entities, and damages in the full amount of those transfers from each Defendant.  *See* Complaint ¶¶ 87–516. The Complaint alleges multiple causes of action against each Defendant, including for intentional and constructive fraudulent conveyances under Sections 548(a)(1)(A) and 548(a)(1)(B) of the Bankruptcy Code, and intentional and constructive fraudulent conveyances under New York Debtor and Creditor Law §§ 270–276 as made applicable under the Bankruptcy Code by Section 544(b).  The Complaint also requests that "any claims filed by [D]efendants or scheduled in favor of [D]efendants against Debtor . . . be disallowed unless and until they return the portion of the PSA Down Payment transferred to each Defendant."  Complaint ¶¶ 517-19.

The Dismissal Motions raise numerous attacks on the sufficiency of the pleadings as well as several affirmative defenses.  Plaintiff filed a single omnibus response to the Dismissal Motions.  *See Memorandum of Law in Support of Plaintiff's Omnibus Opposition to Motions to Dismiss the Complaint* (the "Opposition") [ECF No. 41].  Only Zhu and Meridian filed replies. *See Reply Memorandum of Law in further support of the Motion of Zhu and Crown Mansion to Dismiss* (the "Zhu Reply") [ECF No. 44]; *Meridian Capital Group LLC's Reply in Support of Motion to Dismiss Plaintiff's Complaint* (the "Meridian Reply") [ECF No. 46].

## DISCUSSION

## I.    Applicable Legal Standards

Federal Rule of Civil Procedure 12(b)(6) governs when a pleading fails to state a claim upon which relief can be granted.  This rule is made applicable in bankruptcy litigation through Federal Rule of Bankruptcy Procedure 7012(b).  On a Rule 12(b)(6) motion, the court will not

dismiss a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Thus, conclusory statements and recitations of causes of action will not suffice.  *See Iqbal*, 556 U.S. at 679. Courts apply the same standard for motions under Federal Rule of Civil Procedure 12(c) as they do for motions under Rule 12(b)(6).  *See Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (noting that the standards for motions for Rules 12(b)(6) and 12(c) are "identical").

On a Rule 12(b)(6) motion, courts consider any attached exhibit, referenced materials, and materials integral to the complaint.  *See Sira v. Morton,* 380 F.3d 57, 67 (2d Cir. 2004).  For referenced materials to be relied upon, a complaint must clearly and substantially mention or discuss such materials.  *See B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 167 (S.D.N.Y. 1995).  In order for material to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] documents in framing the complaint.'"  *See N.Y. Internet Co. v. Jobdiva Inc. (In re N.Y. Internet Co.)*, 2018 WL 1792235, at *4 (Bankr. S.D.N.Y. Apr. 13, 2018) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (alteration in original)).

A.  <u>Fraudulent Transfers</u>

There are distinct pleading standards for constructive and intentional fraudulent transfers. Claims of intentional fraudulent transfers, like claims of intentional fraud generally, are subject to the stricter standard of "particularity."  *See Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*, 490 B.R. 84, 93-94 (Bankr. S.D.N.Y. 2013); *see also* Fed. R. Civ. P 9(b).  However, claims of constructive fraud, because they are not grounded in allegations of actual fraud, are

subject to the more lenient Federal Rule of Civil Procedure 8(a)(2) standard that only requires a

defendant to receive "sufficient notice to prepare an answer, frame discovery and defend against

the charges." *See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 96

(Bankr. S.D.N.Y. 2010) (quoting *Nisselson v. Drew Indus. (In re White Metal Rolling &*

*Stamping Corp.)*, 222 B.R. 417, 429 (Bankr. S.D.N.Y. 1998)). This "fair notice" standard

requires a plaintiff to provide sufficient information to permit the defendant to have a fair

understanding of what the plaintiff is complaining about. *See id.* at 102 (citing *Kittay v.*

*Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000).

       1.   Federal Intentional Fraudulent Transfers

      Section 548(a)(1)(A) of the Bankruptcy Code prohibits transfers made with "intent to

hinder, delay, or defraud any creditor." 11 U.S.C. § 548(a)(1)(A). This form of fraud is

commonly referred to as "actual fraud." *See Gowan v. Novator Credit Mgmt. (In re Dreier*

*LLP)*, 452 B.R. 467, 477 (Bankr. S.D.N.Y. 2011). A court will also look at the intent of

corporate agents and individuals in instances where a debtor is not an individual. *See Kirschner*

*v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, 2017 WL 82391, at *5

(S.D.N.Y. Jan. 6, 2017) (finding that a corporate officer's intent may be imputed to a corporation

if the officer was in a position to control the corporation's property).

      Circumstantial evidence may be used to allege actual fraud. "Due to the difficulty of

proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on

'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent

transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St.*

*Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citing *Wall St. Assocs.*

*v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999) (internal citations and quotation marks

omitted)). The badges of fraud may include:

12

    1.     the lack or inadequacy of consideration;

    2.     the family, friendship or close associate relationship between the parties;

    3.     the retention of possession, benefit, or use of the property in question;

    4.     the financial condition of the party sought to be charged both before and after the transaction in question;

    5.     the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

    6.     the general chronology of the events and transactions under inquiry;

    7.     a questionable transfer not in the usual course of business; and

    8.     the secrecy, haste, or unusualness of the transaction.

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).

    2.   Federal Constructive Fraudulent Transfers

Federal law also prohibits instances of constructive fraud where a trustee can prove the presence of several conspicuous elements, rather than proving actual fraud itself. *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 827-28 (Bankr. S.D.N.Y. 2008). Section 548(a)(1)(B) of the Bankruptcy Code states that constructive fraud can be shown where the debtor:

(i) received less than a reasonable equivalent value in exchange for a transfer or obligation; and

(ii) (I) was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

   (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

   (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as debts matured; or

   (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

### 3. Fraudulent Transfers Under State Law

The New York Debtor & Creditor Law ("N.Y. DCL"), like Section 548(a)(1)(A) of the Bankruptcy Code, allows for the recovery of all transfers made with actual fraudulent intent. *See* N.Y. DCL § 276. The pleading requirements for federal and state law are similar. *See Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 733-735 (Bankr. S.D.N.Y. 2008). A party "asserting an intentional fraudulent transfer claim under either the Code and/or the NYDCL must normally allege (1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto." *Id.*

Additionally, the N.Y. DCL, like Section 548(a)(1)(B) of the Bankruptcy Code, allows for recovery of a constructive fraudulent transfer where actual fraudulent intent is absent or cannot be proven. *See Am. Federated Title Corp. v. GFI Mgmt. Servs.*, 126 F. Supp. 3d 388, 400-01 (S.D.N.Y. 2015). Like federal law, New York does not forbid transfers unless the debtor is left insolvent, left undercapitalized from a business venture, or believes he will incur debts beyond his ability to pay on maturity. *See* N.Y. DCL §§ 273–275; *Aluminum Supply Co. v. Camelio*, 32 Misc. 2d 292, 295, 223 N.Y.S.2d 26, 28-29 (Sup. Ct. Monroe Cty. 1962).

Unlike federal law, however, New York law dictates that a transfer is fraudulent under N.Y. DCL Sections 273 and 274 unless it is made with "fair consideration." *See* DCL §§ 272(a), 273, 274. Fair consideration has two parts: "fair equivalency of the consideration given and good faith." *Sec. Inv'r Prot. Corp. v. Rossi (In re Cambridge Capital, LLC)*, 331 B.R. 47, 63 (Bankr. E.D.N.Y. 2005); *see also Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011) ("To defeat a motion to dismiss, the Trustee need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent' value *or* a lack of good faith on the

14

part of the transferee.") (emphasis in original).  "Good faith" means more than to merely be void

of an intent to defraud; it requires one to deal "honestly, fairly and openly."  *See Southern Indus.,*

*Inc. v. Jeremias*, 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 949 (App. Div. 2d Dep't 1978)

(voiding a transfer for lack of good faith because it was "consummated with the intent to obtain

an unconscionable advantage . . . over the rights of other general creditors.").  New York law

thus demands an inquiry into the decision-making process of the transfer, and not simply into the

substantive value of the transfer.

## II.   <u>Standing to Bring These Avoidance Actions</u>

The Court begins by addressing the threshold issue of Plaintiff's standing to bring the

causes of action asserted in this case.

The standing requirement for bringing avoidance actions under the Bankruptcy Code is

found in Section 544.  Under Section 544(b)(1), a debtor in possession "may avoid any transfer

of an interest of the debtor in property or any obligation incurred by the debtor that is voidable

under applicable law by a creditor holding an unsecured claim that is allowable under [S]ection

502," subject to certain enumerated exceptions not relevant here.  11 U.S.C. § 544(b)(1).  The

term "applicable law" refers to causes of action available under both federal and state law.  *See*

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 464 B.R. 606, 612-13 (Bankr.

S.D.N.Y.).  "[F]or a trustee to maintain an action for avoidance of a fraudulent conveyance, the

trustee must show that at least one of the present unsecured creditors of the estate holds an

allowable claim, against whom the transfer or obligation was invalid under applicable state or

federal law." *Mendelsohn v. Kovalchuk (In re APCO Merch. Servs.)*, 585 B.R. 306, 314 (Bankr.

E.D.N.Y. 2018) (quoting *Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.)*, 178

B.R. 938, 945 (Bankr. S.D.N.Y. 1995)).

Defendants argue that Plaintiff has failed to affirmatively identify a single qualifying unsecured creditor to satisfy the standing requirements of Section 544.  *See* Meridian Motion at 6-8.  Defendants also argue that the schedules and filed proofs of claim in this case cannot be relied upon to establish standing because the debts listed in those filings are contested.  *See id.* at 7-8.  Based on this, Defendants conclude that this adversary proceeding only serves to enrich the equity holders of Plaintiff, not unsecured creditors as required by law.  *See id.* at 6 (citing *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582, 584 (2d Cir. 1950) (quoting *In re J.C. Winship Co.*, 120 F. 93, 96 (7th Cir. 1903)).

Defendants' argument must fail at this stage.  It is true that the only creditor directly referenced in the Complaint is Madison, a secured creditor that was ultimately paid in full in the HS 45 bankruptcy case.  *See* Complaint at ¶¶ 5, 16.  But a plaintiff is not required in its complaint to identify a specific unsecured creditor holding an allowed claim.  *See Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 120 (Bankr. S.D.N.Y. 2016) ("The Defendants' second challenge suggests that the Trustee must identify a specific unsecured creditor holding an allowed claim. The Defendants' position [is] contrary to the law of this District.") (citing *Global Crossing Estate Rep. v. Winnick*, 2006 WL 2212776, at *11 (S.D.N.Y. Aug. 3, 2006); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 109 (Bankr. S.D.N.Y. 2011); *Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 234 (Bankr. S.D.N.Y. 2011); *Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 780 (Bankr. S.D.N.Y. 2008); *In re RCM Global Long Term Cap. Appreciation. Fund, Ltd.*, 200 B.R. 514, 523-24 (Bankr. S.D.N.Y. 1996)).

Indeed, there is ample authority to suggest that consideration of the qualifying creditor question be left until motions for summary judgment, if not later.  *See Geron v. Schulman (In re*

*Manshul Constr. Corp.)*, 2000 WL 1228866, at *44 (S.D.N.Y. Aug. 30, 2000) (considering the existence of qualifying creditors post-trial); *In re APCO*, 585 B.R. at 315 (same); *Smith v. George (In re RCK Modular Homes Sys.)*, 402 B.R. 463, 469-70 (Bankr. D. N.H. 2008) (considering the existence of qualifying creditors on a motion for summary judgment); *see also In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997) ([Appellants] complain that the Trustee has not articulated the specific creditor who could set aside [the] gift, but a trustee need not do so. Thirteen unsecured claims have been filed; the Trustee can assume the position of any one of them."). This makes sense given that the existence of a qualifying creditor is inherently a question of fact and is, in fact, an issue in dispute in this case. *See In re Musicland*, 398 B.R. at 778-81 (citing *In re Wingspread*, 178 B.R. at 945-56) (holding that question of whether a qualifying creditor exists is a fact to be proven at trial and not an issue to be disposed of in a motion to dismiss).[2]

### III.    Intentional Fraudulent Transfers

Defendants also argue that Plaintiff has failed to meet the elevated pleading requirements of Federal Rule of Civil Procedure 9(b) for its intentional fraudulent transfer claims for myriad reasons. *See* Zhu Motion at 14; Meridian Motion at 12-13; Zhu Reply at 9-13; Meridian Reply at 6-8. All Defendants' arguments fail.

First, Defendants argue that there could be no intent to defraud creditors because Madison was to be paid in full under the PSA and there were no other creditors of the estate. But this argument fails for the same reasons discussed above. In short, it is premature to consider the

---

[2]         In any event, four proofs of claim were filed before the commencement of this adversary proceeding by three unsecured creditors, Opposition at 8-9; this also provides a basis to reject Defendants' standing argument.

existence of other creditors and, in any event, is at odds with the fact that claims have been filed by three unsecured creditors.

Second, Defendants argue that Plaintiff insufficiently pleads facts showing an intent to defraud. However, the Court concludes that an intent to defraud was properly plead here. The Complaint alleges extensive misconduct by Miller. Complaint ¶¶ 35, 41-43, 51, 56. Under New York law concerning agency and imputation, "the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010). A limited liability company, like a corporation, is not a natural person and can act "solely through the instrumentality of their officers or other duly authorized agents." *Id*. (citing *Loomis v. Pittsburgh Coal & Min. Co.*, 56 How. Pr. 373, 375 (Super Ct. 1877)). All of an agent's acts, whether for good or for ill, are imputed to a limited liability company unless some exception applies. *See id*. The very first paragraph of the Complaint sets forth Miller's status as a member of Plaintiff, and there are several other instances where he is alleged to have acted on behalf of Plaintiff. Complaint ¶¶ 1, 35, 41-42, 51-52.

Given that Miller is alleged to have been a member—and therefore agent—of Plaintiff, his actions can serve as a basis to allege an intent to defraud. For example, the Complaint alleges that Miller and Sprei negotiated and executed the sale of the Property, took the Adjusted Down Payment that was part of the proceeds from the sale of the Property to use in another transaction unrelated to Debtor, attempted to effectuate the sale of the Property without any notice to the other members of Plaintiff, and fabricated a letter in order to conceal the theft of the PSA Down Payment. *Id.* ¶¶ 41, 48, 50-52, 55-56. The Complaint also alleges that Plaintiff received no consideration for any of the transfers initiated by Miller and Sprei that ultimately were disbursed

to Defendants. *Id.* ¶ 69 ("With the possible exception of $1,500,000 wired to Meridian as a purported brokerage fee, no portion of the sums or benefit received by the Defendants were used for the direct or indirect benefit of the Debtor."). And even though the PSA provided for payment of Madison's secured claim in full, no portion of the sale proceeds was ever disbursed to Madison. *Id.* ¶ 62 (listing the entities that received a payment in the Zhu Buy-Out, none of which are Madison). All these allegations fall within the badges of fraud identified in both *Sharp* and *Actrade* and are sufficient to survive a motion to dismiss. *See In re Sharp*, 403 F.3d at 56; *In re Actrade*, 337 B.R. at 809.

Zhu argues that Miller and Sprei were not authorized agents of Plaintiff and that their conduct falls within the so-called adverse interest exception to implication. But without even turning to the substance of these arguments, they must fail because they were raised for the first time in the Zhu Reply. *See* Zhu Reply at 10-14.[3] Given the inability of the other side to respond to allegations raised for the first time in a reply, a bankruptcy court has the discretion to refuse to consider such arguments. *See AMR Corp. v. Comm. of Retired Emp'ees (In re AMR Corp.)*, 508 B.R. 296, 325 (Bankr. S.D.N.Y. 2014) (citing *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999); *Unsecured Claims Estate Rep. of Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)*, 326 B.R. 219, 229 (S.D.N.Y. 2005)).

Moreover, Zhu's argument that Miller and Sprei are not authorized agents of Plaintiff cannot serve as a basis for dismissal because it requires this Court to consider evidence not included, referenced, or relied upon in the Complaint, such as the operating agreement for Plaintiff. *See* Zhu Reply at 12-13 (referencing Plaintiff's operating agreement). As no party has

---

[3]        Zhu's one paragraph argument in his motion regarding the intentional fraudulent transfer claims makes no mention of the terms "agent," "agency," "imputation," or "adverse interest." *See* Zhu Motion at 14. In fact, the crux of Zhu's argument is that Plaintiff made no allegation that Plaintiff intended to hinder, delay, or defraud Madison. *See id.*

requested that the Court convert the Dismissal Motions to ones for summary judgment, the Court

cannot and will not consider such evidence at this juncture.  *B.V. Optische Industrie*, 909 F.

Supp. at 167.

### IV.    Constructive Fraudulent Transfers

Defendants next argue that Plaintiff has failed to adequately plead any of its constructive

fraudulent conveyance causes of action under either federal or state law.  *See* Zhu Motion at 12–

14; Meridian Motion at 8–12.  The Complaint clearly alleges that transfer of the Adjusted Down

Payment to Defendants without Debtor receiving anything of value in return, thus satisfying the

first prong of Section 548(a)(1)(B)(i).  *See* Complaint ¶¶ 62, 69.  To satisfy the requirements for

the federal constructive fraud cause of action, therefore, Plaintiff need only satisfactorily plead

one of the four disjunctive requirements set forth in Section 548(a)(1)(B)(ii) and the

corresponding sections of the DCL.  *See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT*

*Holdings Corp.)*, 426 B.R. 467, 471 (Bankr. S.D.N.Y. 2010).  It does so.  Complaint ¶ 54.

Zhu argues that Plaintiff has provided "no balance sheet information" in the Complaint to

substantiate its assertion that the subject transfers rendered Plaintiff insolvent under either

Section 548(a)(1)(b)(ii)(I) of the Bankruptcy Code or Section 273 of the N.Y. DCL.  Zhu Motion

at 14.  Meridian, on the other hand, concedes that Plaintiff does provide sufficient information to

calculate solvency, but those numbers indicate that Debtor was solvent.  Meridian Motion at 10-

11.  Both contentions miss the mark.

A debtor is insolvent under the traditional "balance sheet test," under New York law,

where "the present fair salable value of his assets is less than the amount that will be required to

pay his probable liability on his existing debts as they become absolute and matured."  N.Y.

DCL § 271.  Similarly, a debtor is insolvent under the Bankruptcy Code where its assets exceed

its liabilities at the time of the transfer.  *See Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d

Cir. 2006) (citing 11 U.S.C. § 101(32)(A)).  Under either description, this test is a mathematical

calculation of assets minus liabilities; where the result of that calculation is negative, a debtor is

insolvent.

Plaintiff alleges here that its assets consisted of the purchase price under the PSA of

$64,500,000.00—including the PSA Down Payment—prior to the subject transfer.  Complaint ¶

54.  As against these assets, the Complaint alleges liabilities including (1) $51,429,334.00 for the

unpaid mortgage; (2) $14,330,000.00 for the return of the PSA Down Payment in the event

Plaintiff terminated the sale; and (3) $1,779,322.99 for HS 45's management fees.  *See*

Complaint ¶ 85; Opposition at 17-18.  Before the transfer of the PSA Down Payment, therefore,

Debtor had assets of $64,500,000.00 and liabilities of $67,538,666.99.[4]  When the transfer took

place, Debtor's assets were reduced by the amount of the Adjusted Down Payment, which would

leave Debtor insolvent.[5]

Defendants also claim that Plaintiff provided "no information to determine whether

capital was unreasonably small" as a result of the subject transfers as required by Section

548(a)(1)(b)(ii)(II) of the Bankruptcy Code and Section 274 of the N.Y. DCL.  Zhu Motion at

13-14; Meridian Motion at 11-12.  Under both the Bankruptcy Code's and the DCL's

unreasonably small capital provisions, transfers are presumptively fraudulent where the

---

[4]    Given the assets and liabilities alleged in the Complaint, Debtor appears to have been insolvent even before the transfer of the PSA Down Payment.

[5]    In its Opposition, Plaintiff presents figures on its assets and liabilities that are not found in the Complaint.  For example, Plaintiff concludes that—prior to the transfer—the total value of assets was $78,230,000.00 and the total liabilities were $71,825,409.21.  Opposition at 17-18.  But neither of these figures are contained in the Complaint and the explanation for these figures is sketchy at best.  In addition, it is not clear if or how certain of the liabilities identified by Plaintiff existed at the time of the transfer.  *See id.* (identifying late fee if monthly management fee not paid on time).  In the face of these problems and with Defendants failing to present a fulsome analysis of the numbers, the Court's analysis above uses the information in the Complaint construed in a manner most favorable to Plaintiff.  *See Official Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 551 (Bankr. S.D.N.Y. 2015) ("If the absence of fair consideration is properly alleged, then the court may presume insolvency and the burden shifts to the defendants to rebut it.") (applying New York law).

transferor, although technically solvent, is "doomed to fail." *See MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody v. Security Pac. Business Credit*, 971 F.2d 1056, 1070 & n.22 (3d Cir. 1992)). Factors such as the transferor's debt to equity ratio, its capital cushion, and the need for working capital can be considered in determining whether the transferor was left with unreasonably small capital. *See id.*

Applying these standards here, the Court concludes that Plaintiff has sufficiently alleged that it was left with unreasonably small capital in the wake of the subject transfer. Using the figures discussed above, Plaintiff had debts of approximately $67 million and assets of approximately $51 million. *See* Complaint ¶¶ 54, 85; Opposition at 17-18. These allegations together with the alleged lack of any cash flow after the disposal of Plaintiff's only revenue generating asset— the Property—is sufficient to allege that Debtor was left with unreasonably small capital after the subject transfer. *See In re Mystique Brands*, 560 B.R. at 414-15 (noting lower debt to equity ratio of .64 and projected cash flows indicated that the debtor "expected to be flush with cash" after the transfer, with enough money to pay all its monthly bills and have cash left over, meaning that the debtor was reasonably capitalized).

Defendants further contend Plaintiff provided "no information concerning whether [Plaintiff] would be able to pay debts as they became due" as required by Section 548(a)(1)(b)(ii)(III) of the Bankruptcy Code and Section 275 of the N.Y. DCL. Zhu Motion at 14; Meridian Motion at 12. But once again, Defendants overlook the facts as plead. A complaint need not specifically state, verbatim, that the transferor made a transfer with the intent or belief that the transferor would be unable to pay debts as they become due. Rather, this element of a cause of action can be inferred by the facts and circumstances alleged in a

complaint, something even Meridian concedes.  *See Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 80 (Bankr. E.D.N.Y. 2007); *see also* Meridian Motion at 12 (citing 5 Collier on Bankr. ¶ 548.05(3)(c) (16th ed. 2010)).

The allegations in the Complaint here support an inference that Miller intended or believed that Plaintiff would be unable to pay its debts as they became due.  First, Miller and Sprei negotiated and executed the PSA, and the PSA disposed of Plaintiff's only asset that could have generated revenue.  Complaint ¶¶ 30, 52, 55.  Second, Miller and Sprei agreed in the PSA to create additional liabilities for Plaintiff, including the potential obligation to return the PSA Down Payment and the management fees owed to the purchaser.  *Id.* ¶ 54; Opposition at 17-18.  Third, Miller and Sprei took the Adjusted Down Payment and transferred it to Riverside for later disbursement to Defendants for other transactions that provided no value to Debtor.  *Id.* ¶¶ 51, 60.  These allegations permit an inference that Miller intended, or believed that he would, incur debts that Plaintiff would be unable to pay as they became due.  *See In re Norstan Apparel*, 367 B.R. at 80 ("It can be inferred that the defendants, who had successfully managed Norstan before the LBO, knew that Norstan would become unable to pay its debts as they matured.") (citation omitted).

## V.  <u>Other Arguments</u>

Defendants raise several other arguments that lack merit.  The first contention is that Plaintiff "generically, and without factual support" alleged "that every transfer out of the commingled account [at Riverside] to the defendants was made with the [Adjusted] Down Payment, including the transfer to Mega Bank."  *See* Zhu Motion at 16.  Implicit in this argument is that there is a requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss.

But this argument is contrary to well-established law.  At the pleading stage of a case, a

plaintiff is not required to give a "dollar-for-dollar accounting" of the transfers at issue in the

case.  *See Picard v. Charles Ellerin Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,

2012 WL 892514, at *2-3 (Bankr. S.D.N.Y. Mar. 14, 2012) (quoting *Silverman v. K.E.R.U.*

*Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007)).  Instead, a

complaint "need only allege sufficient facts to show the relevant pathways through which the

funds were transferred . . . ."  *Id*; Opposition at 27.  To hold otherwise would be to place an

onerous and undue burden on plaintiffs asserting these kinds of claims.  Here, the Complaint

alleges that the Adjusted Down Payment was transferred into an account maintained at Riverside

along with the $16,073,911.00 Collateral Properties Financing.  Complaint ¶ 60.  From there,

those funds were disbursed to Defendants.  *Id.* ¶¶ 60-69.  That allegation is sufficient to survive a

motion to dismiss.

As to the second contention, Reliable argues for dismissal based on Plaintiff's prior

statements in a state court proceeding between Plaintiff and Reliable.  Reliable Motion at 6-8.

More specifically, Reliable relies on Plaintiff's statement in that case that the transfer at issue

"was made by Miller and Sprei from the proceeds of their refinance of an oral contract . . . from

the proceeds of their refinance of various other properties, not from [Plaintiff] . . . ."  *Id*. at 7.

A judicial admission is a "formal concession[] . . . by a party or counsel that ha[s] the

effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.

Thus, a judicial admission . . . is conclusive in the case."  *See Hoodho v. Holder*, 558 F.3d 184,

191 (2d Cir. 2009) (citation and quotation omitted).  However, judicial admissions are only

binding in the cases in which they are made, and only constitute evidence to be considered in

subsequent cases.  *See Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) (citing cases).

Given the current posture of these proceedings, the Court declines to exercise its discretion to grant dismissal based on the statement in the state court pleading.  As noted in *Hausler*, judicial admissions are not binding in subsequent proceedings, and the Court knows little about the state court litigation cited by Reliable and the context for the statement.  *Id.* at 37.  This is particularly crucial given that there was a great deal of confusion caused by the conduct of Miller and Sprei in the days leading up to the HS 45 bankruptcy.  This is something that the Court experienced firsthand in the contentious litigation in that bankruptcy case involving Miller and Sprei.  Given the fact that Plaintiff makes a prima facie allegation that the transfer to Reliable was part and parcel of the fraudulent transfers at issue in this case, the Court considers it premature to evaluate the statement in question until a more fulsome factual record has been presented to the Court.  Complaint ¶ 62(f).

In the next argument, Zhu argues that the safe harbor of Section 546(e) of the Bankruptcy Code applies to most of the causes of action related to the Mega Transfer of $2,827,312.77.  Zhu Motion at 8-12 (citing safe harbor to seek dismissal of all but the intentional fraudulent transfer causes of action under Section 548(a)(1)(A) of the Bankruptcy Code).  The safe harbor provision under Section 546(e) of the Bankruptcy Code provides in relevant part:

> Notwithstanding [S]ections 544, 545, 547, 548(a)(1)(B), and 548(b) of [the Bankruptcy Code], the trustee may not avoid a transfer that is a margin payment, . . . or settlement payment . . . , made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract . . . , commodity contract . . . , or forward contract, that is made before

> the commencement of the case, except under section 548(a)(1)(A)
> of [the Bankruptcy Code].

11 U.S.C. § 546(e).  Zhu argues that the safe harbor applies here because Mega qualifies as a

financial institution, that the ownership interests in the Zhu Buy-Out qualify as securities, and

that proceeds of the Zhu Buy-Out were partially transferred to Mega.  *See* Zhu Motion at 11-12.

But any dismissal of this case based on the safe harbor is premature.  Section 546(e)

provides defendants with an affirmative defense, and unless this affirmative defense is "clearly

established on the face of the complaint," invocation of the safe harbor does not defeat a

plaintiff's otherwise valid complaint.  *See Picard v. Merkin (In re Bernard L. Madoff Inv. Sec.*

*LLC)*, 440 B.R. 243, 266 (Bankr. S.D.N.Y. 2010) (quoting *DeGirolamo v. Truck World, Inc. (In*

*re Laurel Valley Oil Co.*), 2009 WL 1758741, at *2-3 (Bankr. N.D. Ohio June 16, 2009)).  The

Court cannot conclude on these facts, construed in a light most favorable to Plaintiff, that the

safe harbor affirmative defense has been clearly established.  The Complaint does not establish,

for example, that the ownership interests in the Zhu Buy-Out qualify as securities.  Moreover,

Plaintiff's opposition here raises questions about whether the sole purpose of the Mega Transfer

was to satisfy Zhu's pre-existing debts from the Crown Mansion Loan.  *See* Opposition at 29-30.

The Complaint specifies that after the Mega Transfer, the UCC-1 filing statement filed against

Zhu was terminated, and there is nothing in the record to indicate that Mega knew about or

participated in the transfers at issue in this case.  Complaint ¶¶ 60-62, 71-74.  Further

development of the record will allow the Court to determine if there were multiple purposes

underlying these transfers, as Zhu contends.  Zhu Reply at 4.

The Court also notes that the state of the law on the safe harbor provisions in this Circuit

is in flux.  After the conclusion of briefing in this case, the Supreme Court issued an opinion that

effectively overruled a number of precedents cited in Zhu's papers regarding the safe harbor

provisions. *Compare Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 897 (2018)

(holding that the Section 546(e) safe harbor did not apply in a case where a trustee sought to

avoid transfers made to former shareholders of the debtor), *with AP Servs., LLP v. Silva*, 483

B.R. 63, 69 (S.D.N.Y. 2012) (holding the opposite). Although Zhu argued broadly at oral

argument that the Supreme Court's holding in *Merit* does nothing to change the analysis in this

case, it did not provide a detailed explanation of why that is so. Hr'g Tr. of Mar. 12, 2018 at 8:9-

9:19. The Court looks forward to additional briefing on the issue at an appropriate time in the

future.

Zhu next argues that the sale of the Property for $73,000,000 in the HS 45 bankruptcy

case served to satisfy any claims that Plaintiff had for fraudulent transfers of Plaintiff's property

against Defendants. Zhu Motion at 17. If Plaintiff's fraudulent transfer claims were satisfied by

this transaction, recovery of the fraudulent transfers in this action would constitute an

impermissible double recovery under Section 550(d) of the Bankruptcy Code. Under section

550(d) of the Bankruptcy Code, a debtor in possession may recover "only a single satisfaction

under [section 550(a)]." 11 U.S.C. § 550(d). Section 550(a) in turn provides that "to the extent

that a transfer is avoided under [S]ection 544, 545, 547, 548, 549, 553(b), or 724(a) [of the

Bankruptcy Code], the trustee may recover, for the benefit of the estate, the property transferred,

or, if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a). "Thus, although

the trustee can sue many defendants, his total recovery is limited to the initial transfer or its

value." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Sec. Investor Prot.*

*Corp.)*, 568 B.R. 481, 486-87 (Bankr. S.D.N.Y. 2017).

Zhu's Section 550(d) argument misses the mark in at least two ways. First, Zhu's

argument does not comport with the plain language of Section 550(d). Section 550(d) only

applies where transfers have already been avoided and recovered under Section 550(a) and one

of its triggering sections. *See In re CNB Int'l, Inc.*, 440 B.R. 31, 45-46 (W.D.N.Y. 2010)

("Under the plain language of [Section 550(d)], [t]he trustee is entitled to only a single

satisfaction under [Section 550(a)]. . . . But the amounts recovered by the Trust in settlement

from other parties are independent of the amount of [the defendant's liability] . . . .") (citations

and internal quotations omitted).

Second, even if Plaintiff's claims had been settled away as part of the HS 45 plan of

reorganization and global settlement, Zhu has not sufficiently proven that he deserves the relief

he seeks. Simply put, Zhu has not articulated how the sale in the HS 45 bankruptcy case satisfies

the claims in this case. Zhu Motion at 17 (arguing that the claims in this case have been satisfied

by the HS 45 plan and settlement but citing nothing in support of that proposition). The plan and

settlement in that case involved many parties and many claims. It is unclear to the Court, based

on the record and arguments presented here, that the HS 45 plan or settlement satisfied the

claims in this adversary proceeding. There is nothing in the Complaint or in Zhu's submissions

to demonstrate that Section 550(a) provides a basis for dismissal.[6]

## VI.    Dismissal in Favor of Reliable's Underlying Proof of Claim

One Defendant, Reliable, argues that the Court should dismiss the causes of action

against it in favor of litigating its underlying proof of claim separately. Reliable Motion at 8-11.

In support of Reliable's argument, it cites Section 105(a) of the Bankruptcy Code and the Court's

---

[6]    In any event, the fact that some or all of the funds fraudulently transferred away from Debtor ultimately made its way back to Debtor pre-petition would not necessarily prevent a recovery in this action. One of the cases cited by Zhu indicates the existence of a circuit split on this issue. *See Kingsley v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877-78 (11th Cir. 2008). The Seventh Circuit, for example, has held that it is irrelevant, for purposes of calculating damages, that funds fraudulently transferred from the debtor were ultimately returned to the debtor. *See Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir. 2002) ("If it was gratuitous, the fact that some or for that matter all of it may later have seeped back to the debtor does not legitimize the transfer."). The Seventh Circuit's position has been favorably cited by courts in this district. *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 332 n.121 (Bankr. S.D.N.Y. 2013).

inherent power to control its docket. While the Court does possess equitable powers, it does not think it is appropriate to grant the requested relief. Dismissing the causes of action against Reliable in favor of adjudicating these issues in a claims litigation process does not simplify the litigation before the Court, it merely repackages the dispute. Moreover, a separate claims litigation process for Reliable is inefficient given that there are common issues of law and fact in this case among all Defendants that must be decided regardless of whether Reliable's proof of claim is approved in whole or in part. Complaint ¶ 62. The Court sympathizes that Reliable has been litigating these issues for some time before this adversary proceeding was filed and indeed even before Plaintiff's bankruptcy. Reliable's desire for closure, however, does not trump the Bankruptcy Code's overarching goal of efficiently administering the estate of a debtor. This is one instance where the needs of the many outweigh the needs of the few, or the one. *See* Star Trek II: The Wrath of Khan (Paramount Pictures 1982).

## VII.    Dismissal of Counts Seeking Disallowance of Claims

Last but not least, Defendants seek dismissal of the disallowance causes of action because Defendants, other than Reliable, have not filed proofs of claims in this case and thus those causes of action are premature. *See* Zhu Motion at 18; Complaint at ¶¶ 517-19. The Court agrees that dismissal of these claims is appropriate.

Section 502(d) of the Bankruptcy Code "disallows the claim of a creditor that received a *transfer* avoidable under chapter 5 of the Bankruptcy Code unless the creditor returns the transfer to the estate." *In re Asia Glob. Crossing, Ltd.*, 344 B.R. 247, 251 (Bankr. S.D.N.Y. 2006) (emphasis in original). Importantly, "[t]he Trustee must plead a legally sufficient avoidance claim to plead a legally sufficient disallowance claim under § 502(d)." *Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 517 (Bankr. S.D.N.Y. 2011). Additionally, a proof of claim must have actually been filed in the case by the creditor whose claim the debtor seeks to

disallow.  *See* 11 U.S.C. § 502(d); *Maxwell Commun. Corp. PLC by Homan v. Société Générale PLC (In re Maxwell Commun. Corp. PLC)*, 186 B.R. 807, 824 (S.D.N.Y. 1995); *see also Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 341-42 (Bankr. S.D.N.Y. 2011).  Should either requirement be unmet, the Court must dismiss the disallowance causes of action.  *See Maxwell*, 186 B.R. at 824.

Here, Plaintiff admits that the only proofs of claim filed in this case are those filed by 45 John NY, LLC (an entity unrelated to Debtor), the City of New York Department of Finance, and Reliable.  Opposition at 8-9.  Plaintiff is only able to maintain the disallowance causes of action against those that have filed proofs of claim to date.  Accordingly, the causes of action for disallowance of claims are dismissed as to all Defendants except Reliable.

## CONCLUSION

For the reasons set forth above, the motions to dismiss are denied as to the avoidance causes of action and granted as to the claim disallowance cause of action in Count LXXXI of the Complaint for all defendants except Reliable.  All other arguments raised by Defendants but not addressed in this opinion are denied as without merit.[7]

Plaintiff is directed to settle a proposed order on seven days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel to Defendants.

Dated: April 24, 2019
      New York, New York

                                   */s/ Sean H. Lane*
                                   UNITED STATES BANKRUPTCY JUDGE

---

[7]    Two arguments made by Defendant Meridian do not seek dismissal: 1) that Plaintiff's claims should be capped in amounts above the value of allowed claims; and 2) that these proceedings should be stayed until the proofs of claim in this case are fully adjudicated.  *See* Meridian Motion at 8.  Both of these arguments seek procedural relief that is best addressed at a status conference in the first instance.