UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

In re:                                                                :

45 JOHN LOFTS, LLC                                          :    Case No. 16-12043 (SHL)

                                                                        :    Chapter 11

                              Debtor,                           :

-------------------------------------------------------- X

45 JOHN LOFTS, LLC,                                         :

                                                                        :

                              Plaintiff,                          :    Adv. Pro. No. 17-01179 (SHL)

                                                                        :

-against-                                                           :

                                                                        :    TRIAL DECLARATION OF
MERIDIAN CAPITAL GROUP LLC,                      :    YISROEL SCHWARTZ
CROWN MANSION LLC, BO JIN ZHU,               :
MEGA INTERNATIONAL COMMERCIAL            :
BANK, CONGREGATION KAHAL MINCHAS       :
CHINUCH, CHAIM SCHIYA BABAD,                  :
RELIABLE ABSTRACT CO., LLC,                        :
ABRAHAM MANDEL, TOBY MANDEL,              :
SILVER GOLD GROUP LLC,                               :
JOSEPH BRUNNER,   JOSEPH SEGEL,            :
DAVID JANKLOWICZ, MORRIS LOWY,            :
MITCHELL KIRSCHNER, JERRY LOWY,           :
ISAAC GREENFELD, AND                                   :
RENATUS PORTFOLIO COMPANY, LLC,          :

                                                                        :

                              Defendants.                      :

-------------------------------------------------------- X

Yisroel Schwartz affirms, to the best of his knowledge and recollection, the following to

be true under penalty of perjury:

1.        I am an attorney licensed to practice law before the courts of the State of New York.

2.        At various times mentioned herein I was an employee of the firm of Blaivas &

Associates, PC ("Blaivas") and provided legal services on behalf of Chaim Miller also known as

Harry Miller.

3.        On or around March 4, 2014, Blaivas represented 45 John Lofts LLC ("John

Lofts"), at the direction of Mr. Miller as the managing member of John Lofts, in connection with

the closing of the purchase by John Lofts of real property known as street address 45 John Street,

New York, New York (the "John Street Property"). In connection with the closing of such purchase, Blaivas acted as special counsel to John Lofts regarding various matters, including three mortgage loans to John Lofts provided by affiliates of Madison Capital, in the respective amounts of $39 million, $4.5 million, and $6 million. I understand that an attorney by the name of Ann Hsiung represented Chun Peter Dong who was a 35% member in John Lofts and a guarantor of the mortgage loans.

4.     In or around March 2014 I drafted the operating agreement for John Lofts in which Chaim Miller was a 65% member and manager, and Chun Peter Dong was a 35% member, a copy of which operating agreement is annexed as **Exhibit A**.

5.     On or around March 4, 2014 Mr. Miller and Mr. Dong signed a document entitled "First Amendment to the Operating Agreement for 45 John Lofts LLC", a copy of which is annexed as **Exhibit B**.

6.     In July 2014 Blaivas represented Mr. Miller in connection with an agreement among Bo Jin Zhu ("Zhu"), Renatus Portfolio Company LLC ("Renatus") and Miller (the "Zhu Buyout Agreement"). The agreement regarded Miller's purchase of Zhu's membership interests (the "Interests") in four limited liability companies which owned real properties in New York City as referenced in Exhibit A to such agreement (the "LLC Properties"). The Zhu Buyout Agreement and exhibits thereto are annexed hereto as **Exhibit C**.

7.     On or around September 15, 2014, the closing date for the Zhu Buyout Agreement was extended from September 15, 2014 to September 18, 2014, again with time being of the essence for the payment of the remaining balance of the purchase price of $22.5 million.

8.     In September 2014, at the request of Chaim Miller, manager of John Lofts, Blaivas represented John Lofts regarding a sale of the John Street Property.

9.      I negotiated the terms of a Purchase and Sale Agreement ("PSA") on behalf of Mr. Miller (as manager for John Lofts) with attorneys at Goldberg Weprin Finkel Goldstein LLP ("Goldberg Weprin") who represented the purchaser, HS 45 John LLC ("HS 45").

10.     Riverside Abstract Company ("Riverside") was retained to provide vendee title insurance in connection with the sale of the John Street Property to HS 45.

11.     On or about September 19, 2014, Mr. Miller executed the PSA on behalf of John Lofts for the sale of the John Street Property to HS 45, a copy of which (without the exhibits referenced therein) is annexed as **Exhibit D**.

12.     On or about September 19, 2014 Blaivas represented 11-45 Ryerson Holdings, LLC, 97 Grand Avenue LLC, and 203-205 North 8th Street Loft LLC as borrowers, regarding financing provided by affiliates of Madison Capital for the LLC Properties involved in the Zhu Buyout Agreement. The net amount of such financing (the "Zhu Buyout Funding") was wired, at the direction of Mr. Miller, to Riverside.

13.     The PSA contains an exhibit entitled "Direction Letter" a copy of which is annexed hereto as **Exhibit E**.

14.     On or about September 19, 2014, some or all of the $13,330,000 portion of the PSA Down Payment (the "Deposit Funds") was wired to Riverside in accordance with the Direction Letter.

15.     The Zhu Buyout Funding together with a portion of the Deposit Funds (the "Total Funds"), were disbursed by Riverside in accordance with the instructions of Mr. Miller which I provided to Riverside as follows:

(i)      $19,672,687.23 to Herrick Feinstein LLP, a law firm which represented Renatus regarding the Zhu Buyout Agreement;

(ii)   $2,827,312.77 to Mega International Commercial Bank ("Mega International"). It was my understanding that such funds represented the outstanding balance of a loan made by Mega International to Crown Mansion LLC, as the Interests were encumbered by a UCC financing statement filed by Mega International.

16.   Additional disbursements of the Total Funds were made as follows:

(i)   $500,000 to Reliable Abstract Company;

(ii)   $2,000,000 to Babad. It is my understanding that the wire instructions provided for Babad were in fact to Congregation Kahal Minchas Chinuch, which is consistent with my recollection of other instances when Mr. Miller directed funds to be wired to "Babad";

(iii)   $242,000 to Blaivas;

17.   Attached collectively as **Exhibit F** are my emails to Riverside Abstract as referenced in the foregoing paragraphs.

18.   On September 18, 2014 I participated in a meeting for the closing of the Zhu Buyout Agreement at the offices of Herrick Feinstein LLP, 2 Park Avenue, New York, New York which was transcribed by a registered professional reporter. Herrick Feinstein, by Avery Mehlman, Esq., appeared on behalf of Renatus. Blaivas, by myself and David Fishman, Esq., appeared on behalf of Mr. Miller. A copy of a portion of the transcript of such closing conference describing those in attendance is annexed hereto as **Exhibit G**.

Yisroel Schwartz

Affirmed: March _18_, 2022

# EXHIBIT A

## 45 John Loft LLC Operating Agreement

OPERATING AGREEMENT

OF

45 JOHN LOFTS LLC

A NEW YORK LIMITED LIABILITY COMPANY

GWFG 3307

# TABLE OF CONTENTS

Page

SECTION 1 THE COMPANY ................................................................................. 1
   1.1    Company Name. ............................................................................. 1
   1.2    Purpose. ............................................................................................ 1
   1.3    Place of Business. ........................................................................ 1
   1.4    Term. ................................................................................................. 2
   1.5    Filings. .............................................................................................. 2
   1.6    Definitions. ..................................................................................... 2

SECTION 2 MEMBERS' CAPITAL COMMITMENTS AND INTERESTS;
          LEVERAGE ................................................................................. 4
   2.1    Members. ......................................................................................... 4
   2.2    Additional Capital Contributions. ............................................ 5
   2.3    Default. ............................................................................................. 5
   2.4    Other Matters. ............................................................................... 6
   2.5    After Acquired Interests. ............................................................ 6
   2.6    Leverage. .......................................................................................... 6

SECTION 3 APPOINTMENT, DUTIES, OBLIGATIONS, POWERS, RIGHTS AND
          AUTHORITIES OF THE MEMBERs; ACTIVITIES OUTSIDE OF
          THE COMPANY ........................................................................... 6
   3.1    Management. ................................................................................... 7
   3.2    Duties and Obligations of the Members. ............**Error! Bookmark not defined.**
   3.3    Rights, Authority and Powers of the Members. .............................. 7
   3.4    Engagement of Members. ........................................................... 9
   3.5    Member Obligations. ................................................................... 9
   3.6    Officers. ........................................................................................... 10
   3.7    Annual Meeting. ........................................................................... 10
   3.8    Special Meetings. ......................................................................... 10
   3.9    Place of Meetings. ....................................................................... 10
   3.10   Notice of Meetings. ...................................................................... 10
   3.11   Record Date. ................................................................................... 10
   3.12   Quorum. .......................................................................................... 11
   3.13   Manner of Acting. ........................................................................ 11
   3.14   Proxies. ............................................................................................ 11
   3.15   Action by Members Without a Meeting. ................................ 12
   3.16   Waiver of Notice. ......................................................................... 12
   3.17   Voting Agreements. ..................................................................... 12

SECTION 4 INDEMNIFICATION OF THE MEMBERS AND AGREEMENT TO
          SAVE THEM HARMLESS .......................................................... 12
   4.1    Indemnification; Agreement to Save Harmless. ................. 13

SECTION 5 DISTRIBUTIONS ............................................................................. 13

-i-

GWFG 3308

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 5.1 | Net Cash Flow. | 13 |
| 5.2 | Distributions. | 14 |
| SECTION 6 | ALLOCATION OF NET INCOME AND NET LOSS | 14 |
| 6.1 | Allocations. | 14 |
| 6.2 | Special Allocations. | 15 |
| 6.3 | Amendments to Allocations. | 15 |
| 6.4 | Allocations between Transferor and Transferee Members. | 15 |
| 6.5 | Tax Credits. | 16 |
| SECTION 7 | COMPANY FUNDS AND EXPENSES | 16 |
| 7.1 | Company Funds. | 16 |
| 7.2 | Expenses of the Company. | 16 |
| SECTION 8 | ROLE AND OBLIGATIONS OF MEMBERS; COMPANY PROPERTY | 16 |
| 8.1 | Rights or Powers. | 16 |
| 8.2 | Company Property. | 16 |
| SECTION 9 | BOOKS AND RECORDS; TAX MATTERS | 17 |
| 9.1 | Books and Records. | 17 |
| 9.2 | Reports. | 17 |
| 9.3 | Tax Information. | 17 |
| 9.4 | Tax Returns. | 17 |
| 9.5 | Tax Matters Partner. | 18 |
| 9.6 | Classification as a Partnership. | 18 |
| SECTION 10 | AMENDMENTS | 18 |
| 10.1 | Restriction on Amendments. | 18 |
| SECTION 11 | TRANSFERS BY MEMBERS/WITHDRAWAL | 18 |
| 11.1 | Transfers. | 18 |
| SECTION 12 | DISSOLUTION AND WINDING UP | 19 |
| 12.1 | Liquidating Events. | 19 |
| 12.2 | Winding Up. | 19 |
| 12.3 | Certain Rights of Members. | 20 |
| SECTION 13 | INTENTIONALLY DELETED | 20 |
| SECTION 14 | MISCELLANEOUS | 20 |
| 14.1 | Notices. | 20 |
| 14.2 | Binding Effect. | 21 |
| 14.3 | Headings. | 21 |
| 14.4 | Severability. | 21 |
| 14.5 | Further Action. | 21 |
| 14.6 | Usage. | 21 |

GWFG 3309

## TABLE OF CONTENTS
(continued)

                                                                    Page

14.7    Governing Law. ........................................................................... 21
14.8    Counterpart Execution/Facsimile. ................................................ 22
14.9    Power to Reconstitute. ................................................................. 22
14.10   Entire Agreement. ....................................................................... 22
14.11   Discretionary Decisions and Determinations. ............................. 22
14.12   Cost and Expenses of Litigation. ................................................ 23
14.13   Third Party Beneficiaries. ........................................................... 23
14.14   Representations/Interpretation. ................................................... 23
14.15   Time of the Essence. ................................................................... 23

GWFG 3310

# OPERATING AGREEMENT

## OF

## 45 JOHN LOFTS LLC

## A NEW YORK LIMITED LIABLILITY COMPANY

THIS OPERATING AGREEMENT is entered into as of February 28 2014 by and among the members (the "Members") set forth on Exhibit A, annexed hereto and made a part hereof.

## WITNESSETH:

The Members hereby acknowledge that Farah Moiso, as organizer, caused the Articles of Organization of the Company to be filed in the Office of the Secretary of State of the State of New York on February 21, 2014 solely for the purpose of forming a limited liability company pursuant to and in accordance with the Law (as hereinafter defined), and hereby agree as to the terms and conditions of the Operating Agreement of the Company, as follows:

## SECTION 1

## THE COMPANY

### 1.1    Company Name.

The name of the Company is 45 JOHN LOFTS LLC (the "Company"). All business of the Company shall be conducted in such name. The Company's business may be conducted under any other name or names as shall be approved by all of the Members; provided, however, that the words "Limited Liability Company" or the abbreviation "LLC" shall be included in the name where necessary to comply with the laws of the jurisdiction that so requires.

### 1.2    Purpose.

The Company has been formed solely to (i) own that certain real property commonly known as 45-49 John Street a/k/a 1-5 Dutch Street, New York, New York, Block 78, Lots 1701-1787 (excluding Lot 1703) (collectively, the "Property"), (ii) own, hold, sell, assign, transfer, operate, lease, mortgage, pledge and otherwise deal with the Property and (iii) otherwise conduct all business activities related to the foregoing. The Company shall have the power to engage in any and all activities necessary, convenient and/or incidental to the foregoing.

### 1.3    Place of Business.

The Company's principal place of business 1324 46th Street, Brooklyn, NY 11219, or such other place as the Members may hereafter designate.

-1-

### 1.4    Term.

The term of the Company commenced on December 18, 2013, the date that the Articles of Organization (the "Articles") were filed in the office of the Secretary of State of the State of New York (the "Secretary") in accordance with the Law (defined below) and shall continue until terminated as provided in this Agreement.

### 1.5    Filings.

The Members have caused the Articles to be filed in the office of the Secretary in accordance with the provisions of the Law. The Members shall take any and all other actions reasonably necessary to perfect and, except as otherwise provided in this Agreement, to maintain the status of the Company as a limited liability company under the laws of the State of New York. The Members shall cause amendments to the Articles to be filed whenever required by the Law.

### 1.6    Definitions.

In addition to terms that may be defined elsewhere in this Agreement, the following words and phrases with initial upper-case letters as used in this Agreement have the following meanings:

(a)    "**Affiliate**" means, with respect to any Person, any other Person who (i) directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person, or (ii) is an Immediate Family Member of any such Person, or (iii) is a legal representative or trustee of any such Person (other than a legal representative or trustee appointed by a court of competent jurisdiction by reason of the death, insanity, incompetency, bankruptcy, insolvency, dissolution, or termination and liquidation of such Person, or by reason of the making by such Person of an assignment for the benefit of creditors), or (iv) is an entity of which a majority of the voting interests is owned by such Person or an Affiliate of such Person.

(b)    "**Agreement**" means this Operating Agreement, as amended, modified or supplemental from time to time. Words such as "herein", "hereinafter", "hereof", "hereto", and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

(c)    "**Articles**" means the Articles of Organization described in the Law, as such Articles may be amended from time to time.

(d)    "**Capital Account**" means, with respect to any Member, the capital account maintained for such Member.

(e)    "**Capital Contributions**" means, with respect to any Member, the aggregate amount of money contributed to the Company by such Member pursuant to Section 2 hereof.

(f)    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

GWFG 3312

(g)    "**Control,**" "**controlled**" or "**controlling**" shall include, without limitation, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

(h)    "**Fiscal Year**" shall mean the calendar year, except that the first Fiscal Year of the Company shall have commenced on the date of commencement of the Company and end on the next December 31, and the last Fiscal Year of the Company shall end on the date on which the Company shall terminate and commence on the January 1 immediately preceding such date of termination.

(i)    "**Immediate Family Member**" means, as to any Person who is a natural person, such Person's spouse (including any Member's "significant other"), sibling, or lineal descendant or forebear, or a trust for the benefit of such Person or such Person's spouse, sibling, or lineal descendant or forebear (including a trust which includes as a beneficiary the spouse of any such lineal descendant or forebear). A Person's "lineal descendant or forebear" shall include the adoptive parent and the adopted child of any such Person or of any of such Person's lineal descendants or forebears.

(j)    "**Interest**" means an ownership interest in the Company, as initially set forth on Exhibit A, and as adjusted in accordance with the terms of this Agreement including any and all benefits to which the holder of such an Interest may be entitled as provided in this Agreement, together with all obligations of such Member under the terms and conditions of this Agreement.

(k)    "**Law**" means the New York Limited Liability Company Law, as amended from time to time (or any corresponding provisions of succeeding law).

(l)    "**Member**" means any of the persons set forth in Section 2.1 of this Agreement, and any other Person who is admitted as an additional or substituted Member. "Members" means all such Members.

(m)    "**Net Cash Flow**" means the gross cash proceeds received from all Company operations and assets regardless of how derived, less the portion thereof used to pay or establish cash reserves for any or all Company expenses, disbursements, liabilities and contingencies, all as determined by the Manager in his sole but reasonable discretion.

(n)    "**Net Income**" and "**Net Loss**" means, for any Fiscal Year (or portion thereof), the net income or net loss or the Company during such Fiscal Year (or portion thereof), as determined for federal income tax purposes, plus any income earned by the Company that is exempt from federal income tax and minus the amount of any expenditures accrued by the Company that are described in Section 705(a)(2)(B) of the Code or are treated as described in Section 705(a)(2)(B) of the Code pursuant to Regulation 1.7042(b)(2)(iv)(i); provided, however, that Net Income and Net Loss shall not include any amount of income, gain, loss or deduction specially allocated pursuant to the provisions of Section 6.2.

(o)    "**Notice**" has the meaning set forth in Section 14.1 of this Agreement.

-3-

GWFG 3313

(p)    **"Person"** means an individual, partnership, corporation (including a business trust), joint stock company, limited liability company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

(q)    **"Qualifying Indebtedness"** means all obligations for borrowed money (secured or unsecured) to Persons other than Members or Member's Affiliates that are evidenced by bonds, debentures, notes or other similar instruments.

(r)    **"Regulations"** means the federal Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(s)    **"Transfer"** means, as a noun, any direct or indirect, voluntary or involuntary transfer, sale, pledge, hypothecation, assignment or other disposition and, as a verb, voluntarily or involuntarily, directly or indirectly to transfer, sell, pledge, hypothecate, assign or otherwise dispose of.

(t)    **"Transferee"** means any Person to whom or to which a Transfer is made or proposed to be made.

(u)    **"Transferor"** means any Person from whom or from which a Transfer is made or proposed to be made.

(v)    **"USPS"** means United States Postal Service.

## SECTION 2

## MEMBERS' CAPITAL COMMITMENTS
## AND INTERESTS; LEVERAGE

2.1    Members.

(a)    The name, address, initial Capital Contribution and initial Interest of each Member in the Company are set forth on Exhibit A. Each Member hereby confirms that such Member has subscribed to purchase the Interest set forth opposite such Member's name on Exhibit A and that such Member has purchased such Member's Interest by contributing cash to the Company in the amount of such Member's initial Capital Contribution. The Company acknowledges and accepts the subscription of each Member for each such Member's Interest.

(b)    A certificate shall be issued to a Member to evidence the Interest of such Member in the Company at the request of any Member or to facilitate any financing to be provided to the Company. Any such certificate shall provide that the Interests represented thereby are subject to certain restrictions on transfer as more fully set forth in the Operating Agreement.

-4-

GWFG 3314

2.2    Additional Capital Contributions.

(a)    Except as provided in this Article 2, no Member shall be required to make additional Capital Contributions or to make a loan to the Company.

(b)    At any time after the initial Capital Contributions have been funded in full, the Members shall be required to make additional capital contributions to the Company upon receipt of a brief description of the expenditures or obligations giving rise to the requirement for additional capital contributions to the extent that either (x) the Manager determines in good faith that the Company requires additional capital to fund amounts due and owing by the Company for Emergency or Non-Discretionary Expenses (collectively, "**Required Funds**"), or (y) the Manager determines that the Company requires additional capital to fund an operating deficit of the Company or any other reasonably anticipated expense or other obligation of the Company before they become past due and delinquent (each, a "**Capital Call**"). If, in accordance with this Section 2.2, a Manager determines that additional Capital Contributions are required, then the Managers shall notify the Members in writing that additional capital is required by the Company (a "**Capital Call Notice**"). The Manager's Capital Call Notice shall specify the amount of the Capital Call, the amount of each Member's pro-rata share (in accordance with its Percentage Interest) of the Capital Call, the purpose of the Capital Call, and the date by which such additional Capital Contributions ("**Additional Capital Contributions**") are needed (which shall be no less than thirty (30) days after the date of the Capital Call Notice unless in the case of an Emergency in which event the due date may be less than thirty (30) days as required by the Emergency but not less than 5 days).

2.3    Failure to Make a Capital Contribution.    In the event that any Member shall fail (a "Non-Contributing Member") to timely make its Additional Capital Contribution and such failure shall continue for five (5) business days (a "Funding Failure") the contributing Members (the "Contributing Members") shall have the right, in their discretion (but shall not be obligated), to, within fifteen (15) days following the effective date of such Funding Failure, contribute as an additional Capital Contribution in lieu of such Non-Contributing Member, on a pro-rata basis based on the Percentage Interests of the Contributing Members as a group, such Contributing Member's pro-rata share of the additional Capital Contribution that the Non-Contributing Member failed to make (the amount of the additional Capital Contribution that the Non-Contributing Member failed to make is hereinafter referred to as the "Non-Contributed Amount").

2.4    Adjustments If Non-Contributed Amount Funded.    If the Contributing Members make Capital Contributions of any portion of the Non-Contributed Amount of a Non-Contributing Member or in the event that no Contributing Member makes a Capital Contribution of any of the Non-Contributed Amount, the Percentage Interests shall be adjusted as follows: the Percentage Interest of each Member shall be adjusted to equal a fraction (expressed as a percentage), the numerator of which is the sum of (i) all Capital Contributions made by such Member including with respect to such Capital Call (excluding the amount of any additional Capital Contributions made in respect of the Non-Contributed Amount of a Non-Contributing Member), plus (ii) all additional Capital Contributions made by such Member in respect of the Non-Contributed Amount of a Non-Contributing Member multiplied by two hundred percent (200%), minus (iii) the aggregate Non-Contributed Amount that such Member failed to

-5-

GWFG 3315

contribute as a Non-Contributing Member that has been contributed by another Member multiplied by one hundred percent (100%), and the denominator of which is the aggregate amount of all Capital Contributions including with respect to such Capital Call.

### 2.5   Other Matters.

(a)   Except as expressly provided under this Agreement, no Member shall demand or receive a return of such Member's Capital Contributions, or withdraw from the Company, without the consent of each of the other Members, which consent may be withheld in such other Member's sole and absolute discretion. Under any circumstances requiring a return by the Company of any Capital Contributions, no Member shall have the right to receive property or other assets other than cash.

(b)   No Member shall receive any interest, salary or drawing with respect to such Member's Capital Contributions or such Member's Capital Account or for services rendered on behalf of the Company or otherwise in such Member's capacity, as a Member, except as otherwise provided or permitted in this Agreement.

(c)   No Member shall be liable for the debts, liabilities, contracts or any other obligations of the Company. Except as otherwise provided by this Agreement, by any other agreements among the Members or by applicable state law, (i) a Member shall be liable only to make such Member's Capital Contributions as required under this Agreement and (ii) a Member shall not be required to lend any funds to the Company.

### 2.6   After Acquired Interests.

All of the provisions of this Agreement shall apply to all of the Interests now owned or which may be issued hereafter to the parties hereto in consequence of any additional issuance, purchase, exchange or reclassification of Interests, reorganization or any other form of recapitalization or consolidation, or which are acquired by the Members in any manner whatsoever.

### 2.7   Leverage.

Subject to the provisions of this Agreement, the Company shall be permitted to employ leverage in connection with its business, which leverage may be in such amounts and on such terms as the Manager determines appropriate, including, but not limited to, leverage in connection with (i) the acquisition ownership, financing or refinancing of the Property; (ii) distributions by the Company to the Members in respect thereof; or (iii) the payment of expenses of the Company.

## SECTION 3

## APPOINTMENT, DUTIES, OBLIGATIONS, POWERS, RIGHTS AND AUTHORITIES OF THE MEMBERS; ACTIVITIES OUTSIDE OF THE COMPANY

GWFG 3316

-6-

3.1   Management.

(a)   Subject to the terms and conditions of this Agreement, the Company shall be managed by two (2) managers (the "Managers"). Each of the Managers shall have the right and authority to manage and control the business and affairs of the Company, and shall possess all rights and powers of a "manager" of a limited liability company as provided in the Act and otherwise by law. Except as otherwise expressly provided for herein, the Members hereby agree to the exercise by the Managers of all such powers and rights conferred on them by the Act with respect to the management and control of the Company. The initial Manager appointed by the Member is Chaim Miller.

3.2   Rights, Authority and Powers of the Manager.

(a)   Except as otherwise set forth in this Agreement, the Managers shall have the sole and exclusive right to manage the business of the Company, including such rights, authority and powers as are necessary or useful for the Managers to conduct the affairs of the Company; provided, however, that the Managers shall not exercise such rights, authority and powers in any manner in violation of applicable law or the terms of this Agreement and further provided that the Manager shall owe a fiduciary duty to the Members. Consistent with the terms of this Agreement, the Managers shall have, but shall not be limited to, the following rights, authority and powers as Managers of the Company:

(i)   to execute and deliver on behalf of the Company such proposals, bids, agreements in principal, definitive agreements and other documents of any character, and amendments to any of the foregoing, and to take such other actions, with respect to acquiring, managing, operating, financing and refinancing of the Company's business and affairs;

(ii)   to acquire the interest in the Property and to finance such acquisition, and from time to time refinance such borrowings, and to execute and deliver on behalf of the Company obligations, agreements, instruments and other documents of any character relating to any such borrowings, including, but not limited to, mortgages, notes, deeds, trust indentures and assignments;

(iii)   to use any assets of the Company, and any income earned thereon, to make any contract deposits, option payments, escrow deposits or similar payments or deposits, to employ such Persons as are necessary or useful in connection with the Company, including, but not limited to consultants, attorneys and accountants and to pay any or all of the costs, fees and expenses thereof under this Agreement;

(iv)   to invest any income earned by the Company in United States treasury bills, United States government securities, other United States government-backed investments and/or United States governmental agency insured bank accounts; provided that the maturity thereof shall not exceed one (1) year at the time of acquisition of such treasury bills, securities, other investments or bank accounts;

(v)   to cause the Company to borrow money for Company purposes, to provide guarantees of the Company or other assistance of any kind to facilitate or enable

GWFG 3317

-7-

such borrowings and to pledge, mortgage or encumber the interests of the Company in any or all of the assets of the Company as security for such borrowings, guaranties or other assistance;

(vi)    to engage on behalf of the Company, and to thereafter terminate, the services of any accountant, agent, attorney, broker, property managers and other Person as may be deemed advisable by the Manager and to pay each of them such compensation as the Managers deems proper;

(vii)    to acquire and enter into any contract of insurance which the Managers determine to be necessary or appropriate for the protection of the Company or the Members;

(viii)    to prepare or cause to be prepared reports, statements, tax returns and other relevant information for distribution to Members;

(ix)    to open accounts and deposit and maintain funds in banks, trust companies, savings banks or savings and loan associations;

(x)    to select us the Company's taxable year the calendar year or such fiscal year as may be required or permitted by the Code;

(xi)    to determine the appropriate accounting method or methods to be used by the Company in maintaining its books and records or preparing its financial reports;

(xii)    to sign or authorize the signing of checks or Company certificates or documents on behalf of the Company;

(xiii)    to take such actions as the Managers may determine to be necessary or desirable in connection with the Company's affairs to the extent permitted by law;

(xiv)    to sign and deliver any certificate or other document which any Person dealing with the Company or the Members may rely upon as authority with respect to:  (a) the identity of the any Members hereof; (b) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Members or which are in any other manner germane to the affairs of the Company; (c) the persons who are authorized to execute and deliver any instrument or document on behalf of the Company; or (d) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in his capacity as a Member of the Company;

(xv)    to make any and all elections for federal, state, and local tax purposes which the Members may determine to be desirable including, without limitation, any election, if permitted by applicable law, to represent the Company and the Members in their capacities as Members of the Company before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and/or the Members in their capacities as Members of the Company, and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other

-8-

GWFG 3318

documents that bind the Members in their capacities as Members of the Company with respect to such tax matters or otherwise affect the rights of the Company and the Members in their capacities as Members of the Company; and

(xvi)   to execute, acknowledge and deliver any and all instruments to effectuate the foregoing, and to take any such action in connection therewith as the Members shall determine to be necessary or appropriate,

(b)   The Members may engage in or possess an interest in any other business or venture of every nature and description, independently or with others and neither the Company nor any Member shall have any right, by virtue of this Agreement or the relationship created hereby or otherwise in or to such other ventures or activities or to the income or proceeds derived therefrom and the pursuit of such ventures or activities, even if competitive with the assets or business of the Company, shall not be deemed to constitute a breach of this Agreement.

### 3.3   Engagement of Members.

(a)   It is specifically understood and agreed by the parties hereto that the Company may contract with any Member, or any Affiliate of such Member, to have such Person provide services to the Company, including, without limitation, accounting services, and management services, if such services are required by the Company's business; provided that the compensation or fee for such services does not exceed prevailing market rates and the terms of such contract are fair and reasonable to the Company and consistent with accepted industry practices.

### 3.4   Member Obligations.

(a)   Except as set forth herein, no Member shall participate in the management or control of the Company and no Member shall act for or bind the Company in any way.  No Member shall be restricted in any manner from businesses or activities that are competitive with the Company.

(b)   Anything in this Agreement to the contrary notwithstanding, unless a Member has executed a waiver for the withholding of applicable tax(es) (if and as available), if (i) federal, state and/or local income tax withholding is required to be made by the Company with respect to any Member under applicable federal, state and/or local law and (ii) the Members reasonably determine that the Company has insufficient available cash to afford the Company to withhold and pay such amounts to the applicable taxing authorities, such Member, upon five (5) days written notice from the Members (each a "Tax Notice"), shall forthwith deliver to the Company an amount equal to the amount required to be withheld by the Company as shall be specified by the Members in a Tax Notice and such amount shall constitute a transfer payment from such Member through the Company to the applicable taxing authority.  The Company may in any appropriate court of law or equity sue a Member for all amounts owed to the Company by a defaulting Member, and in addition to such sums as may be payable to the Company hereunder and all of the Company's other rights and remedies under applicable law, such defaulting Member shall pay to the Company a fee in an amount equal to fifty percent (50%) of all amounts that such defaulting Member failed to pay to the Company when due.

GWFG 3319

-9-

(c)     Each Member shall indemnify and hold the Company harmless from and against any and all Losses suffered or paid, directly or indirectly, by the Company in any action or proceeding brought by the Company to collect any and all sums payable by such Member pursuant to the provisions of Section 3.5(b).

### 3.5     Officers.

The Manager may designate one or more individuals as officers of the Company, who shall have such title and exercise and perform such powers and duties as shall be assigned to them from time to time by the Manager.  Subject to the terms of any written employment agreement, any officer may be removed by the Manager at any time, with or without cause. Each officer shall hold office until so removed or until his or her successor is elected and qualified.  Any number of offices may be held by the same individual.  The salaries and other compensation of the officers shall be fixed by the Manager and may be set forth in written employment agreements between the Company and such officers.

### 3.6     Annual Meeting.

The Company shall hold such meetings as required to comply with the provision of the Law.

### 3.7     Special Meetings.

Special meetings of the Members, for any purpose or purposes, may be called by the Members.

### 3.8     Place of Meetings.

Meetings of the Members may be held at any place, within the State of New York, for any meeting or the Members designated in any notice of such meeting.  If no such designation is made, the place or any such meeting shall be at the then principal office or the Company.  Any or all Members may participate in a meeting of the Members by means of conference telephone or any means of communication by which all persons participating in the meeting are able to communicate with each other.

### 3.9     Notice of Meetings.

Written notice setting forth the place, day and hour of the meeting and providing that it is being issued by or at the direction of the person or persons calling the meeting, stating the purpose or purposes for which the meeting is called shall be delivered no fewer than ten (10) nor more than thirty (30) days before the date of the meeting.

### 3.10     Record Date.

For the purpose of determining the universe of Members entitled to notice of, or to vote at, any meeting or any adjournment of such meeting or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which a resolution is adopted, as the case may be, shall be the record date for making a determination of

GWFG 3320

who is a Member.  When a determination of the universe of Members entitled to vote at any meeting has been made pursuant to this Section 3.11, the determination shall apply to any adjournment of the meeting.

### 3.11    Quorum.

Members holding not less than 100% of the Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members.  In the absence of a Quorum at any meeting of Members, the Interests so represented may adjourn the meeting for a period not to exceed thirty (30) days without further notice.  However, if the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at such meeting.  At an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.  The Members present at a meeting may continue to transact business until adjournment, notwithstanding the withdrawal during the meeting of Interests whose absence results in less than a quorum being present.

### 3.12    Manner of Acting.

If a quorum is present at any meeting, the unanimous vote or written consent of the Members shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Law or this Agreement.

### 3.13    Proxies.

(a)    A Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.

(b)    The Member or his attorney-in-fact must sign every proxy.  No proxy shall be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the Member executing it, except as otherwise provided in this Section 3.14.

(c)    The authority of the holder of a proxy to act shall not be revoked by the incompetence or death of the Member who executed the proxy unless, before the authority is exercised, written notice of an adjudication of such incompetence or of such death is received by the Members.

(d)    Except when other provisions shall have been made by written agreement between the parties, the record holder of an Interest which he, she or it holds as pledgee or otherwise as security or which belong to another, shall issue to the pledgor or to such owner of such Interest, upon demand therefor and payment of necessary expenses thereof, a proxy to vote or take other action thereon.

(e)    A proxy which is entitled "irrevocable proxy" and which states that it is irrevocable, is irrevocable when it is held by (i) a pledgee, (ii) a Person who has purchased or agreed to purchase the Interests, (iii) a creditor or creditors of the Company who extend or

GWFG 3321

continue credit to the Company in consideration of the proxy if the proxy states that it was given in consideration of such extension or continuation of credit, the amount thereof, and the name of the person extending or continuing credit, or (iv) a nominee of any of the Persons described in clauses (i)-(iv) of this sentence. Nothing contained herein shall permit a Member to otherwise Transfer his Interest, except as may otherwise be permitted pursuant to the terms of this Agreement.

(f)     A proxy may be revoked, notwithstanding a provision making it irrevocable, by a purchaser of an Interest without knowledge of the existence of such proxy.

### 3.14   Action by Members Without a Meeting.

(a)     Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote; provided, that (i) each Member shall be given at least ten (10) days prior written notice of the proposed action to be taken without a meeting and (ii) a consent or consents in writing, setting forth the action to be taken shall be signed by all of the Members.

(b)     Every written consent shall bear the date of signature of each Member who signs the consent, and no written consent shall be effective to take the action referred to therein unless, within thirty (30) days of the earliest dated consent delivered in the manner required by this Section 3.15 to the Company, written consents signed by a sufficient number of Members to take the action are delivered to the office of the Company, at its principal place of business, the Member or an employee or agent of the Company having custody of the records of the Company.   Delivery made to such office, principal place of business or the Members, an employee or agent shall be by hand or by certified or registered mail, return receipt requested.

### 3.15   Waiver of Notice.

Notice of a meeting need not be given to any Member who submits a signed waiver of notice; in person or by proxy, whether before or after the meeting.   The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by him.

### 3.16   Voting Agreements.

An agreement between two or more members, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the Interest held by them shall be voted as therein provided, or as they may agree, or as determined in accordance with a procedure agreed upon by them.

## SECTION 4

## INDEMNIFICATION OF THE MEMBERS
## AND AGREEMENT TO SAVE THEM HARMLESS

GWFG 3322

-12-

**4.1    Indemnification; Agreement to Save Harmless.**

(a)    To the maximum extent permitted by law, the Company, its receiver, and/or its trustee, as the case may be, shall indemnify, save harmless, and pay all judgments and claims against the Members and all loss, damage or expense incurred by the Members or by the Company by reason of any act performed or omitted to be performed by the Members in connection with the Company (including, but not limited to, attorneys' fees and other costs and expenses incurred by the Members in connection with the investigation and defense of any action based on any such act or omission, which attorneys' fees and any other costs and expenses shall be paid as incurred and any amounts expended in the settlement of any claim of liability, loss or damage).

(b)    Without limiting the generality of the foregoing, in the event of any action by a Member against the other Members, including a Company derivative suit or any class action, the Company shall indemnify, save harmless, and pay all costs and expenses of such Members, including attorneys' fees incurred in the defense of such action, which shall be paid as incurred.

(c)    No Member shall have any liability to the Company or the Members except for liabilities of such Member for any loss, damage or expense which, by a final judgment or other final adjudication, has been determined to have arisen from such Member's fraud, willful misconduct or bad faith, which fraud, willful misconduct or bad faith in each case has been determined to have been material to the cause of action adjudicated. Notwithstanding the provisions of Sections 4.1 (a) and 4.1(b), the Members shall not be indemnified for any loss, damage or expense if a final judgment or other final adjudication adverse to such Member establishes that such Member's loss, damage or expense arose from such Managing Member's fraud, willful misconduct or bad faith which, in each case, was material to the cause of action so adjudicated and in the event of any such adverse final judgment or other final determination establishing such Member's fraud, willful misconduct or bad faith material to the cause of action so adjudicated, such Member shall reimburse to the Company any costs and expenses, including attorneys' fees, previously advanced to such Member.

## SECTION 5

## DISTRIBUTIONS

**5.1    Net Cash Flow.**

Cash available in the Company from all sources shall be used to pay fees, expenses and costs or the Company, including but not limited to those provided in Sections 4 and 7.1 hereof. Any Net Cash Flow which is invested by the Company may be invested by the Members as provided in this Agreement. Upon the occurrence of a Liquidating Event, all cash available for distribution (after setting aside such reserves as the Members or liquidator permitted pursuant to Section 12.2, determines are prudent) shall be distributed to each of the Members in accordance with the other provisions of this Section 5.

GWFG 3323

5.2    <u>Distributions.</u>

(a)    All distributions from the Company to the Members shall be of distributable available cash, after the payment of debt service on the Loan and after setting aside a reasonable reserve, as reasonably determined by the Manager, and shall be distributed to the Members as follows:

(i)    to the Members that have made Additional Capital Contributions, on a pro rata basis with respect to the Additional Capital Contributions made, in an amount equal to such Additional Capital Contributions; and

(iii)    to the Members, in proportion to their respective Interests.

(b)    All distributions to Members prior to the termination of the Company shall be solely in the form of cash. Upon termination of the Company, distributions in the amounts required by Section 12.2 may also be made, on a pro rata or other equitable basis, in other assets of the Company.

(c)    No Member shall have any obligation to refund to the Company any amount that shall have been distributed to such Member pursuant to this Agreement, unless such amount was distributed to such Member by reason of manifest error.

## SECTION 6

## ALLOCATION OF NET INCOME AND NET LOSS

6.1    <u>Allocations.</u>

(a)    Except as otherwise provided in this Agreement, Net Income for each Fiscal Year (or portion thereof) shall be allocated among the Members as follows:

(i)    First, to the Members in proportion to and to the extent of the excess, if any, of (x) the aggregate amount of Net Loss previously allocated to the Members under Section 6.1(b)(ii) over (y) Net Income previously allocated to the Members under this Section 6.1(a)(i);

(ii)    Second, to the Members that received the Preferred Return, to the extent of, and in an amount equal to, the Preferred Return; and

(iii)    Thereafter, to the Members in proportion to their respective Interests.

(b)    Except as otherwise provided in this Agreement, Net Loss for each Fiscal Year (or portion thereof) shall be allocated among the Members as follows and in the following order of priority:

(i)    First, to the Members in proportion to and to the extent of the excess, if any, of (x) the aggregate amount of Net Income previously allocated to them

-14-

GWFG 3324

pursuant to Section 6.1(a)(ii) for all prior periods over (y) the aggregate amount of Net Loss previously allocated to them pursuant to this Section 6.1(b)(i); and

(ii)   Thereafter, to the Members in proportion to their respective Interests.

(c)   For federal, state and local income tax purposes, items of income, gain, loss, deduction and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for Capital Account purposes under this Section 6.1, except that items with respect to which there is a difference between tax and book basis will be allocated in accordance with section 704(c) of the Code, the Regulations thereunder and Regulation 1.704-1(b)(4)(i).

## 6.2   Special Allocations.

Section 704 of the Code and the Regulations issued thereunder, including without limitation, the provisions of such Regulations addressing qualified income offset provisions, minimum gain chargeback requirements and allocations of deductions attributable to nonrecourse debt and partner nonrecourse debt, are hereby incorporated by reference. If, as a result of the provisions of section 704 of the Code and the Regulations issued thereunder, items of Net Income or Net Loss are allocated to the Members in a manner that is inconsistent with the manner in which the Members intend to divide Company distributions as reflected in Sections 5 and 12 hereof, to the extent permitted under the Regulations, items of future income and loss shall be allocated among the Members so as to prevent such allocations from distorting the manner in which Company distributions will be divided among the Members pursuant to this Agreement.

## 6.3   Amendments to Allocations.

The Members may make amendments to the allocations of items pursuant to this Section 6 if necessary in order to comply with Code Section 704 or applicable Regulations thereunder; provided that no such change shall have a material adverse effect upon the amount distributable to any Member hereunder.

## 6.4   Allocations between Transferor and Transferee Members.

In the case of a Transfer, the Transferor and Transferee shall each be entitled to receive distributions of Net Cash Flow and allocations of Net Profits or Net Losses and Nonrecourse Deductions (defined in the Code), as follows:

(a)   Unless the Transferor and Transferee agree to the contrary and shall so provide in the instrument effecting the Transfer, distributions shall be made to the Person owning the Member's Interest according to the Company's records on the date of the distribution.

(b)   Net Profits or Net Losses and Nonrecourse Deductions shall be allocated by the number of days of the fiscal year each Person held the Interest; provided, however, Net Profits or Net Losses attributable to a capital transaction shall be allocated to the Member owning the Interest when a recognition event occurred for federal income tax purposes.

-15-

GWFG 3325

6.5   Tax Credits.

Any Company tax credits shall be allocated to the Members pro rata in accordance with their respective Interests.

## SECTION 7

## COMPANY FUNDS AND EXPENSES

7.1   Company Funds.

All funds received by the Company shall be deposited in the name of the Company in such bank account or accounts as the Members may designate from time to time, and withdrawals therefrom shall be made upon the signature of the Members or upon such other signature or signatures on behalf of the Company as the Members may designate from time to time.

7.2   Expenses of the Company.

The Company shall be responsible for all of the costs and expenses of operating the Company, including, without limitation, all costs and expenses of the Company relating to identifying, investigating, analyzing and negotiating the purchase or sale of the Property, as well as all costs and expenses related to the preparation and distribution of reports and tax information to Members, and shall reimburse the Members for any of such costs and expenses paid by such Member.

## SECTION 8

## ROLE AND OBLIGATIONS OF MEMBERS; COMPANY PROPERTY

8.1   Rights or Powers.

Except as otherwise expressly provided in this Agreement, no Member shall have any right or power (i) to take part in the management or control of the Company or its business and affairs, (ii) to act for or bind the Company in any way, (iii) to vote on any matters affecting the Company or (iv) to withdraw or reduce such Member's Capital Contribution except as a result of the dissolution of the Company.

8.2   Company Property.

All property owned by the Company shall be owned by the Company as an entity and insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. The foregoing provision shall govern over any contrary or inconsistent provision in any other document or instrument governing the affairs of the Company.

GWFG 3326

-16-

## SECTION 9

## BOOKS AND RECORDS;
## TAX MATTERS

### 9.1    Books and Records.

The Company shall maintain books and records at its principal place of business, setting forth a true and accurate account of all business transactions arising out of and in connection with the activities of the Company. Any Member or his designated representative shall have the right, upon reasonable notice and at any reasonable time, to have access to and inspect and copy the contents of such books or records, at such Member's sole cost and expense.

### 9.2    Reports.

The Members shall cause the Company to deliver to each and every Member the following statements, reports and estimates in respect of the Company as follows:

        (i)    an annual unaudited balance sheet, unaudited statement of revenues and expenses and unaudited statement of Members' capital; and

        (ii)    such additional reports and information in respect of the Company as reasonably may be requested by such Member and as reasonably may be available to the Company.

All costs and expenses resulting from or incidental to marshaling information necessary or useful for producing such statements, reports, and estimates, and from preparing and distributing them, shall be an expense of the Company.

### 9.3    Tax Information.

The Members shall cause the Company to deliver to each Member after the end of each Fiscal Year of the Company such tax information in respect of the Company as is reasonably necessary for the preparation of such Member's tax returns. The Members shall make reasonable efforts to cause the Company to furnish such information within ninety (90) days after the end of each Fiscal Year; provided, however, that if the Company is unable to deliver such information within such time period, the Members shall use their reasonable efforts to cause the Company to prepare and deliver preliminary estimated tax information within such time period.

### 9.4    Tax Returns.

The Members shall cause information or other returns for the Company to be prepared and filed with the appropriate authorities on a timely basis at the expense of the Company.

-17-

GWFG 3327

**9.5**    Tax Matters Partner.

The Members shall designate a "Tax Matters Partner" under Code Section 6231(a)(7) who shall manage audits of the Company conducted by the Internal Revenue Service or any other taxing authority pursuant to the audit procedures under the Code and the Regulations promulgated thereunder or other applicable law.

**9.6**    Classification as a Partnership.

The Members intend that the Company be classified as a partnership for federal income tax purposes. The Members shall take all steps as may be required to maintain the Company's classification as a partnership for federal income tax purposes and no Member shall take a position inconsistent with the foregoing.

## SECTION 10

## AMENDMENTS

**10.1**    Restriction on Amendments.

This Agreement shall not be amended without the consent of the Members. Notwithstanding the foregoing, for so long as the Loan remains outstanding, this Agreement shall not be amended without the prior written consent of Lender.

## SECTION 11

## TRANSFERS BY MEMBERS/WITHDRAWAL

**11.1**    Transfers.

(a)    Except as otherwise set forth in this Section 11, no Member shall Transfer an Interest without the consent of the other Members, except that the Interests may be pledged as collateral in connection with any loan or other financing obtained by the Company or by any Member from any other Member or Affiliate of a Member. Notwithstanding the foregoing, so long as the Loan remains outstanding, no Transfer shall be permitted by any Member without the prior consent of Lender.

(b)    Anything to the contrary herein notwithstanding, it shall not be a violation of this Agreement for a Member to Transfer all or any portion of an Interest to (i) an Affiliate of such Member or between Affiliates of such Member; (ii) any other Member; or (iii) such Member's Immediate Family Member or trust for the benefit of any such Immediate Family Member for estate planning purposes (each, a "Permitted Transfer"); provided, however, that the Transferor shall retain voting control over such transferred Interest until the earlier of the Transferor's death or complete disability and during such period, the Transferee shall have no ability to participate in the management or operation of the Company.

(c)    In the event of a Permitted Transfer, the Transferee shall be admitted to the Company as a Member to the extent of the transferred Interest, and shall have the right to

GWFG 3328

exercise the rights and privileges of a Member, and the Transferee shall hold such Interest subject to the terms of this Agreement; provided, that such Transferee shall have agreed in writing to be bound by the terms of this Agreement. Any such Transfer is subject to the Transferee executing all agreements agreeing to be bound by the terms of this Agreement and any other instrument or documentation reasonably required by the Members.

(d)    Unless otherwise required by applicable law, with respect to any Person acquiring an Interest in violation of the terms and conditions of this Agreement: (i) no distribution shall be made on such Interest and (ii) the Company shall not transfer on its books or records the ownership of any such Interest.

(e)    In the case of a Transfer or attempted Transfer (other than a Permitted Transfer) of an Interest not in accordance with the provisions of this Agreement, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all Losses that any of such indemnified persons may incur as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

## SECTION 12

## DISSOLUTION AND WINDING UP

### 12.1    Liquidating Events.

The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following (each, a "Liquidating Event"):

(i)    the happening of any event that, in the reasonable judgment of the Members makes it unlawful, impossible, or impractical to carry on the business of the Company;

(ii)    the affirmative vote of the Members;

(iii)    the sale or other disposition by the Company of the Loans;

(iv)    any event requiring the dissolution of the Company under Section 701 of the Law; or

(v)    the inability of the Members to elect a successor manager, if, as and when required under, and then in accordance' with the provisions of, this Agreement, after a reasonable period of time not to exceed ninety (90) days.

### 12.2    Winding Up.

Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors including creditors who are Members, and distributing any remaining property or the proceeds therefrom to the Members. No Member shall take any action that is

GWFG 3329

-19-

inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  The Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and assets. The Company's assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom and any cash of the Company, to the extent sufficient therefor, shall be applied and distributed in the following order; provided, however, that no distribution shall be made that creates or increases a Capital Account deficit for any Member which exceeds such Member's obligation (deemed or actual) to restore such deficit:

(a)    First, to the payment and discharge of all of the Company's debts and liabilities to creditors, if any, including any Members who are creditors, or reserves therefor and for contingencies as determined by the Members or liquidator elected as provided above in this Section 12.2; then

(b)    Second, to the Members in accordance with the provisions of Section 5.2(a) hereof.

### 12.3    Certain Rights of Members.

Except as specifically provided herein, each Member shall look solely to the assets of the Company for the return of such Member's Capital Contributions and shall have no right or power to demand or receive property other than cash from the Company, and no Member shall have priority over any other Member as to the return of a Member's Capital Contributions, distributions or allocations.

## SECTION 13

## INTENTIONALLY DELETED

## SECTION 14

## MISCELLANEOUS

### 14.1    Notices.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement (other than reports and tax information specified in Section 9) (each, a "Notice") shall be in writing and shall be delivered personally, receipt requested, to the Member to whom the same is directed, or sent by USPS certified mail, return receipt requested or by a nationally recognized overnight courier, addressed as follows, or to such other address as such Member may from time to time specify by Notice to the Company and, in the case of the Company, to the Members:

(a)    If to the Company, to the Company at the address set forth in Section 1.3 hereof; or

GWFG 3330

-20-

(b)    If to a Member, to his or her address set forth on <u>Exhibit A</u> hereto.

Any Notice shall be deemed to be delivered or given, and received for all purposes as of the date so delivered, if delivered personally or the first business day after delivery to the USPS or overnight courier service, if sent by USPS or overnight courier. Notices required or permitted to be given hereunder may be given by a party's attorneys.

### 14.2    Binding Effect.

Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors and permitted transferees and assigns. Except as specifically provided herein, no other Person is or shall be entitled to bring any action to enforce any provision of this Agreement against any Member.

### 14.3    Headings.

Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

### 14.4    Severability.

Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

### 14.5    Further Action.

Each Member, agrees to perform all further acts and to execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

### 14.6    Usage.

All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural as the identity of the Members may require. All terms defined in this Agreement in their singular or plural forms have correlative meanings when used in their plural or singular forms respectively. Unless otherwise expressly provided, the words "include" "includes," and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation".

### 14.7    Governing Law.

The laws of the State of New York, without reference to its choice of law or conflicts of law provisions, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Members. The parties hereto irrevocably consent to

-21-

GWFG 3331

the jurisdiction of the Courts of the State of New York, with venue in any action or proceeding to lie in the State, City and County of New York.

### 14.8    Counterpart Execution/Facsimile.

This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. Each counterpart shall be deemed to be an original and it shall not be necessary in making proof of the contents of this Agreement to produce or account for more than one counterpart. All counterparts shall be construed together and shall constitute one agreement. Photostatic or facsimile signatures of the original signatures of this Agreement, and photostatic or facsimile copies of this Agreement fully executed, shall be deemed originals for all purposes, and the parties hereto and/or beneficiaries hereof waive the "best evidence" rule or any similar law or rule in any proceeding in which this Agreement shall be presented as evidence or for enforcement.

### 14.9    Power to Reconstitute.

In the event that the State of New York amends the Law in any manner or there occurs any other event which prevents the Company, at any time, from being treated as a partnership for federal income tax purposes, then the Members, may, in their sole and absolute discretion, reconstitute the Company under the laws of another state.

### 14.10    Entire Agreement.

This Agreement sets forth the entire agreement among the Members and supersedes all prior discussions or understandings in respect of the Company or this Agreement, and this Agreement shall not be modified or amended except as permitted under this Agreement and only with the prior written consent of the Members.

### 14.11    Discretionary Decisions and Determinations.

Whenever in this Agreement a Person is permitted to make a decision or determination in his "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider only such factors and interests as he desires and shall have no duty or obligation to give any consideration to any interest of or factor affecting any other Person; and unless otherwise expressly stated to the contrary herein, any such decision or determination may be arbitrary and capricious, and made for any reason or for no reason.

### 14.12    Cost and Expenses of Litigation.

Except as otherwise set forth in this Agreement, in any action or proceeding brought by the Company or a Member against the Company, or another Member in connection with a dispute arising out of the provisions of this Agreement, the prevailing party shall be entitled to recover the costs and expenses (including, without limitation, to, reasonable attorneys' fees and expenses) incurred by the prevailing party in connection with such action or proceeding.

GWFG 3332

-22-

### 14.13  Third Party Beneficiaries.

Except as expressly provided elsewhere in this Agreement, there are no third party beneficiaries of or in this Agreement, or of any of the terms or provisions hereof or of any of the rights, privileges, duties, liabilities or obligations created hereby.

### 14.14  Representations/Interpretation.

Each party hereto warrants and represents that:  (i) by entering into this Agreement and agreeing to be bound by the terms and conditions set forth herein, such party represents and warrants that he has obtained independent legal counsel to review this Agreement and all legal documents executed by such party in connection herewith, or has knowingly waived such representation, and that such party has not relied upon any representation (legal or otherwise), statement or advice offered by the Company or Blaivas & Associates, P.C. ("Blaivas"), and/or any representative or principal of Blaivas; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation hereof; (iii) the terms and provisions hereof shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation hereof; and (iv) if such party is a Member, (A) the Interest being acquired by such Member is for investment purposes only, and is not being purchased for subdivisions, fractionalization, resale or distribution, (B) the Interests issued pursuant to this Agreement have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or registered or qualified under any applicable federal or state securities laws, including, without limitation, blue-sky laws (collectively with the Securities Act, the "Securities Laws"), (C) the Interests may not be able to be resold or transferred by a Member absence registration or qualification under the Securities Laws or an exemption from the registration or qualification requirement, (D) the Company has offered no commitment to register the Interests under the Securities Laws, (E) there is no public market for the Interests nor is any likely to develop, (F) such Member is a "sophisticated investor" with substantial prior experience in high-risk business investments and is aware of and familiar with the risks associated with a private general partnership and similar investments and would qualify as an "accredited investor" as such term is defined in Rule 501 of Regulation D, as enacted pursuant to Sections 3 and 4 of the Securities Act, and (G) this Agreement has been duly authorized, executed and delivered by such Member and constitutes the legal and binding obligation of such Member enforceable against such Member in accordance with its terms.

### 14.15  Time of the Essence.

Whenever in this Agreement there is a time set forth for an event to occur, including, without limitation, any time within which to give a notice or make a payment, time shall be of tile essence with respect thereto.

[This space intentionally left blank.]
[Signatures appear on next page.]

-23-

GWFG 3333

IN WITNESS WHEREOF, the parties have entered into this Agreement on the day first above set forth.

Members:

Chaim Miller

Chun Peter Dong

Manager:

Chaim Miller

-1-

GWFG 3334

EXHIBIT A

| Member Name and Address | Initial Capital Contribution | Initial Interest |
|---|---|---|
| Chaim Miller<br>1324 46th Street<br>Brooklyn, NY | $680 | 68% |
| Chun Peter Dong | $320 | 32% |
|  |  |  |
|  |  |  |
| Total | $1000 | 100% |

GWFG 3335

1

# EXHIBIT B

## First Amendment to John Loft Operating Agreement

### FIRST AMENDMENT TO THE OPERATING AGREEMENT FOR
### 45 JOHN LOFTS LLC

This First Amendment to the Operating Agreement (this **"Amendment"**) 45 JOHN LOFTS LLC, a New York limited liability company (the **"Company"**), dated as of March 4, 2014, is among the individuals signing it below.

**WHEREAS**, the individuals signing this Amendment desire to amend that certain Operating Agreement (**"Operating Agreement"**) of the Company dated as of February 28, 2014 which formed the Company, pursuant to the New York Limited Liability Company Law;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the individuals/entities signing this Amendment below agree to amend Operating Agreement as follows by adding the following provisions, which terms shall modify, amend and supersede any contrary terms of the Operating Agreement:

I.    **Single Purpose Entity Provisions**

Notwithstanding any other provision of the Operating Agreement, any other organizational documents or any provisions of law that empowers the Company, the following provisions shall be operative and controlling so long as those certain loan arrangements in the aggregate principal sum of up to $61,500,000.00 (collectively, the **"Loan"**) by SDF81 45 JOHN STREET 1 LLC and SDF81 45 JOHN STREET 2 LLC, or their successors and/or assigns (collectively, the **"Lender"**) to the Company is outstanding:

(a) Company has not owned, does not own and will not own any asset or property other than (i) 45-49 John Street a/k/a 1-5 Dutch Street, New York, New York, Block 78, Lots 1701-1787 (excluding Lot 1703) (collectively, the **"Mortgaged Property"**), and (ii) incidental personal property necessary for the ownership, management or operation of the Mortgaged Property.

(b) Company has not engaged, does not engage, and will not engage in any business other than the ownership, management and operation of the Mortgaged Property and Company will conduct and operate its business as presently conducted and operated.

(c) Company has not entered and is not a party to and will not enter into or be a party to any contract or agreement with any affiliate of Company, any constituent party of Company or any affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are disclosed to Lender in advance and that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

1

HSIUNG 0001

(d) Company has not incurred and will not incur any indebtedness other than (i) the Loan and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding two percent (2%) of the original principal amount of the Loan at any one time; provided that any Indebtedness incurred pursuant to sub-clause (ii) shall be (x) not more than sixty (60) days past due and (y) incurred in the ordinary course of business (the indebtedness described in the foregoing clauses (i) and (ii) is referred to herein, collectively, as "**Permitted Indebtedness**"). No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Mortgaged Property.

(e) Company has not made and will not make any loans or advances to any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national, federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof) (including any affiliate or constituent party) (a "**Person**"), and has not acquired and shall not acquire obligations or securities of its affiliates.

(f) Company is and will endeavor to remain solvent and Company has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, to the extent there is sufficient revenue generated from the Mortgaged Property.

(g) Company has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Company will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless Lender has consented, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents.

(h) Company has maintained and will maintain all of its accounts, books, records, financial statements and bank accounts separate from those of its affiliates and any other Person. Company's assets have not been and will not be listed as assets on the financial statement of any other Person; provided, however, that Company's assets may be included in a consolidated financial statement of its affiliates if (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Company and such affiliates and to indicate that Company's assets and credit are not available to satisfy the debts and other obligations of such affiliates or any other Person, and (ii) such assets shall be listed on Company's own separate balance sheet. Company has and will file its own tax returns (to the extent Company is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Company has maintained and shall maintain its books, records, resolutions and agreements as official records.

(i) Company has been and will be, and has held and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of

Amendment to Operating Agreement

2

HSIUNG 0002

Company or any constituent party of Company), has corrected and shall correct any known misunderstanding regarding its status as a separate entity, has conducted and shall conduct business in its own name, has not identified and shall not identify itself or any of its affiliates as a division or part of the other, and has maintained and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j) Company has maintained and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, to the extent there is sufficient revenue generated from the Mortgaged Property.

(k) Neither Company nor any constituent party has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Company.

(l) Company has not commingled and will not commingle the funds and other assets of Company with those of any affiliate or constituent party or any other Person, and has held and will hold all of its assets in its own name.

(m) Company has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party or any other Person.

(n) Company has not assumed or guaranteed or become obligated for the debts of any other Person and has not held itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, and Company will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o) Company hereby covenants and agrees that it will comply with or cause the compliance with, (i) all the representations, warranties and covenants contained within the Loan documents, and (ii) all the organizational documents of Company.

(p) Company has not permitted and will not permit any affiliate or constituent party independent access to its bank accounts.

(q) Company has paid and shall pay the salaries of its own employees (if any) from its own funds and has and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations, to the extent there is sufficient revenue generated from the Mortgaged Property.

(r) Company has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

3

HSIUNG 0003

(s) Company has not, and without the unanimous consent of all of its Members or Managers will not, take any action that might reasonably be expected to cause Company to become insolvent.

(t) Company has allocated and will allocate fairly and reasonably any shared expenses, including shared office space.

(u) Notwithstanding any provision of the Operating Agreement or this Amendment, except in connection with the Loan or any prior mortgage financing that has been fully paid and discharged in full prior to the date hereof, Company has not pledged and will not pledge its assets for the benefit of any other Person.

(v) Company either (i) has no, and will have no, obligation to indemnify its officers, directors, managers, members, shareholders or partners, as the case may be, or (ii) if it has any such obligation, such obligation is fully subordinated to the Loan and will not constitute a claim against Company if cash flow in excess of the amount required to pay the Loan is insufficient to pay such obligation.

(w) Company will consider the interests of Company's creditors in connection with all limited liability company actions.

(x) Except as provided in the Loan documents, Company has not and will not have any of its obligations guaranteed by any affiliate.

(y) Company's organizational documents shall provide that there shall at all times be (and Company shall at all times cause there to be) at least one (1) duly appointed manager or member of the board of managers (each, an **"Independent Director"**) of Company:

(i) who shall be a natural person who is provided by a nationally recognized professional service company;

(ii) who shall have at least three (3) years prior employment experience as an independent director; and

(iii) who shall not have been at the time of such individual's appointment or at any time while serving as an Independent Director, and shall not have ever been (A) a stockholder, member, director or manager (other than as an Independent Director), officer, employee, partner, attorney or counsel of Company or any affiliate of Company or any direct or indirect equity holder of any of them, (B) a creditor, customer, supplier, service provider or other Person who derives any of its purchases or revenues from its activities with Company or any affiliate of Company, (C) a member of the immediate family of any such stockholder, member, director, manager, officer, employee, partner, attorney, counsel, creditor, customer, supplier, service provider or other Person, (D) a Person who is otherwise affiliated with Company or any affiliate of Company or any direct or indirect

Amendment to Operating Agreement                    4

HSIUNG 0004

equity holder of any of them or any such stockholder, member, director, manager, officer, employee, partner, attorney, counsel, creditor, customer, supplier, service provider or other Person, or (E) a Person controlling, controlled by or under common control with any of (A), (B), (C) or (D) above.

As used in this subsection (y), "nationally recognized professional service company" includes Corporation Services Company, CT Corporation, National Registered Agents, Inc., Stewart Management Company, Wilmington Trust Company and Lord Securities Corporation or, if none of those companies is then providing professional Independent Directors, another nationally-recognized company reasonably approved by Lender, in each case that is not an affiliate of Company and that provides professional Independent Directors and other corporate services in the ordinary course of business. As used in this subsection (y), the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise and the term "controlled" and "controlling" shall have a correlative meaning.

(z) As long as any portion of the Loan remains outstanding:

(i) the directors or managers of Company shall not take any action which, under Company's certificate of formation or operating agreement, requires the unanimous affirmative vote of Company's directors or managers unless at the time of such action there are at least one (1) Independent Director then serving in such capacity and each Independent Director has participated in such vote;

(ii) no resignation or removal of an Independent Director, and no appointment of a successor Independent Director, shall be effective until such successor shall have executed a counterpart to Company's operating agreement; provided, however, that no Independent Director shall resign or be removed, and no successor Independent Director shall be appointed unless Company provides Lender with at least fifteen (15) days prior written notice of any such proposed resignation or removal and the identity of any such successor Independent Director, together with a certification that such successor satisfies the requirements for an Independent Director as required by Lender in its sole but commercially reasonable discretion;

(iii) in the event of a vacancy in the position of Independent Director, the member of Company shall, subject to the preceding clause (ii), appoint a successor Independent Director as soon as practicable;

(iv) to the fullest extent permitted by law and notwithstanding any duty existing at law or equity, the Independent Director shall consider only the interests of the Company, including Lender and its other creditors, in acting or otherwise voting on the matters referred to in clauses (z)(vii)(C) or (z)(vii)(D) below of this Amendment;

5

HSIUNG 0005

(v) except for duties to Company as set forth in the immediately preceding clause (iv) (including duties to the member(s) of Company and Company's creditors solely to the extent of their respective economic interests in Company but excluding (A) all other interests of the member(s) of Company, (B) the interests of other affiliates of Company, and (C) the interests of any group of affiliates of which Company is a part), the Independent Director shall not have any fiduciary duties to the member(s) of Company or any other Person bound by Company's operating agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing;

(vi) in exercising their rights and performing their duties under Company's operating agreement, each Independent Director shall have a fiduciary duty of loyalty and care similar to that of a director of a business corporation organized under the General Corporation Law of the State of New York; and

(vii) Company will not:

(A) dissolve, merge, liquidate or consolidate, except as provided in clause (z)(viii) below;

(B) except in connection with a sale or other transfer permitted under the Loan Documents, sell all or substantially all of its assets;

(C) amend its organizational documents with respect to the matters set forth in this Amendment, without the consent of Lender and without the affirmative vote of its Independent Director; or

(D) without the affirmative vote of its Independent Director and of all other directors or managers of Company, take any Material Action with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest. For purposes herein, a **"Material Action"** shall mean: to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

(viii) Company shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining

Amendment to Operating Agreement

6

HSIUNG 0006

member of Company or the occurrence of any other event which terminates the continued membership of the last remaining member of Company in Company unless the business of Company is continued in a manner permitted by its operating agreement or the New York Limited Liability Company Act (the "**Act**"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act;

(ix) upon the occurrence of any event that causes the last remaining member of Company or the sole member of Company (in each case, the "**Final Member**") to cease to be a member of Company (other than (A) upon an assignment by Final Member of all of its limited liability company interest in Company and the admission of the transferee, if permitted pursuant to the organizational documents of Company and the Loan Documents, or (B) the resignation of Final Member and the admission of an additional member of Company, if permitted pursuant to the organizational documents of Company and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Company, agree in writing (1) to continue the existence of Company and (2) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Company, effective as of the occurrence of the event that terminated the continued membership of such member in Company;

(x) the bankruptcy of Final Member or a special member of Company shall not cause Final Member or such special member, respectively, to cease to be a member of Company and upon the occurrence of such an event, the business of Company shall continue without dissolution;

(xi) in the event of the dissolution of Company, Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Company in an orderly manner), and the assets of Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and

(xii) to the fullest extent permitted by law, each of Final Member and the special members of Company shall irrevocably waive any right or power that they might have to cause Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Company, to compel any sale of all or any portion of the assets of Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Company.

2.        **Uniform Commercial Code**

(a)      Each Membership Interest in the Company shall constitute and shall remain a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial

HSIUNG 0007

Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Company hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code.

(b)     The Company shall maintain books for the purpose of registering the transfer of Membership Interests of the Company. Notwithstanding anything in this Amendment to the contrary, the transfer of any Membership Interest in the Company requires delivery of an endorsed Certificate and any transfer of Membership Interests in the Company shall not be deemed effective until the transfer is registered in the books and records of the Company.

(c)     Each Membership Interest in the Company shall be represented by a certificate, and shall contain the following legend: "THE TRANSFER OF THIS CERTIFICATE AND THE MEMBERSHIP INTEREST REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE OPERATING AGREEMENT OF THE COMPANY, DATED FEBRUARY 28, 2014 AS THE SAME MAY BE AMENDED OR AMENDED AND RESTATED FROM TIME TO TIME." Each such Certificate shall be denominated in terms of the percentage of membership interests in the Company evidenced by such Certificate and shall be signed by the Manager on behalf of the Company.

(d)     Notwithstanding any provision of this Amendment to the contrary, to the extent any provision of this Amendment is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of New York, the provisions of Article 8 of the Uniform Commercial Code as in effect in the State of New York, shall control.

(e)     THE TRANSFER OF THE MEMBERSHIP INTERESTS IN THE COMPANY DESCRIBED IN THIS AMENDMENT ARE RESTRICTED AS PROVIDED HEREIN.

(f)     To the fullest extent permitted by applicable law, without any further act, vote or approval of any Member, Person or officer the Company shall issue a new Certificate in place of any Certificate previously issued if the holder of the Membership Interests in the Company represented by such Certificate, as reflected on the books and records of the Company:

(i)     makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Certificate has been lost, stolen or destroyed;

(ii)     requests the issuance of a new Certificate before the Company has notice that such previously issued Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(iii)     if requested by the Company, delivers to the Company a bond, in form and substance satisfactory to the Company, with such surety or sureties as the Company may direct,

Amendment to Operating Agreement

8

to indemnify the Company against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Certificate; and

> (iv)   satisfies any other reasonable requirements imposed by the Company.

(g)   To the fullest extent permitted by applicable law, upon a Member's transfer or assignment, in whole or in part, of its Membership Interest in the Company represented by a Certificate, the transferee of such Membership Interests in the Company shall deliver the Certificate or Certificates representing such Membership Interest to the Company for cancellation (executed by such transferee on the reverse side thereof), and the Company shall thereupon issue a new Certificate to such transferee for the percentage of Membership Interests in the Company so transferred or assigned and, if applicable, cause to be issued to the transferring or assigning Member a new Certificate for that percentage of Membership Interests in the Company that were represented by the canceled Certificate and that are not so transferred or assigned.

3.    **Additional Provisions**

(a)   The Company shall not, without the prior written consent of the Lender, issue, and shall not permit the issuance of any additional Membership Interests in the Company other than its initial issuance of Membership Interests issued on or prior to the date of this Amendment.

(b)   For so long as the Loan is outstanding, HARRY MILLER and CHUN PETER DONG, shall be the sole Member(s) and Managing Member(s) of the Company.

(c)   The Managing Member(s) as of the date hereof shall remain as Managing Member(s) of the Company and may not resign, or appoint a successor Managing Member(s) for Company, without prior written consent from Lender, in addition to observing all other resignation requirements of this Amendment.

(d)   The Member(s) and the Managing Member(s) shall not, and cause the Company to not, amend, alter, change or repeal any Section or Schedule of the Operating Agreement if such change would adversely impact (i) any of the Lender's collateral, or (ii) Lender's ability to enforce its remedies under the Loan documents or (iii) amend any of the terms in this Amendment.

[SIGNATURE PAGE TO FOLLOW]

9

IN WITNESS WHEREOF, the individuals and entities signing this Amendment below conclusively evidence their agreement to the terms and conditions of this Amendment by so signing this Amendment.

MEMBER(S):

_____
HARRY MILLER

_____
CHUN PETER DONG

INDEPENDENT DIRECTOR:

_____

Amendment to Operating Agreement

10

HSIUNG 0010

IN WITNESS WHEREOF, the individuals and entities signing this Amendment below conclusively evidence their agreement to the terms and conditions of this Amendment by so signing this Amendment.

MEMBER(S):

_____

HARRY MILLER

_____

CHUN PETER DONG

INDEPENDENT DIRECTOR:

_____

RICARDO BEAUSOLEIL

Amendment to Operating Agreement

10

HSIUNG 0011

# EXHIBIT C

## Renatus Agreement



## Agreement

This Agreement ("Agreement") made as of July __, 2014 between Renatus Portfolio Company LLC ("Renatus") having an address at 200 Railroad Avenue, Suite 200, Greenwich CT 06840; Chaim Miller ("Miller") having an address at 1324 46th Street, Brooklyn, NY and Bo Jin Zhu ("Zhu") having an address at 86-26 Queens Blvd, Elmhurst, New York, 11373.

## RECITALS:

WHEREAS, Zhu is the owner of the membership interest set forth on Exhibit A annexed hereto (the "Interests").

WHEREAS, in consideration of funds advanced by Renatus to Zhu and/or his affiliates Renatus has the right to acquire the Interest from Zhu and/or cause the sale of same.

WHEREAS, Renatus and Zhu would like to permit the transfer of the Interests to Miller or his designee in accordance with that certain agreement dated May 12, 2014 between Miller and Renatus (the "Miller Agreement"), a copy of which is annexed hereto as Exhibit B.

WHEREAS, Miller has requested and Zhu and Renatus have agreed to clarify the rights as among the parties.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and the mutual covenants and premises hereinafter contained, the parties agree as follows:

1) In the event that, on or prior to August 11, 2014 (as the same may be extended pursuant to Paragraph 2 hereof, the "Closing Date"), TIME BEING OF THE ESSENCE, Miller shall comply with his obligations under the Miller Agreement, then in such event, Zhu shall transfer at such time the Interests directly to Miller and/or his designee and Renatus shall have the right to receive the proceeds in connection therewith, in consideration of funds previously advanced. Renatus hereby expressly agrees to such transfer by Zhu provided all such proceeds are delivered to Renatus.

2) Provided that on or before 5:00 p.m. EST on July 25, 2014, Miller delivers to Herrick Feinstein LLP (the "Escrow Agent") the sum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) (the "Second Deposit" and, together with all sums previously delivered by or on behalf of Miller to Renatus, the "Deposit"), the Closing Date shall be extended so that all references to the Closing Date, the Closing and/or other similar references in the Miller Agreement shall be deemed to mean September 15, 2014, TIME BEING OF THE ESSENCE TO THE PERFORMANCE OF MILLER'S OBLIGATIONS. The Second Deposit shall be held in escrow by the Escrow Agent in accordance with an Escrow Agreement to be entered into among Escrow Agent, Renatus and Miller in the form annexed hereto as Exhibit A and otherwise in accordance with the terms of the Miller Agreement. From and after the date of delivery of the Second Deposit, all references to the Deposit in the Miller Agreement shall be deemed to refer to the Deposit as increased by the Additional Deposit

3) In the event that Miller shall fail to comply with his obligations under the Miller Agreement on or prior to the Closing Date, then in such event Miller and Zhu hereby consent to the transfer by Zhu of the Interest to Renatus or its designee.

SSHM
02766

4)  All parties acknowledge that, upon the consummation of the transaction contemplated under the Miller Agreement, all such transfers, pledges and/or hypothecations to and/or from Renatus shall be permitted with respect to the Interests and neither Chaim Miller nor Bo Jin Zhu shall take any steps to prevent such transfers. By their signature below, both parties hereby consent to such transfers, pledges and/or hypothecations upon the closing of the transaction contemplated under the Miller Agreement  Zhu hereby represents that Zhu has not previously transferred, pledged and/or hypothecated the Interests except as contemplated hereby, and that at the closing under the Miller Agreement, Miller shall receive all of the Interests free of any encumbrances except for any pledges, if any, given to an affiliate of Madison Realty Capital LLC in connection with the initial financing of the Premises (all as previously disclosed to Miller). This representation shall survive Closing for a period of six (6) months.

5)  At the Closing, Miller shall have the right to examine and review all agreements, understandings, undertakings and other documentation between Zhu and Renatus in redacted form (the "Understandings").

6)  Upon the closing of the transaction contemplated under the Miller Agreement, and as an express condition to the obligations of each party to close under the Miller Agreement, all parties shall deliver a full, unconditional and irrevocable general release (the "Releases") with respect to any and all claims which Zhu, Renatus (collectively, "Releasor") or any of Releasor's successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, members, managers, services, officers, attorneys, employees, consultants, agents and other representatives may have against Miller, and Miller's successors and assigns, affiliates, subsidiaries, divisions, predecessors, directors, members, managers, services, officers, attorneys, employees, consultants, agents and other representatives (collectively, "Releasees"), the form of which General Release shall be reasonably acceptable to Miller, Renatus and Zhu.

7)  All parties agree that this document shall be considered "compromise negotiations" pursuant to Federal Rules of Evidence 408 and similar state laws and rules, and shall not be considered "otherwise discoverable" or be permitted to be discoverable or admissible in court for any purpose such as to prove bias, intent, prejudice, interest of a witness or a party, negating a contention of undue delays, or for any other purpose.

8)  This agreement shall be governed by and construed in accordance with the laws of the State of New York.

9)  This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.  For purposes of this Agreement, signatures delivered by facsimile or .pdf shall be as binding as originals upon the parties so signing

10) This Agreement may not be changed or terminated orally. This Agreement shall insure to the benefit of and bind the heirs, executors, administrators, successors and assigns of the respective parties.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

_____

BO JIN ZHU

_____

CHAIM MILLER

RENATUS PORTFOLIO COMPANY LLC

By: _____
Name:
Title:

SSHM
02702

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

_____
BO JIN ZHU


_____
CHAEM MILLER

RENATUS PORTFOLIO COMPANY LLC

By: _____
Name: Chaim Miller
Title: Authorized Signatory

SSHM
02792

STATE OF NEW YORK    }
                                    } ss.:
COUNTY OF ____N____ }

On July ___, 2014, before me, the undersigned, a notary public in and for said State, personally appeared Chaim Miller personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me he/she/they executed the same in his/her/their/ capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

> DEBORAH BEY
> NOTARY PUBLIC STATE OF NEW YORK
> WESTCHESTER COUNTY
> LIC. #02BE6233300
> MY COMMISSION EXPIRES DECEMBER 9, 20__

_____
Notary Public

STATE OF NEW YORK    }
                                    } ss.:
COUNTY OF _____ }

On July ___, 2014, before me, the undersigned, a notary public in and for said State, personally appeared Bo Jin Zhu personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me he/she/they executed the same in his/her/their/ capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK    }
                                    } ss.:
COUNTY OF _____ }

On July ___, 2014, before me, the undersigned, a notary public in and for said State, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me he/she/they executed the same in his/her/their/ capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF _____ )

On July __, 2014, before me, the undersigned, a notary public in and for said State, personally appeared Chaim Miller personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF ___NY___ )

On July 22, 2014, before me, the undersigned, a notary public in and for said State, personally appeared Bo Jin Zhu personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

TANYA VITERI
Notary Public, State of New York
No. 01VI6032087
Qualified in New York County
Commission Expires April 22, 20_

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF ___NY___ )

On July 22, 2014, before me, the undersigned, a notary public in and for said State, personally appeared Shaya Mann personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

TANYA VITERI
Notary Public, State of New York
No. 01VI6032087
Qualified in New York County
Commission Expires April 22, 20_

**Exhibit "A"**
MEMBERSHIP INTERESTS

| PROPERTY | ENTITY INFORMATION | PERCENTAGE INTERESTS |
|---|---|---|
| 97 Grand Avenue (a/k/a 96 Steuben), Brooklyn, New York | 97 Grand Avenue LLC, a Delaware limited liability company | 50% Bo Jin Zhu |
| 203-205 North 8th Street, Brooklyn NY | 203-205 North 8th Street Loft LLC | 40% Bo Jin Zhu |
| 32-34 Fifth Avenue, Brooklyn, NY | Besud 5th LLC, 32 5th Avenue Loft LLC, 32 5th Avenue Holdings LLC | 50% Bo Jin Zhu |
| 29 Ryerson Street, Brooklyn, NY 265 Flushing Avenue, Brooklyn, NY | 11-45 Ryerson Holdings LLC, a New York limited liability company | 50% Bo Jin Zhu |

SSHM
02796

Exhibit "B"

MILLER AGREEMENT

SSHM
02707

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement") made as of the May 12, 2014, by and among RENATUS PORTFOLIO COMPANY LLC, having an address at 200 Railroad Avenue, 3rd Floor, Greenwich, CT 06840, ("Seller,) and CHAIM MILLER and SAM SPREI, each having an address at 1324 46th Street, Brooklyn, New York or to an entity formed by either of them (collectively, "Purchaser"). Purchaser and Seller shall be referred to herein as a "party" and collectively as the "parties".

## WITNESSETH

WHEREAS, Pursuant to a certain contract between Seller and Bo Jin Zhu (the "Contract"), Seller has the right to acquire the membership interests listed on Exhibit A annexed hereto (the **"Membership Interests"**) in the entities listed thereon (collectively, the "Companies");

WHEREAS, Upon Seller's acquisition of the Membership Interests, Seller wishes to sell, and Purchaser wishes to purchase, the Membership Interests upon the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I
#### Sale of Membership Interests

1.1    Membership Interests.  Subject to the terms and conditions of this Agreement, Seller hereby agrees on the Closing Date to sell, transfer and convey to Purchaser all of the Membership Interests, and Purchaser hereby agrees to purchase from Seller, the Membership Interests.

### ARTICLE II
#### Payment

2.1    Purchase Price.  Purchaser shall pay to Seller for the Membership Interests the sum of THIRTY ONE MILLION ($31,000,000) Dollars (the "Purchase Price").

2.2    Method of Payment.  The Purchase Price shall be payable as follows:

2.2.1  Simultaneously with the execution and delivery of this Agreement, Seven Million ($7,000,000) Dollars (the **"Deposit"**) by wire transfer of immediately available federal funds released directly to Seller, receipt of which is hereby acknowledged. Notwithstanding anything in this Agreement to the contrary, the Deposit shall be non-refundable in any instance, except in the event of a Seller default, Seller's inability to perform hereunder, or Seller's failure to acquire the Membership Interests prior to Closing Date.

SSHM
02708

2.2.2  On the Closing Date, Twenty Four Million ($24,000,000) Dollars, (the "Balance") by wire transfer of immediately available federal funds as directed by Seller.

## ARTICLE III
### Closing

3.1    Closing.  The closing of the transactions contemplated herein (the "Closing") shall be held in escrow through the offices of First American Title Insurance Company on August 11, 2014, TIME BEING OF THE ESSENCE (the "Closing Date").

3.2    Conditions to Closing.

3.2.1  Conditions Precedent to Seller's Obligations.  Notwithstanding anything to the contrary contained herein, the obligation of the Seller to close the transactions contemplated by this Agreement are expressly conditioned upon the fulfillment by and as of the Closing Date, of each of the conditions listed below, provided that Seller, at their election, evidenced by written notice delivered to Purchaser on or prior to the Closing Date, may waive any such conditions.

3.2.1.1  Purchaser shall have executed and delivered to Seller all of the documents, shall have paid all sums of money and shall have taken or caused to be taken all of the other action required of Purchaser in this Agreement.

3.2.2  Conditions Precedent to Purchaser's Obligations.  Notwithstanding anything to the contrary contained herein, the obligations of Purchaser to close the transaction contemplated by this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing Date, of each of the conditions listed below, provided that Purchaser, at its election, evidenced by written notice delivered to Seller on or prior to the Closing Date, may waive all or any of such conditions:

3.2.2.1Seller shall have executed and delivered to Purchaser all of the documents, and shall have taken or caused to be taken all of the other action required of Seller under this Agreement and as Purchaser under the Contract.

## ARTICLE IV
### Representations and Covenants of the Parties

4.1    Representations of Seller.  The Seller warrants, represents and covenants to Purchaser that the following are true and correct on the date hereof and will be true and correct in all material respects on the Closing Date:

4.1.1  Seller has the requisite power and authority to enter into and to perform the terms of this Agreement.  Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  This Agreement constitutes, and each document and

2

SSHM
03709

instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall be, the legal, valid and binding obligation of Seller enforceable against Seller in accordance with their respective terms. The Membership Interests have not been sold, pledged or hypothecated by Seller and Seller has not granted any party other than Purchaser any right or option to purchase the Membership Interests.

4.1.2   The execution, delivery or performance of this Agreement by Seller and the consummation of the transactions contemplated hereby is not prohibited by, and does not require Seller to obtain, any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller, or any agreement to which Seller is a party.

4.2   Representations of Purchaser.  Purchaser warrants, represents and covenants to and with Seller that the following are true and correct on the date hereof and will be true and correct in all material respects on the Closing Date:

4.2.1   Neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

4.2.2   There are no judgments, orders, or decrees of any kind pending with respect to Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or threatened against Purchaser.

4.2.3   Purchaser represents that it is the holder of the remaining membership interests in each of the entities comprising the Companies. Purchaser acknowledges that, except as expressly set forth herein, there are no representations made with respect to the Membership Interests. Purchaser shall cause each entity to consent to any such transfer to the extent required by such entities organizational documents, and conversely, Seller shall take such action necessary to cause the Company to consent, to the extent it has such authority.

4.3   The representations, warranties and covenants contained in this Article 4 shall survive the Closing.

ARTICLE V

Brokerage

5.1   Seller and Purchaser warrant represent to the other that they have dealt with no brokers, salesperson, agent or finder in connection with this Agreement or the transactions contemplated by this Agreement Seller and Purchaser agree that they will indemnify and hold the other harmless from and against any and all claims, demands, actions, liability and costs (including, without limitation, attorneys' fees, costs, expenses and disbursements) of any kind in any way relating to or arising from a claim of any person or entity that he/she or it acted as a broker, salesperson, agent or finder on behalf of the indemnifying party in connection with this Agreement or the transaction contemplated by this Agreement.   Seller's and Purchaser's obligations under this Article 5 shall survive the Closing.

3

## ARTICLE VI
### Closing Deliveries

6.1    Seller's Deliveries.  On the Closing Date, Seller shall deliver or cause to be delivered each of the following items to Purchaser:

6.1.1  For Seller, a duly executed counterpart of one or more Assignments of Membership Interests to Chaim Miller and Sam Sprei, in such percentages as directed by Purchaser.

6.1.2  A release with respect to the Membership Interests to Sam Sprei and Chaim Miller with respect to all claims and actions held by the owner of such Membership Interests.

6.1.3  Executed transfer tax returns, to the extent required by applicable law.

6.2    Purchaser's Deliveries.  On the Closing Date, Purchaser shall deliver or cause to be delivered each of the following items to Seller:

6.2.1  All sums required to be paid by Purchaser under this Agreement.

6.2.2  A duly executed counterpart of the Assignment of Membership Interests.

6.2.3  Any other documents which Purchaser is required pursuant to the terms of this Agreement to deliver to Seller at the Closing.

6.3    Seller and Purchaser, on the Closing Date, shall prepare, execute and deliver to each other, subject to all the terms and provisions of this Agreement, (a) a closing statement setting forth, inter alia, the closing adjustments (if any) and material monetary terms of the transaction contemplated hereby and (b) such other instruments and documents as may be reasonably required to effectuate the consummation of the transactions contemplated in this Agreement.

## ARTICLE VII
### Closing Costs

7.1    Closing Costs.

7.1.1  Except as otherwise set forth herein, Seller and Purchaser shall pay their respective legal, consulting and professional fees and expenses incurred in connection with this Agreement and the transactions contemplated herein. Purchaser shall pay any transfer taxes that may be applicable to the present transaction.

## ARTICLE VIII
### Default and Liability

8.1    If the Closing does not occur, the provisions of this Paragraph 8, as applicable in the stated circumstances, shall be the sole and exclusive rights and remedies of the parties hereto,

4

and, except as otherwise herein provided, this Agreement shall terminate and the parties shall be released from all further liability to the other under this Agreement. If the Closing does not occur:

(a) because of Seller's default under this Agreement, then the Deposit and the shall be promptly returned to Purchaser; or

(b) because of the default of Purchaser's failure to close under this Agreement, then Seller, as its sole right and remedy by reason of such default may retain the Deposit as liquidated damages, for all loss, damage and expense suffered by Seller, it being agreed by the parties to this Agreement that Seller's damages are difficult if not impossible to ascertain and the amount of the Deposit is the parties' mutually acceptable determination of an appropriate amount of liquidated damages and is not a penalty.

## ARTICLE IX
### Notices

9.1    Except as otherwise provided herein, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Article 9 collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) upon receipt or refusal, when sent by prepaid reputable overnight courier or (c) three (3) days after the date so mailed, if sent by certified mail, return receipt requested, postage prepaid, in all cases addressed to the party to be notified at its address set forth above or to such other address as such party shall have specified most recently by like Notice. Attorneys for the respective parties shall have the right to give and receive notices on behalf of their respective clients. Notifications are as follows:

To Seller:      Renatus Portfolio Company LLC
                200 Railroad Avenue, 3rd Floor
                Greenwich, CT 06840

To Purchaser:   Chaim Miller
                1324 46th Street
                Brooklyn, New York

## ARTICLE X
### Miscellaneous

10.1    Survival. Except as expressly provided herein, all representations, warranties, covenants and agreements contained in this Agreement shall merge into the documents executed on the Closing Date, and shall not survive the Closing Date.

5

SSHM
62712

10.2    Gender; Numbers.  Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural and *vice versa* unless the context requires otherwise.

10.3    Headings.  The captions used in connection with the articles and sections of this Agreement are for convenience only and shall not be deemed to construe or limit the meaning of the language of this Agreement.

10.4    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the state of New York applicable to agreements made and to be performed entirely within such state, without regard to the conflicts of law principles of such state.

10.5    Waiver of Trial by Jury.  The parties hereto hereby waive trial by jury in any action, proceeding or counter-claim (whether arising in tort or contract) brought by any party against another on any matter arising out of or in any way connected with this Agreement.

10.6    Interpretation.  The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or Exhibits hereto.

10.7    Severability.  If any provisions of this Agreement are held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect and not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement, provided that both parties may still effectively realize the complete benefit of the transaction contemplated hereby.

10.8    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

10.9    Amendments.  No modification or amendment of this Agreement shall be effective unless made in writing and executed by both the Seller and the Purchaser.  In the event any approval or consent is required pursuant to any provision of this Agreement, such approval or consent shall be deemed given only if it is in writing, executed by the party whose approval or consent is required.

10.10    Entire Agreement; No Third Party Beneficiaries.  This Agreement (including all Exhibits annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto.  This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein.  The parties do not

SSHM
02713

intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto.

10.11 Further Assurances.    In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by the parties on the Closing Date, the parties agree to perform, execute and/or deliver or cause to be delivered, executed and/or delivered, but without any obligation to incur any additional liability or expense, on or after the Closing Date, any and all further acts, deeds and assurances as may be reasonably necessary to consummate the transactions contemplated hereby.

10.12 No Recording.    The parties hereto agree that neither this Agreement nor any memorandum or notice hereof shall be recorded.

10.13 This Article 10 shall survive the Closing.

SIGNATURE PAGE FOLLOWS

7

SSHM
02734

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

SELLER:

RENATUS PORTFOLIO COMPANY LLC

By: _____
Name: Stephen Mostel
Title: Authorized Signatory

PURCHASER:

_____
CHAIM MILLER

_____
SAM SPREI

8

SSHM
02715

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

SELLER:

RENATUS PORTFOLIO COMPANY LLC

By: _____
Name: Stephen Madri
Title: Authorized Signatory

PURCHASER:

_____

CHAIM MILLER

_____

SAM SPREI

8

SSHM
02716

**EXHIBIT "A"**
**MEMBERSHIP INTERESTS**

| PROPERTY | ENTITY INFORMATION | PERCENTAGE INTERESTS |
|---|---|---|
| 97 Grand Avenue (a/k/a 96 Steuben), Brooklyn, NY | 97 Grand Avenue LLC, a Delaware limited liability company | 50% |
| 203-205 North 8th Street, Brooklyn, NY | 203-205 North 8th Street Loft LLC | 40% |
| 32-34 Fifth Avenue, Brooklyn, NY | Besad 5th LLC<br><br>32 5th Avenue Loft LLC<br><br>32 5th Avenue Holdings LLC | 50% |
| 29 Ryerson Street, Brooklyn, NY;<br><br>256 Flushing Avenue, Brooklyn, New York | 11-45 Ryerson Holdings LLC, a New York limited liability company | 50% |

9

SSHM
02717

# EXHIBIT D

## Purchase and Sale Agreement



AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "**Agreement**"), made as of September 19, 2014 (the "**Effective Date**"), by and between 45 JOHN LOFTS LLC, a limited liability company, having an address at 1324 46th Street, Brooklyn, New York 11219 ("Seller") and HS 45 JOHN LLC, a Delaware limited liability company, having an address c/o Orin Management, 37-04 Parsons Boulevard, Flushing, New York 11354 ("**Purchaser**").

## W I T N E S S E T H :

1.    Agreement to Sell and Purchase.

1.1    Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter contained: (a) that certain property known as 45 JOHN STREET CONDOMINIUM, the condominium created under that certain Declaration recorded on July 10, 2008 as CRFN #2008000273773 against that certain land in the City of New York, and the building and improvements thereon, located at 45 John Street, New York, New York, and known as Block 78, Lots 1701-1787 (f/k/a Block 78, Lot 28) on the Tax Map of the City of New York, New York County, and more particularly described in Schedule A annexed hereto and hereby made a part hereof (the "**Land**"), together with (i) the building erected thereon (the "**Building**") and any and all other fixtures and improvements erected thereon (the Building and such other fixtures and improvements being hereinafter collectively referred to as the "**Improvements**"; and together with the Land, the "**Premises**"), (ii) all right, title and interest of Seller in and to the land lying in the bed of an street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, (iii) all right, title and interest of Seller in and to any rights of way, appendages, appurtenances, easements, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land or any portion thereof and used in conjunction therewith, (iv) any development rights appurtenant to the Land or any portion thereof, and (v) all right, title and interest of Seller in and to any award or payment made or to be made in lieu of any of the foregoing or any portion thereof and any unpaid award for damage to the Land or any of the Improvements by reason of change of grade or closing of any street, road or avenue, it being understood and agreed that Seller will execute and deliver to Purchaser on the Closing Date (as hereinafter defined) or thereafter, which obligation shall survive the Closing (as hereinafter defined) upon reasonable written request, all proper instruments for the conveyance of such right, title and interest and for the assignment and collection of any such awards or payments; (b) all fixtures, machinery, tangible personal property and equipment used in connection with or attached or appurtenant to or at or upon all or any portion of the Land and the Improvements at the date hereof, including, without limitation, such fire protection, heating, plumbing, electrical and air conditioning systems as now exist thereat (collectively, the "Personal Property"); (c) all transferable permits, licenses, approvals, certificates, names or other intellectual properties held solely for use in connection with or required for use in or relating to the ownership, use, maintenance, occupancy or operation of any part of all of the Premises; and (d) all transferable guaranties, warranties, and other intangible personal property related to the Premises.

1.2    All of the above enumerated property, rights and interests to be sold to Purchaser pursuant to this Agreement (including, without limitation, the Building and

I:\Users\Eliza\Sohn\45 John St\Agreement of P&S 9-18-14.doc

MRC 004693

Improvements erected on the Land or any part thereof), are hereinafter sometimes collectively referred to as the "Property".

2.    Exceptions to Title; Title Matters.

2.1    The Property is sold and shall be conveyed subject only to the following matters (collectively, the "Permitted Exceptions"):

2.1.1    All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the Closing Date, subject to adjustment as hereinafter provided;

2.1.2    All present and future zoning, laws and regulations and zoning variances and special exceptions, if any, not violated by the existing Improvements or its uses (collectively, "Laws and Regulations").

2.1.3    All rights and all easements and agreements of record for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Property (collectively, "Rights"), provided that any of same do not materially interfere with Purchaser's use of the Property as a residential multiple dwelling, or materially adversely affect the value of the Property.

2.1.4    The state of facts shown on or by the survey (the "Survey") of the Property, dated February 20, 2014, made by T. Eason Land Surveyor (collectively, "Facts").

2.1.5    Any financing statements filed on a date more than five (5) years prior to the Closing Date, so long as the Title Company shall "omit" same from the fee policy and the mortgage policy.

2.1.6    All violations of building, fire, sanitary, environmental, housing and similar laws and regulations whether or not noted or issued at the date hereof or at the date of the Closing, provided that Seller shall pay any fines and fees associated therewith (collectively, "Violations").

2.1.7    Consents of record by Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

2.1.8    Possible minor encroachments and/or minor projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Property or any adjoining property, provided that in each instance, the Title Company insures that the encroachments or projections may remain undisturbed for so long as the Building may stand, and that such condition does not have an adverse effect on the value of the Property or its present use.

2

MRC 004094

2.1.9   Minor variations between tax lot lines and lines of record title so long as such variations do not have a material adverse effect on the value or use of the Property.

2.1.10  Any other matter which the Title Company may raise as an exception to title, provided the Title Company, without imposition of additional premium, will "omit" for mortgage title insurance purposes, and insure against collection or enforcement of same out of the Property with no cost or liability to Purchaser, and provided that Purchaser's institutional lender will have no objection thereto, and/or that no prohibition of present use or maintenance of the Property will result therefrom, as may be applicable.

2.1.11  The matters described in Exhibit B attached hereto and made a part hereof.

2.2   Attached hereto as Exhibit C is a current Commitment for Title Insurance (the "Title Report") from Riverside Abstract, LLC. Notwithstanding, Purchaser agrees promptly upon execution of this Agreement, at its sole cost and expense, to cause title to the Property to be examined by the Title Company and shall direct the Title Company to deliver copies of such Title Report to Seller's attorneys simultaneously with the delivery of same to Purchaser. Purchaser and Seller hereby agree that the title exceptions marked as "except" on Schedule B of the Title Report are the only exceptions to title to the Property which are Permitted Exceptions and "subject to" which Purchaser believes is required to accept title. In the event the Title Company fails or refuses to insure title pursuant to the terms of this Agreement, at standard rates, Purchaser, at its option, may substitute the Title Company for any other reputable title company licensed to do business in the State of New York or an abstract company writing through such a title company (the "Substitute Title Company"), and in such event the Substitute Title Company, shall, for purposes of this Agreement be the "Title Company."

2.3   If, on the Closing Date, Seller is unable to convey to Purchaser title to the Property subject to and in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser on or prior to the Closing Date, to reasonable adjournments of the Closing one or more times for a period not to exceed thirty (30) days in the aggregate or expiration of Purchaser's mortgage commitment, whichever is sooner, to enable Seller to convey such title to the Property. Subject to Seller's obligations to clear title as hereafter set forth, if Seller does not so elect to adjourn the Closing, or if at the adjourned date Seller is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser shall be entitled, to either: (A) terminate this Agreement by written notice to Seller and Escrow Agent prior to the Closing Date, in which event Purchaser shall be entitled to a return of the Downpayment, and this Agreement shall thereupon be deemed terminated and of no further effect, and neither party hereto shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement; or (B) complete the purchase (with an appropriate reduction in the Purchase Price) with such title as Seller is able to convey on the date, as applicable, that is either ten (10) Business Days after the Closing Date if Seller does not elect to adjourn the Closing or ten (10) Business Days after the adjourned date of the Closing if Seller does elect to adjourn the Closing. If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms. Purchaser shall make its election between clauses (A) and (B) of the second sentence of this Section 2.3 by written notice

3

MRC 004696

to Seller given not later than the fifth (5th) Business Day after notice by Seller to Purchaser of Seller's inability or unwillingness to remove any objection(s) to title. If Purchaser shall fail to give such notice as aforesaid, Purchaser shall be deemed to have elected clause (A) above, in which event Purchaser shall be entitled to the return of the Downpayment. Notwithstanding anything to the contrary contained in this Agreement, except as hereafter set forth to the contrary, Seller shall not be required to take or bring any action or proceeding or any other steps to remove any defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller for failing to clear title exceptions, at law or in equity, except that Seller shall be obligated to, on or prior to the Closing, pay, discharge or remove of record or cause to be paid, discharged or removed of record at Seller's sole cost and expense all of the following items: (a) subject to Section 26, Voluntary Liens (as hereinafter defined); (b) other liens (other than Permitted Exceptions) encumbering the Property (including, judgments, federal, state and municipal tax liens and real estate taxes and water and sewer charges) which are in liquidated amounts and which may be satisfied solely by the payment of money (including the preparation or filing of appropriate satisfaction instruments in connection therewith); and (c) fines and penalties arising from Violations. The term "Voluntary Liens" as used herein shall mean liens and other encumbrances (other than Permitted Exceptions) which Seller has knowingly and intentionally placed (or allowed to be placed) on the Property or that have continued in place without objection by Seller, including, without limitation, mortgages.

2.4    Notwithstanding anything in Section 4.1 above to the contrary, Purchaser may at any time accept such title as Seller can convey, with a credit or allowance on account thereof.

2.5    The amount of any unpaid taxes, assessments and water and sewer charges due prior to the Closing shall be paid by Seller, with interest and penalties; however, Seller may at the option of Seller allow Purchaser out of the balance of the Purchase Price all amounts due therefor with interest and penalties thereon, figured to the date which is five (5) Business Days after the Closing, or pay such amount to the Title Company at the Closing for payment thereof.

2.6    If the Property shall, at the time of the Closing, be subject to any liens (such as for judgments or transfer, inheritance, estate, franchise, license or other similar taxes), encumbrances or other title exceptions which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title and Seller shall, at the time of the Closing, either (a) delivers bank checks or by wire transfer at the Closing in the amount required to satisfy the same and delivers to Purchaser and/or the Title Company at the Closing instruments in recordable form (and otherwise in form reasonably satisfactory to the Title Company in order to omit same as an exception to its title policy) sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments, or (b) makes arrangements for the Title Company to issue or bind itself to issue a policy which will insure Purchaser against collection thereof from or enforcement thereof against the Property with no cost or liability to Purchaser.

4

MRC 094093

3.    Purchase Price.

3.1    The consideration for the Property shall be the sum of (i) SEVENTEEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($17,500,000.00) and (ii) an amount equal to the unpaid principal balance (the "Unpaid Principal") of those certain mortgage loans (the "Loans") made by SDF81 45 John Street 1 LLC and SDF81 45 John Street 2 LLC (collectively, "Lender") to the Seller (collectively, the "Purchase Price"), subject to such apportionments, adjustments and credits as are provided in Sections 6, 11 and 24.

3.2    Purchaser shall pay the Purchase Price as follows:

3.2.1    FOURTEEN MILLION THREE HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($14,330,000.00) (such principal amount being the "Downpayment") upon the signing of this Agreement, wire transfer of immediately available funds, shall be paid to Seller.

3.2.2    The balance of the Purchase Price shall be paid to Seller on the Closing Date (as hereinafter defined), subject to the apportionments, adjustments and credits referenced herein, by Purchaser taking title to the Property subject to the existing Loans, with the balance paid by federal funds wire transfer of immediately available funds to an account at such bank or banks as shall be designated by Seller to Purchaser on not less than one (1) Business Day's prior notice.

3.3    Seller and Purchaser acknowledge and agree that the value of the Personalty that is included in the transaction contemplated by this Agreement is de minimis and that no part of the Purchase Price is allocable thereto.

4.    Closing.

4.1    The closing of the transaction contemplated hereby (the "Closing") shall occur on the date which is seventy-five (75) days following the Effective Date (being herein referred to as the "Closing Date").

5.    As Is.

5.1    Except as expressly set forth in this Agreement to the contrary, Purchaser is expressly purchasing the Property in its existing condition "AS IS, WHERE IS, AND WITH ALL FAULTS" on the date hereof with respect to all facts, circumstances, conditions and defects, and, Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects on the date hereof or to compensate Purchaser for same. Except as expressly set forth in this Agreement to the contrary, Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, Laws and Regulations, Rights, Facts, Violations and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Purchaser has undertaken all such investigations of the Property, Laws and Regulations, Rights, Facts and Violations as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal

5

MRC 004697

counsel and officers. Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property in its present condition

5.2     Except as expressly set forth in this Agreement to the contrary, Seller hereby disclaims all warranties of any kind or nature whatsoever (including, without limitation, warranties of habitability and fitness for particular purposes), whether expressed or implied including, without limitation warranties with respect to the Property. Except as is expressly set forth in this Agreement to the contrary, Purchaser acknowledges that it is not relying upon any representation of any kind or nature made by Seller, or Broker (as hereinafter defined), or any of their respective direct or indirect members, partners, shareholders, officers, directors, employees or agents (collectively, the "Seller Related Parties") with respect to the Property, and that, in fact, except as expressly set forth in this Agreement to the contrary, no such representations were made. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

5.3     Except as set forth in this Agreement to the contrary, Seller makes no warranty with respect to the presence of Hazardous Materials on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Property, other than as hereafter set forth regarding the specific representation that there are no Hazardous Materials (as hereinafter defined) in, at or under the Property in violation of applicable law. As used herein, the term "Hazardous Materials" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials", "hazardous wastes", "hazardous substances", "industrial wastes", and "toxic pollutants", as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (h) any other substance with respect to which any Environmental Law or governmental authority requires governmental investigation, monitoring or remediation. As used herein, the term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), any

5

URC 004598

state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

5.4    Purchaser shall rely solely upon Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition. Except as expressly set forth in this Agreement to the contrary, Purchaser releases Seller, the Seller Related Parties and their respective successors and assigns from and against any and all claims which Purchaser or any party related to or affiliated with Purchaser (each, a "Purchaser Related Party") may have arising from or related to any matter or thing related to or in connection with the Property, arising after the Closing, except as expressly set forth in this Agreement to the contrary, including the documents and information referred to herein, any construction defects, errors or omissions in the design or construction and any environmental conditions and, except as expressly set forth in this Agreement to the contrary, neither Purchaser nor any Purchaser Related Party shall look to Seller, the Seller Related Parties or their respective successors and assigns in connection with the foregoing for any redress or relief. This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected claims, damages and causes of action, except if such is caused by a misrepresentation of Seller or caused by any actual act of a Seller Related Party. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

5.5    The provisions of this Section 5 shall survive the Closing or the earlier termination of this Agreement and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

6.    Apportionments.

6.1    At the Closing, the following items shall be apportioned between the parties as of 11:59 PM on the day preceding the Closing Date. Any errors in the apportionments pursuant to this Section 6 shall be corrected by appropriate re-adjustment between Seller and Purchaser after the Closing, provided that notice of any such error, with supporting calculations, shall be given by Purchaser to Seller or by Seller to Purchaser, as the case may be, no later than ninety (90) days after the Closing, if ascertainable within such period, it being understood and agreed that if any such items or errors are not ascertainable at the Closing or within ninety (90) days thereafter, the apportionment shall be made subsequent to the Closing when the charge or error is determined. Except as otherwise specifically provided for herein, all apportionments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc. and there shall be no other apportionments. The items to be apportioned are:

6.1.1    Real estate taxes, business improvement district charges, rent stabilization fees and vault charges, if any, and any and all other municipal or governmental assessments of any and every nature levied or imposed upon the Property in respect of the current fiscal year of the applicable taxing authority in which the Closing Date occurs (the "Current Tax Year") shall not be adjusted. Seller shall be responsible to make all payments with respect to the Current Tax Year. After the Closing Date, Purchaser shall be responsible for

7

ERG 004099

real estate taxes and assessments levied or imposed upon the Property payable in respect of the Current Tax Year with a due date after the Closing and all periods after the Current Tax Year. In no event shall Seller be charged with or be responsible for any increase in the real estate taxes or assessments levied or imposed upon the Property resulting from the transfer of the Property herein contemplated or from any improvements made at any time or for any reason after the Closing Date. In the event that any assessments levied or imposed upon the Property are payable in installments, and the first installment is due prior to the Closing Date, then Seller shall pay all outstanding installment obligations for such assessments. If any governmental assessments of any and every nature levied or imposed upon the Property in respect to the period ending after the Closing Date, then such assessments shall be adjusted on a per diem basis based upon the number of days from the end of the fiscal year prior to the Closing Date to be allocated to Seller, and the number of days on and after the Closing Date for such assessments to be allocated to Purchaser.

6.1.2    Fuel, if any, then stored at the Property on the basis of Seller's last cost therefor, including sales tax, as evidenced by a written current statement of Seller's fuel oil supplier which shall be based upon an actual reading within twenty-four (24) hours prior to the Closing, which statement shall be conclusive as to quantity and cost absent manifest error.

6.1.3    Any amounts in arrears under any of the Loans, if not paid by Seller on or prior to Closing, shall be credited to Purchaser against the Purchase Price.

6.2    If there are water meters on the Property, Seller shall furnish readings to a date not more than thirty (30) days prior to the Closing Date, and the unfixed meter charges and the unfixed sewer rents, if any, based thereon for the intervening time shall be apportioned on the basis of such last readings. If Seller fails or is unable to obtain such readings, the Closing shall nevertheless proceed and Seller shall escrow with the Title Company a sum sufficient for the Title Company affirmatively to insure against water and sewer charges through the actual Closing Date.

6.3    Seller shall not be required or entitled to assign any policies of insurance in respect of the Property to Purchaser, Purchaser shall be responsible for obtaining its own insurance as of the Closing Date, and no adjustment shall be made for any insurance premiums.

6.4    The provisions of this Section 6 shall survive the Closing; provided, however, that any re-prorations or re-apportionments shall be made as and when required under Section 6.1 above.

7.    Representations and Warranties of the Parties; Certain Covenants

7.1    Seller represents, covenants and warrants to Purchaser that the following are true and correct as of the date hereof and will be true and correct on the Closing Date:

7.1.1    Seller is a limited liability company validly existing under the laws of the state of its formation and has the requisite power and authority to enter into and to perform the terms of this Agreement. Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the

8

MRC 004700

consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally).

7.1.2    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller.

7.1.3    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "Code").

7.1.4    Seller has entered into no leases, licenses or other occupancy agreements affecting any portion of the Property.

7.1.5    Seller has delivered true and correct copies of all service, maintenance and supply contracts in connection with the Property (collectively, the "Service Contracts") in effect as of the date hereof, and there are no other Service Contracts which will be binding after closing.

7.1.6    There are no employees of Seller with respect to the Property and no person has been provided with a tenancy or occupancy at the Property in exchange for providing services. There are no union contracts or collective bargaining agreements affecting the Property (or affecting any prior employee) and Seller has had no communications during its ownership with any labor unions, nor will it enter into any negotiations or execute any contract with a labor union nor has it paid any sums of money to any labor union or union benefits or welfare in reference to the Property.

7.1.7    Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Property.

7.1.8    There are no brokerage agreements for the payment of leasing commissions due on or after the date hereof in connection with the Leases or Contracts affecting the Property.

7.1.9    Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

9

JRC 004761

7.1.10  To the best of Seller's knowledge, the Property complies with all governmental regulations regarding the presence and/or condition of Hazardous Materials, including asbestos.

7.1.11  Except as set forth on the Title Report, the development and/or air rights for the Property have not been previously transferred or conveyed.

7.1.12  Seller has provided to Purchaser all of the loan documents regarding the mortgages presently encumbering the Property. The mortgages are not in default. Seller has not received written notice that any of the mortgages are in default and Seller is not aware of any fact or matter that could constitute a default by Seller under any of the loan documents. The principal balances of the Loans are set forth on **Exhibit D**. Seller will not modify the loan documents between the date hereof and the Closing Date.

7.1.13  To the extent any representation is not included in this Section 7.1, but is provided for in the JV Agreement (as hereinafter defined), including, without limitation, Sections 11.2, 11.3 and 11.4 thereunder, such representations shall be deemed to be incorporated herein and to have been made hereunder.

7.2      Purchaser represents to Seller that the following are true and correct on the date hereof:

7.2.1   Purchaser is a limited liability company, duly formed and in good standing under the laws of the State of Delaware and has the requisite power and authority to enter into and to perform the terms of this Agreement. The execution and delivery of this Agreement and consummation of the transaction contemplated hereby have been duly authorized by all requisite action of Purchaser. Purchaser is not subject to any law, order, decree, restriction, or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Purchaser. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor's rights generally).

7.2.2   Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

7.2.3   There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Purchaser or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

10

MRC 004702

7.2.4    Purchaser is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of OFAC (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

7.2.5    Purchaser is not the subject of any bankruptcy or insolvency proceedings. Purchaser has not made an assignment for the benefit of creditors.

7.3    Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither Seller nor any of the Seller Related Parties nor any agent nor any representative nor any purported agent or representative of Seller or any of the Seller Related Parties or Broker have made, and neither Seller nor any of the Seller Related Parties nor Broker are liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or any part thereof. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Seller, the Seller Related Parties and Broker have not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to (a) the current or future real estate tax liabilities, assessments or valuations of the Property, (b) the potential qualification of the Property for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's' non-compliance, if any, with said zoning ordinances, (d) the availability of any financing for the alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or Federal government or any institutional lender, (e) the current or future use of the Property, including but not limited to the Property's use for residential (including hotel, cooperative or condominium use) or commercial purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (g) the ownership or state of title of any personal property on the Property and (h) the presence or absence of any Laws and Regulations or any Violations. Further, Purchaser acknowledges and agrees that neither Seller nor any of the Seller Related Parties nor Broker are liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations or any other information respecting the Property furnished by Seller, any of the Seller Related Parties or Broker or any broker, employee, agent, consultant or other person representing or purportedly representing Seller, any of the Seller Related Parties or Broker. The provisions of this Section 7.3 shall survive the Closing or the earlier termination of this Agreement.

7.4    The representations and warranties of Seller contained in Section 7.1 shall survive the Closing for one hundred and twenty (120) days following the Closing Date (the "Limitation Period"). Each such representation and warranty shall automatically be null and void and of no further force and effect following the end of the Limitation Period unless, on or

11

MRC 004765

prior to end of the Limitation Period, Purchaser shall have provided Seller with a notice alleging that Seller is in breach of such representation or warranty and specifying in reasonable detail the nature of such breach. Notwithstanding, the Limitation Period shall not apply to the representations of the Class B Member under the JV Agreement, which representations shall survive indefinitely.

7.5    From the Effective Date until the Closing Date:

7.5.1    Seller shall not enter into new leases, or renewals or modifications of existing leases for the Premises, or any portions thereof, without first obtaining Purchaser's consent thereto, which consent may be granted or denied in Purchaser's sole and absolute discretion.

7.5.2    Seller shall manage the Property or shall cause the Property to be managed under policies substantially similar to those existing prior to the date hereof, provided that Seller shall have no obligation to make any capital improvements or replacements to the Property or any portion thereof, except as is necessary to prevent injury to any person or the Property. Notwithstanding, Purchaser shall manage the Property as set forth in Section 24.

7.5.3    Seller shall not grant, create, assume or permit to be created any mortgage, lien, encumbrance, lease, easement, covenant, condition, right-of-way or restriction upon the Property or take any action adversely affecting the title to the Property as it exists as of the date hereof.

7.5.4    Seller shall not enter into any contract or any other agreement affecting the Property that would be binding on Purchaser or the Property after Closing, including, without limitation, a contract to convey, transfer or sell the Property or any interest therein, including, without limitation, any developments appurtenant thereto.

7.5.5    Seller shall not draw upon the funds available to it pursuant to that certain Building Mortgage and Security Agreement (the "Building Loan"), dated as of March 4, 2014, given in favor of SDF81 45 John Street 2 LLC. Seller represents and warrants that, as of the date hereof, no funds have been advanced by Lender pursuant to the Building Loan.

7.5.6    Seller shall neither incur any indebtedness nor further encumber the Property.

7.5.7    Seller shall provide Purchaser with access to the Property at reasonable times and on reasonable notice.

8.    Closing Deliveries.

8.1    Seller shall deliver to Purchaser at Closing the following:

(a)    A bargain and sale deed with covenants against grantor's acts, in the form attached hereto as Exhibit F and made a part hereof (the "Deed"), duly executed and acknowledged by Seller;

12

MRC 004704

(b)    A bill of sale, conveying and transferring to Purchaser all right, title and interest of Seller, if any, in and to the Personal Property, in the form annexed hereto as Exhibit G and made a part hereof, duly executed by Seller; it being expressly understood that no portion of the Purchase Price shall be attributable to such Personal Property;

(c)    The keys and access codes to the Property, to the extent in Seller's possession or control;

(d)    A certificate of non-foreign status, duly executed and acknowledged by Seller, in accordance with Section 1445 of the Code;

(e)    A New York State Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, Form TP-584 for the conveyance of the Property (the "State Transfer Tax Return"), duly executed by Seller;

(f)    A New York City Department of Finance Real Property Transfer Tax Return for the conveyance of the Property (the "City Transfer Tax Return"), duly executed and acknowledged by Seller;

(g)    A New York State Real Property Transfer Report, Form RP-5217NYC (the "Transfer Report"), duly executed by Seller;

(h)    A title affidavit reasonably acceptable to the Title Company;

(i)    To the extent in the possession or control of Seller, all books, records and other documents relating to the Property, including, without limitation, (a) licenses and permits relating to the operation of the Property, (b) certificates, permits and licenses with respect to the Property issued by any governmental authority, (c) current certifications verifying elevator and boiler inspections, and (d) survey, architectural plans, building plans or specifications pertaining to the Property;

(j)    A Registration Statement required by the Department of Housing Preservation and Development;

(k)    Smoke Detector Affidavit executed by Seller;

(l)    A limited liability company resolution of Seller authorizing the transaction contemplated herein, together with a copy of the operating agreement, and the execution and delivery of the documents required to be executed and delivered thereunder;

(m)    Oil Tank Fire Department Permit, DEC Field Tank Registration and a Certificate of Operation for the oil burner;

(n)    Copies of offering materials and other condominium documents regarding the condominium plan having been filed in connection with the Property;

(o)    If the Property is charged for water and sewer on a frontage basis, a Department of Environmental Protection frontage reconciliation;

13

MPC 004705

(p)    A certificate stating that the representations, warranties and covenants made by Seller are true and correct as of the Closing Date; and

(q)    Any other document required to be delivered by Seller at the Closing pursuant to the provisions of this Agreement or reasonably requested by the Title Company in connection with the conveyance of the Property.

8.2    Purchaser shall deliver to Seller at Closing the following:

(a)    The balance of the Purchase Price;

(b)    The State Transfer Tax Return, duly executed by Purchaser;

(c)    The City Transfer Tax Return, duly executed by Purchaser;

(d)    The Transfer Report, duly executed by Purchaser;

(e)    Such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

(f)    Such other instruments, agreements or other documents as may be necessary or convenient to effectuate the provisions of this Agreement.

8.3    Seller shall use commercially reasonable efforts to prepare, no later than two (2) Business Days' prior to the Closing, a closing statement (the "Closing Statement"), which shall contain Seller's best estimate of the amounts of the items requiring adjustment pursuant to this Agreement. The amounts set forth on the Closing Statement shall be subject to the reasonable review of Purchaser and shall be the basis upon which the prorations and apportionments provided for in this Agreement shall be made at the Closing. Subject to the provisions of Section 6 of this Agreement, any errors in the Closing Statement shall be corrected post-Closing.

9.    Conditions to the Closing.

9.1    Notwithstanding anything to the contrary contained herein, the obligation of Seller to close title in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the Closing Date of each of the conditions listed below, provided that Seller, at its election, evidenced by notice delivered to Purchaser at or prior to the Closing, may waive any of such conditions:

9.1.1  Purchaser shall have executed and delivered to Seller all of the material documents and shall have paid the balance of the Purchase Price subject to adjustments and apportionments hereunder.

9.1.2  All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects as of the Closing Date.

14

MRC 004766

9.2    Notwithstanding anything to the contrary contained herein, the obligation of Purchaser to close title and pay the Purchase Price in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the Closing Date of each of the conditions listed below, provided that Purchaser, at its election, evidenced by notice delivered to Seller at or prior to the Closing, may waive all or any of such conditions:

9.2.1   Seller shall have executed and delivered to Purchaser all of the documents required to be delivered by Seller at the Closing and shall have taken all other action required of Seller pursuant to this Agreement at the Closing.

9.2.2   All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing Date, except to the extent the facts and circumstances underlying such representations and warranties may have changed as of the Closing and such change is not the result of a breach by Seller of its obligations hereunder.

10.    Limitation on Liability of Parties

10.1   If Purchaser shall default in closing hereunder (a "Purchaser Default"), Seller shall have the right to elect, as its sole and exclusive remedy, upon written notice to Purchaser, to either (a) terminate this Agreement and retain the Downpayment as and for full and complete liquidated and agreed damages for Purchaser's Default, and upon Seller's receipt of the Downpayment, the parties hereto shall be released from any further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement, or (b) waive Purchaser's Default and proceed to close the transactions contemplated hereby, provided that Seller shall not have the remedy of specific performance. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DOWNPAYMENT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT.  SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW. Notwithstanding the foregoing, none of the above liquidated damages shall be deemed to reduce, waive or limit in any respect the additional obligations of Purchaser to indemnify Seller as provided in this Agreement.

10.2   If Seller shall default in the performance of Seller's obligations under this Agreement, and the Closing does not occur as a result thereof, Purchaser's sole and exclusive remedy shall be, and Purchaser shall be entitled, to either (a) terminate this Agreement and receive the Downpayment, and upon Purchaser's receipt of the Downpayment, the parties hereto shall be released from any further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement, or (b) seek specific performance of Seller's obligations hereunder, (c) waive the default and proceed to close the transactions contemplated hereby and/or (d) exercise all other remedies available at law and in equity.

15

MRC 004707

10.3    The parties hereto agree that Purchaser shall record a memorandum of this this Agreement, in form reasonably acceptable to Purchaser and Seller.

11.    Fire or Other Casualty; Condemnation.

11.1    Seller agrees to (a) maintain (i) its present property insurance policy including fire and extended coverage or (ii) similar insurance coverage and (b) give Purchaser reasonably prompt notice of any fire or other casualty occurring at the Property of which Seller obtains knowledge, between the date hereof and the Closing Date, or of any actual or threatened condemnation of all or any part of the Property of which Seller obtains knowledge.

11.2    If prior to the Closing there shall occur (a) damage to the Property caused by fire or other casualty which would cost an amount equal to $1,000,000 or more to repair, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser or (b) a taking by condemnation of any material portion of the Property, then, and in either such event, Purchaser may elect to terminate this Agreement by notice given to Seller within thirty (30) days after Seller has given Purchaser the notice referred to in Section 11.1 hereof, which notice shall state the reasonable estimate for the cost of repair, in which event Seller shall promptly instruct Escrow Agent to return the Downpayment to Purchaser and upon Purchaser's receipt of the Downpayment, this Agreement shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement. If Purchaser does not elect to terminate this Agreement, then the Closing shall take place as herein provided, without abatement of the Purchase Price except to the extent of any deductible, and Seller shall assign to Purchaser at the Closing, by written instrument in form reasonably satisfactory to Purchaser, all of the insurance proceeds or condemnation awards which may be payable on account of any such fire, casualty or condemnation, shall deliver to Purchaser any such proceeds or awards actually theretofore paid, less any amounts (the "Reimbursable Amounts") (i) actually and reasonably expended or incurred by Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses) and/or (ii) theretofore actually and reasonably incurred or expended by or for the account of Seller for the cost of any compliance with laws, protective restoration or emergency repairs made by or on behalf of Seller (to the extent Seller has not theretofore been reimbursed by its insurance carriers for such expenditures), and Seller shall pay to Purchaser the amount of the deductible, if any, under Seller's property insurance policy(ies), less all Reimbursable Amounts not received by Seller from any insurance proceeds or condemnation awards paid to Seller prior to the Closing. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

11.3    If, prior to the Closing, there shall occur (a) damage to the Property caused by fire or other casualty which would cost less than $1,000,000 to repair, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser or (b) a taking by condemnation of any part of the Property which is not material, then, and in either such event, Purchaser shall not have the right to terminate this Agreement by reason thereof, but Seller shall assign to Purchaser at the Closing, by written instrument in form and substance reasonably satisfactory to Purchaser, all of Seller's interest in any insurance proceeds or

16

condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, or shall deliver to Purchaser any such proceeds or awards actually theretofore paid, in each case less any Reimbursable Amounts, and Seller shall pay to Purchaser the amount of the deductible, if any, under Seller's property insurance policy(ies), less all Reimbursable Amounts not received by Seller from any insurance proceeds or condemnation awards paid to Seller prior to the Closing. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

11.4    Nothing contained in this Section 11 shall be construed to impose upon Seller any obligation to repair any damage or destruction caused by fire or other casualty or condemnation. For purposes of this Section 11, a taking of a material part of the Property shall mean any taking which has an economic effect on the value of the Property. If Purchaser does not elect to terminate this Agreement in accordance with Section 11.2, or upon the occurrence of the events set forth in Section 11.3(a) or Section 11.3(b), Seller shall have the exclusive right to negotiate, compromise or contest the obtaining of any insurance proceeds and/or any condemnation awards.

11.5    In the event Purchaser elects not to terminate this Agreement in accordance with Section 11, Purchaser shall have the sole and exclusive right to negotiate, compromise or contest the obtaining of any insurance proceeds and/or any condemnation awards.

12.    Brokerage.

Seller represents and warrants that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated hereby. Purchaser represents and warrants that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated hereby. Seller agrees to indemnify and hold harmless Purchaser from and against all claims, losses, liabilities and expenses, including, without limitation, reasonable attorneys' fees and disbursements caused by or arising out of: (a) a breach of the foregoing representation of Seller; and (b) any claim made by any broker, consultant, finder or like agent claiming to have dealt with Seller. Purchaser agrees to indemnify and hold harmless Seller from and against all claims, losses, liabilities and expenses, including, without limitation, reasonable attorneys' fees and disbursements caused by or arising out of: (a) a breach of the foregoing representation of Purchaser; and (b) any claim made by any broker, consultant, finder or like agent (other than Broker) claiming to have dealt with Purchaser.

13.    Closing Costs.

At the Closing, Seller shall pay the New York State Real Estate Transfer Tax imposed pursuant to Article 31 and Section 1402 of the New York Tax Law and any other amount indicated on the TP-584 (the "State Transfer Tax") and the New York City Real Property Transfer Tax imposed pursuant to Title 11, Chapter 21 of the New York City Administrative Code (the "City Transfer Tax"), upon or payable in connection with the transfer of title to the

17

Property and the recordation of the Deed, which State Transfer Tax and City Transfer Tax shall, at Seller's election, be allowed for out of the Purchase Price and paid by Purchaser on behalf of Seller. At the Closing, Seller and Purchaser shall each execute, acknowledge (if appropriate) and deliver the State Transfer Tax Return, the City Transfer Tax Return and the Transfer Report to the Title Company or to the appropriate government offices. Seller shall also pay all title charges for a policy in the amount of the Purchase Price together with a non-imputation endorsement and all of Purchaser's legal fees. All tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Company. Except as otherwise expressly provided to the contrary in this Agreement, Seller shall pay (a) all charges for recording and/or filing the Deed, (b) all title charges and survey costs, including the premium on Purchaser's title policy, and (c) all costs and expenses related to Purchaser's financing of its acquisition of the Property. Seller shall pay any escrow fees of the Title Company. It is the intent of the parties that Seller pays all expenses of this transaction of every kind and nature, including, without limitation, the Transaction Expenses (as hereafter defined). The provisions of this Section 13 shall survive the Closing or the termination of this Agreement.

14.    Notices.

Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) upon receipt, when sent by prepaid reputable overnight courier or (c) three (3) days after the date so mailed if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed as follows:

If to Seller, to:

      45 JOHN LOFTS LLC.
      1324 46th Street
      Brooklyn, New York 11219
      Attention: Chaim Miller
      E-mail: acumen@prodigy.net

with a copy to:

      Blaivas & Associates, P.C.
      1430 Broadway, Suite 1603
      New York, NY 10018
      Attention: Yisroel S. Schwartz, Esq
      E-mail: yschwartz@blpclaw.com

If to Purchaser, to:

      HS 45 JOHN LLC

18

MRC 004710

c/o Orin Management
37-04 Parsons Boulevard
Flushing, New York 11354
Attention: Steven Sohn
steve@orinmgmt.com

with a copy to:

Goldberg Weprin Finkel Goldstein
1501 Broadway, 22nd Floor
New York, New York 10036
Attention: Andrew W. Albstein, Esq.
E-Mail: aalbstein@gwfglaw.com

Personal delivery to a party or to any officer, partner, member, agent or employee of such party at the foregoing addresses shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Notices may be sent by the attorneys for the respective parties and each such notice so served shall have the same force and effect as if sent by such party. Notices shall be valid only if served in the manner provided in this Article 14.

15.    1031 Exchange. (a) Seller may consummate the sale of the Property as part of a so-called like kind exchange ("Exchange") pursuant to §1031 of the Code, and Seller is expressly entitled to assign its rights hereunder to an affiliate of Seller and/or to a Qualified Intermediary as provided in the Code and the Treasury Regulations promulgated thereunder, on or before the Closing Date, provided that Seller shall remain liable for all of its obligations under this Agreement, including those which survive Closing. Purchaser agrees that it shall execute and deliver to Seller or to the Qualified Intermediary at or prior to the Closing any and all documents reasonably required or requested by Seller or the Qualified Intermediary to complete such Exchange.

(b)    Purchaser may consummate the sale of the Property as part of a so-called like kind exchange ("Exchange") pursuant to §1031 of the Code, and Purchaser is expressly entitled to assign its rights hereunder to an affiliate of Purchaser and/or to a Qualified Intermediary as provided in the Code and the Treasury Regulations promulgated thereunder, on or before the Closing Date, provided that Purchaser shall remain liable for all of its obligations under this Agreement, including those which survive Closing. Seller agrees that it shall execute and deliver to Purchaser or to the Qualified Intermediary at or prior to the Closing any and all documents reasonably required or requested by Purchaser or the Qualified Intermediary to complete such Exchange.

16.    Assignment.

Purchaser may assign its rights and/or delegate its obligations hereunder to a limited liability company. Purchaser shall provide a copy of its assignment document to Seller prior to Closing.

19

HRC004711

17.    Tax Proceedings

From and after the date hereof until the Closing, Purchaser shall control any new proceeding or proceedings and/or any existing proceeding or proceedings now pending for the reduction of the assessed valuation of the Property, and Purchaser shall be entitled to that portion of any refund relating to the period occurring after the Closing. If any tax protests or certiorari proceedings are pending as of the Closing, Purchaser's counsel shall be substituted in place of Seller's counsel and the amounts recovered as a result thereof, after attorneys' fees and expenses for recovery thereof, shall be apportioned between Purchaser and Seller as of the date of Closing. Purchaser and Seller shall deliver to the counsel handling such proceedings, reasonably promptly after request therefor, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing necessary for the collection of such refund by Seller. Any refunds or credits due for the periods prior to Purchaser's ownership of the Property shall remain the sole property of Seller. The provisions of this Section 17 shall survive the Closing.

18.    Further Assurances.

The parties each agree to do such other and further acts and things, and to execute and deliver such instruments and documents (not creating any obligations additional to those otherwise imposed by this Agreement) as either may reasonably request from time to time to effectuate the transactions contemplated hereunder, whether at or after the Closing, in furtherance of the purposes of this Agreement. The provisions of this Section 18 shall survive the Closing or the earlier termination of this Agreement.

19.    Assignment of Mortgage.

If requested by Purchaser, Seller shall use its good faith efforts to cause the holder of existing mortgages (the "Existing Lender"), if any, encumbering the Property (the "Existing Mortgages"), to assign the lien of the Existing Mortgages to Purchaser's lender at the Closing; provided that at least five (5) days prior to the Closing Date, Purchaser shall provide Seller with the name of Purchaser's lender and the name and contact information of Purchaser's lender's attorneys. As used herein, "good faith efforts" shall be deemed to mean reasonable request by Seller to the Existing Lender regarding the assignment of the Existing Mortgages, and if Existing Lender does not respond to such written request, reasonable telephonic request by Seller to Existing Lender. Notwithstanding anything to the contrary contained in this Agreement, the assignment by the Existing Lender of the Existing Mortgages to Purchaser's lender shall not be a condition precedent to the obligation of Purchaser to close hereunder, nor shall the refusal or inability of the Existing Lender to assign the Existing Mortgages give Purchaser a reason or right not to close hereunder. Purchaser also agrees to pay all fees (other than prepayment fees) charged by the Existing Lender for such assignment, including, without limitation, the legal fees and expenses of Existing Lender's attorneys and all recording and filing costs in connection with such assignment. The obligations of Purchaser pursuant to this Section 19 shall survive the Closing or the earlier termination of this Agreement.

MRC 004712

20.   Miscellaneous.

20.1   Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing.

20.2   This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New York.

20.3   This Agreement may be executed in counterparts, each of which shall be deemed an original.

20.4   The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

20.5   This Agreement (including all exhibits annexed hereto), contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto.

20.6   This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged.

20.7   The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto.

20.8   No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained.  No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

20.9   All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require.  If Purchaser consists of two or more parties, the liabilities of such parties shall be joint and several.

20.10   As used herein, the term "Business Day" means any day of the year other than a Saturday, Sunday, Jewish holiday, national holiday and other day on which banks generally close in New York City.

20.11   This Agreement shall bind and inure to the benefit of Seller, Purchaser and their respective permitted successors and assigns.

20.12   This Agreement may be executed and delivered by facsimile transmission and such transmission of the Agreement shall be treated as an original.

20.13   Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms

21

MRC 004713

and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

20.14   If any action is brought by either party against the other in connection with or arising out of this Agreement or any of the documents and instruments delivered in connection herewith or in connection with the transactions contemplated hereby, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred in connection with the prosecution or defense of such action.

20.15   (a) Any legal action or proceeding with respect to this Agreement shall be brought in a Federal or state court of competent jurisdiction sitting in the City, County and State of New York (including the appellate courts thereof) (each, a "New York Court") and by execution and delivery of this Agreement, each party to this Agreement hereby accepts, generally and unconditionally, the jurisdiction of the New York Courts. Each party to this Agreement hereby expressly and irrevocably submits the person of such party to this Agreement to the in personam jurisdiction of the New York Courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Agreement. To the extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Agreement or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of such party to this Agreement in any such New York Court.

(b)      To the fullest extent permitted under applicable law, each party to this Agreement irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any objection which may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in a New York Court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum, any claim that it is not personally subject to the jurisdiction of any such New York Court or that this Agreement or the subject matter hereof may not be enforced in or by such New York Court.

20.16   SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANYWAY CONNECTED WITH THIS AGREEMENT.

20.17   To the extent applicable, all of the foregoing provisions of this Section 21 shall survive the Closing or the earlier termination of this Agreement.

21.      Limitation of Liability. Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed that none of the employees, directors, officers, members, partners, managers, principals, consultants, shareholders, advisors, attorneys, or agents of Seller, or any other person or entity, shall have any personal liability or obligation whatsoever for obligations entered into by or on behalf of Seller, except to the extent of the proceeds of sale. Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed that none of the employees, directors, officers, members, partners, managers, principals,

22

MRC 004714

consultants, shareholders, advisors, attorneys or agents of Purchaser, or any other person, shall have any personal liability or obligation whatsoever for any obligations under this Agreement or under any documents delivered at Closing, and the individual assets of such parties shall not be subject to any claims of any person relating to such obligations. However, the foregoing shall not in any way limit the parties' obligations and liabilities under this Agreement. The provisions of this Section 21 shall survive the Closing or any early termination of this Agreement.

22.    No Offer. This Agreement shall not be deemed an offer or binding upon Seller or Purchaser until this Agreement is fully executed and delivered by Seller and Purchaser.

23.    Conversion Rights. At the Closing, either of Purchaser, or if all management fees have been timely paid pursuant to Section 24 hereof, subject to a ten(10) day written notice and cure period, Seller, provided such party has otherwise performed its respective obligations to be performed on or prior to the Closing Date and provided that Purchaser shall receive, at Seller's sole cost and expense, a title policy with a non-imputation endorsement, satisfactory in all respects to Purchaser, shall have the right to elect (the "JV Election") to enter in a joint venture operating agreement under which Purchaser shall be the Class A Member, in the form attached hereto as Exhibit E (the "JV Agreement"), (and, if required by lender, the first amendment to such joint venture operating agreement in the form attached hereto as Exhibit E-1) in lieu of the Seller delivering the Deed. In the event that either party decides to pursue the JV Election, (i) each of Purchaser and Seller shall execute the JV Agreement, (ii) Chaim Miller, as to 17.9% of the membership interests, and Chun Peter Dong, as to 32% of the membership interests, shall deliver to Purchaser the assignments of membership interests in the company (the "Assignments") in the form attached hereto as Exhibit H and (iii)Sam Sprei shall execute and deliver the Certificate and Guaranty (the "Certificate") attached hereto as Exhibit I. Upon the execution and delivery of the JV Agreement, the Assignments and the Certificate, Seller shall be deemed to have performed its obligations under this Agreement. In the event that neither party elects to pursue the JV Election, then at Closing, Purchaser or its designee shall take title to the Property in accordance with the terms of the Agreement and there shall be no joint venture or similar arrangement of any kind with Seller and/or its affiliates or principals.

24.    Management of Property. From and after the Effective Date, Purchaser shall act as the property manager of the Property, in the manner and upon such terms as is provided in the JV Agreement. On account thereof, Purchaser shall receive a fee from Seller, which fee shall be personally, jointly and severally, guaranteed by Chaim Miller and Sam Sprei, of $104,166.66 per month, payable in advance, commencing on the date hereof and on the 18th day of each consecutive month thereafter during the pendency of this Agreement. Thereafter, the management fee shall be paid as provided in the JV Agreement. Failure timely to make such payments shall, in addition to all other such remedies hereunder, result in interest being due thereon at sixteen (16%) percent per annum, with costs of collection, including attorneys' fees.

25.    Termination. Notwithstanding anything contained herein to the contrary, Purchaser, at its sole and absolute discretion, shall have the right, upon written notice to Seller, given any time prior to Closing, to terminate this Agreement, for any reason or no reason whatsoever (the "Termination Notice"). Following the delivery of the Termination Notice, Seller shall within fifteen (15) days return the Downpayment to Purchaser, whereupon, this Agreement shall terminate and neither party shall have any further rights or obligations against or to the

23

MRC 054715

other except for such provisions which are expressly provided in this Agreement to survive the termination hereof. This obligation of Seller to return the Downpayment is personally, jointly and severally, guaranteed by Chaim Miller and Sam Sprei. Failure timely to make payment shall result in interest being due thereon at sixteen (16%) percent per annum, with costs of collection, including attorneys' fees. In the event Seller shall fail to deliver the Downpayment to Purchaser as required by this section within ninety (90) days after delivery of the Termination Notice, Purchaser shall have the option, upon written notice to Seller (the "**Downpayment Default Notice**"), to elect to acquire fee title to the Property and proceed to close hereunder upon the terms and condition contained in this Agreement, except that (a) the Purchase Price shall be the sum of (i) FOURTEEN MILLION THREE HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($14,330,000.00) and (ii) an amount equal to the Unpaid Principal of the Loans made by Lender to the Seller and (b) The Closing Date shall be a date designated by Purchaser, which shall in no event be less than ten (10) days following Seller's receipt of the Downpayment Default Notice. Time shall be of the essence with respect to Seller's obligations under this section. This provision shall survive the termination of this Agreement.

26. **Expenses.** Seller acknowledges and agrees that in consideration of Purchaser entering into this transaction and agreeing to pay the Purchase Price hereunder, SIX HUNDRED FIFTY DOLLARS AND 00/100 ($650,000.00) shall be disbursed to Purchaser, or its designees from the Downpayment hereunder and used by Purchaser to pay certain expenses in connection with the Property and/or this transaction as determined by Purchaser in its sole discretion, whether incurred prior to the Effective Date or thereafter, including, without limitation for payment of the real estate taxes and water and sewer charges for the Property. Additionally, the disbursements to be made by the title company as set forth on attached hereto as **Exhibit J** shall be the sole responsibility and obligation of Seller. The amount paid by Seller pursuant to this section shall not be credited to the Seller in any way, including, without limitation, as a capital contribution under the JV Agreement.

27. **Property Documents.** Promptly after execution of this Agreement, Seller shall deliver all plans and other documents in Seller's possession with respect to the Property to Purchaser.

28. **Mortgage Paydown.** Immediately prior to the execution of this Agreement Seller discovered that the principal balance on that certain mortgage in the original principal amount of $4,500,000.00, dated March 4, 2014, made by the Seller, to and in favor of SDF81 45 John Street 2 LLC (the "**4.5 Million Dollar Mortgage**") has an approximate outstanding balance of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,400,000), inclusive of principal and interest. Notwithstanding anything to the contrary contained herein, Seller agrees that on or prior to Closing hereunder, Seller shall cause the total amount due under the 4.5 Million Dollar Mortgage to be no greater than TWO MILLION DOLLARS ($2,000,000), inclusive of principal and interest (as of Closing). In the event that the Seller shall fail to cause the 4.5 Million Dollar Mortgage to be so reduced on or prior to Closing, same shall be considered a material default hereunder, and in addition to any other remedies provided to Purchaser for a Seller default under this Agreement, Purchaser shall have the option to acquire fee title to the Property and proceed to close hereunder upon the terms and condition contained in this Agreement, except that the Purchase Price shall be the sum of (i) FOURTEEN MILLION THREE HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($14,330,000.00) and (ii) an amount equal to the Unpaid

24

NYSC 004718

Principal of the Loans made by Lender to the Seller. Notwithstanding, this provision shall not affect the Class B Member's obligation to repay the loan (and the remedy for failure to do so) contained in the JV Agreement.

29.    Lender Consent. In the event Seller is unable to obtain written consent from Lender to assign the membership interests in Seller and/or sell the Property, as applicable, as contemplated in this Agreement, then same shall be considered a material default hereunder, and in addition to any other remedies provided to Purchaser for a Seller default under this Agreement, Purchaser shall have the option to acquire fee title and proceed to close hereunder upon the terms and condition contained in this Agreement, except that the Purchase Price shall be the sum of (i) FOURTEEN MILLION THREE HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($14,330,000.00) and (ii) an amount equal to the Unpaid Principal of the Loans made by Lender to the Seller.

[Signature Page Follows]

25

MRC 004717

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SELLER:

45 JOHN LOFTS LLC

By: _____

PURCHASER:

HS 45 JOHN LLC

By: _____

As to Section 24 and 25 of this Agreement:

_____

Chaim Miller

_____

Sam Sprei

MRC 004718

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SELLER:

45 JOHN LOFTS LLC

By _____

PURCHASER:

HS 45 JOHN LLC

By. _____

As to Section 24 and 25 of this Agreement:

_____

Chaim Miller

_____

Sam Sprei

MRC 004719

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK )

On this 18 day of September, 2014, before me, a Notary Public in and for said State, personally appeared _____ before me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

ALAN HIRSCH
Notary Public, State of New York
No. 01HI____
Qualified in ____ County
Commission Expires July 14, 2015

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK )

On this 18 day of September, 2014, before me, a Notary Public in and for said State, personally appeared _____ before me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

ALAN HIRSCH
Notary Public, State of New York
No. 01HI____
Qu____
Co____

ALAN HIRSCH
Notary Public, State of New York
No. 01HI6093704
Qualified in New York County
Commission Expires July 14, 2015

MRC 004730

# EXHIBIT E

## Direction Letter



## DIRECTION LETTER

The amount of $14,330,000 (the "Downpayment") shall be funded by HS 45 JOHN LLC ("Purchaser") of which sum of $13,330,000 (the "Riverside Funds") shall be funded to Riverside Abstract LLC and $1,000,000 shall be paid to Meridian Capital.

The Riverside Funds shall be disbursed at the direction of 45 JOHN LOFTS LLC ("Seller") as follows:

| | | |
|---|---|---|
| 1. | Wire at the direction of Seller | $9,750,159.00 |
| 2. | Wire to Goldberg Weprin Finkel Golstein LLP (Agreed upon interest reserve for any payments which come due under the Loans) | $1,100,000.00 |
| 3 | Wire to Goldberg Weprin Finkel Golstein LLP (Agreed upon expense reserve as set forth in Section 26 of the Agreement) | $650,000.00 |
| 4. | Wire to Goldberg Weprin Finkel Goldstein LLP (Agreed upon reimbursement by Seller to Purchaser of Purchaser's cost of funds, regardless of actual costs) | $700,000.00 |
| 5 | Wire to Goldberg Weprin Finkel Golstein LLP (Agreed upon advance of management fee to Purchaser) | $330,000.00 |
| 6. | Wire to Goldberg Weprin Finkel Goldstein LLP (Legal Fee) | $70,000.00 |
| 7. | Riverside Abstract | $ 227,341.00 |
| 8. | Check to Alan Hirsch (title closer) | $1,500.00 |
| 9. | Check to Javier Doural (Royal title closer) | $1,000.00 |
| 10. | Wire to Meridian Capital | $500,000.00 |

Seller acknowledges that any funds disbursed pursuant to this Direction Letter are the sole responsibility and obligation of Seller. The funds directed by Seller pursuant to this Direction Letter shall not to be credited to the Seller in any way, including, without limitation, as a capital contribution under the JV Agreement (as such term is defined in the purchase and sale agreement in connection with this transaction).

*Remainder of Page Intentionally Blank; Signature Page to Follow*

GWFG 2611

IN WITNESS WHEREOF, the undersigned has duly executed this Disbursement Letter as of the day and year first above written.

**45 JUIN LOFTS LLC**

By:
Name:
Title:

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK )

On this___day of September, 2014, before me, a Notary P__ and for said State, personally appeared Chaim Miller, before me or proved to me on the b__ satisfactory evidence to be the individual whose name is subscribed to the within instrum__ acknowledged to me that he executed the same in his capacity, and that by his signature instrument, the individual, or the person on behalf of which the individual acted, executed__rument.

_____
Notary Public

[SIGNATURE PAGE TO DISBURSEME__]

GWFG 2612

# EXHIBIT F

## Instructions to Riverside

Exh. #5

## BLAIVAS & ASSOCIATES, P.C.

1430 Broadway, Suite 1603

New York, New York 10018

(212) 949-7550

David G. Blaivas, Esq.

Joel A. Graa, Esq., Counsel

Yisroel Schwartz, Esq.

David Fischman, Esq.

Deborah Bey, Esq.

Michael Loeb, Esq.

Long Island Office:

335 Central Avenue

Lawrence, New York 11559

September 19, 2014

Riverside Abstract LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
Attention; Shaul Greenwald, Esq.

Re:    RANY-12445 & RANY-16788

Dear Shaul:

We represent 11-45 Ryerson MB LLC, 11-45 Ryerson Holdings LLC, 3052 Brighton First, LLC, 3052 Brighton MB LLC, 97 Grand MB LLC, 203-205 North 8th Street Loft LLC and 203-205 N8 MB LLC (collectively, "Borrower"). Pursuant to that certain escrow Instructions letter ("Escrow Letter"), dated as of the date hereof, by and between Kriss & Feuerstein LLP ("Lender's Counsel") and Riverside Abstract LLC ("Title Company"), you are in receipt of funds in the amount of $16,073,911.98 (the "Lender's Funds"). Additionally, you are in receipt of funds from an affiliate of Borrower in the amount of $6,426,088.02 (the "Borrower's Funds"). Upon the break of escrow pursuant to the Escrow Letter, you are directed to distribute the Borrower's Funds and the Lender's Funds as follows:

$19,072,687.23 by wire to Herrick Feinstein pursuant to the following wire instructions:

BANK: Citibank., N.A.
666 Fifth Avenue, Fifth Floor
New York, New York 10103

R000106

Reliable000541

ABA#: 021000089
ACCT# 004971716165
ACCT NAME: Herrick, Feinstein LLP
REF: RENATUS/MILLER

2) $2,827,312.77 by wire to Mega International pursuant to wire instructions attached

Sincerely,

BLAIVAS & ASSOCIATES, P.C.,

By:_____
Yisroel S. Schwartz, Esq.

R000107

Reliable000542

**Production**

EXHIBIT
$PAE1 11
RSC 6/19/15

| From: | Yisroel Schwartz <yschwartz@blpclaw.com> |
|---|---|
| Sent: | Thursday, September 18, 2014 9:35 PM |
| To: | Andrew W. Albstein (AAlbstein@gwulaw.com) |
| Cc: | Michael Podolsky <mpodolsky@gwfglaw.com> (mpodolsky@gwfglaw.com) |
| Subject: | 45 John |

Andy,

I'm trying to make sure that Sam has all the funds that he needs tomorrow morning, as I was able to get the other Seller's attorney to agree to hold off until noon tomorrow before I failure to fund today becomes a default. Are you available for a quick call so that I can fully understand exactly what is being funded tomorrow?

Yisroel S. Schwartz, Esq.
**Blaivas & Associates, P.C.**
1430 Broadway, Suite 1603
New York, New York 10018

Telephone- (212) 949-7550
Direct Dial – (646) 776-5803
Facsimile- (646) 349-2042
Email- yschwartz@blpclaw.com

Long Island Office:
335 Central Avenue
Lawrence, New York 11559

This message is intended only for the use of the addressee and may contain information that is privileged and confidential by law. If you are not the intended recipient, you are hereby notified that any review, use, dissemination, or copying of this communication is strictly prohibited. If you have received this communication in error, please forward the email back and delete all copies of the message and attachments.

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or applicable provisions of state and local tax law or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

GWFG 3835

**Archived:** Monday, June 08, 2015 7:21:56 PM
**From:** Hadassah Abbott
**Sent:** Monday, September 22, 2014 10:37:54 AM
**To:** Gitty Alnusky
**Subject:** FW: 45 John - Escrow Letter
**Response requested:** No
**Importance:** Normal

Hadassah Abbott

Riverside Abstract
212 Second Street, Suite 502
Lakewood, NJ 08701
D: (718) 215-5107
O: (718) 252-4200
F: (718) 252-4226
E: habbott@rsabstract.com

**Corporate Headquarters:**
Riverside Abstract, LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
P: 718.252.4200
F: 718.252.4226
info@rsabstract.com

**From:** Yisroel Schwartz [mailto:yschwartz@blpclaw.com]
**Sent:** Monday, September 22, 2014 9:47 AM
**To:** Mark Pollak; Shaul C. Greenwald, Esq.; Azi Mindick
**Cc:** Elliot Schon, Esq.; Azi Mindick; Hadassah Abbott; Mark Pollak
**Subject:** RE: 45 John - Escrow Letter

Hadassah,
Good morning. Have the wires for Reliable and Blaivas gone out yet?
If not, would greatly appreciate if you could get them out as soon as possible this morning, but please have the
Blaivas wire go to the following account:

Chase Bank
ABA # 021000021

credit to: Image Capital LLC
a/c# 995236601

Please let me know.



R000669

Thanks,

Yisroel

**From:** Yisroel Schwartz
**Sent:** Friday, September 19, 2014 3:15 PM
**To:** mpollak@rsabstract.com; Shaul Greenwald; Azi Mindick
**Cc:** Elliot Schon, Esq.; Azi Mindick; Hadassah Abbott; Mark Pollak
**Subject:** RE: 45 John - Escrow Letter

After we take care of the $22,500,000,
The following funds will be left:
$2,823,912.98
In addition, you will have $1,750,842 delivered for the title invoices, which pursuant to the iska, is being funded back to the deal.
From this money, please send $500,000 to Reliable Abstract, please send $2,332,000 to 3839 funding and please send $2,000,000 to Babad. I will forward his wire instructions separately.
The balance of $242,000 should be sent to Blaivas.
You will be getting a separate wire for the contract veneers policy from Alston later today or Monday.
Please confirm.

Sent from my Verizon Wireless 4G LTE smartphone

--------- Original message ---------
**From:** "Shaul C. Greenwald, Esq." <sgreenwald@rsabstract.com>
**Date:**09/19/2014 2:32 PM (GMT-05:00)
**To:** Yisroel Schwartz <yschwartz@blpclaw.com>
**Cc:** "Elliot Schon, Esq." <ESchon@rsabstract.com>, Azi Mindick <AMindick@rsabstract.com>, Hadassah Abbott <HAbbott@rsabstract.com>, Mark Pollak <mpollak@rsabstract.com>
**Subject:** Re: 45 John - Escrow Letter

Will do. Mark - this concept is approved. Of course send in clean email.

Shaul

Shaul C. Greenwald, Esq.
Chief Executive Officer
Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
T: (718) 252-4200
C: (347) 844-2729
F: (718) 252-4226
E: sgreenwald@rsabstract.com

**From:** Yisroel Schwartz [mailto:yschwartz@blpclaw.com]
**Sent:** Friday, September 19, 2014 02:28 PM
**To:** Shaul C. Greenwald, Esq.

R000670

**Cc:** Elliot Schon, Esq.; Azi Mindick; Hadassah Abbott; Mark Pollak
**Subject:** Re: 45 John - Escrow Letter

Shaul,

Pursuant to our conversation, you will be receiving a wire of $9,750,000 from Andy Albsteins office. Upon receipt, please confirm to Feuerstein that you are in receipt of $6,500,000 of Borrowers funds so that they may fund the balance.

Once you are in receipt of all funds, please contact me for additional info.

Sent from my iPad

On Sep 19, 2014, at 1:59 PM, "Shaul C. Greenwald, Esq." <sgreenwald@rsabstract.com> wrote:

> Prior to final funding - please speak w me to approve all
>
> Shaul
>
> Shaul C. Greenwald, Esq.
> Chief Executive Officer
> Riverside Abstract
> 3839 Flatlands Avenue, Suite 208
> Brooklyn, NY 11234
> T: (718) 252-4200
> C: (347) 844-2729
> F: (718) 252-4226
> E: sgreenwald@rsabstract.com

**From:** Elliot Schon, Esq.
**Sent:** Friday, September 19, 2014 01:56 PM
**To:** 'Yisroel Schwartz' <yschwartz@bipclaw.com>; Shaul C. Greenwald, Esq.; Azi Mindick; Hadassah Abbott; Mark Pollak
**Subject:** RE: 45 John - Escrow Letter

Attached

Elliot Schon, Esq.
*Counsel*

Riverside Abstract
Lexington Towers
212 Second Street, Suite 502
Lakewood, NJ 08701
D: (718) 215-5149
P: (718) 252-4200 ext. 5149
F: (718) 252-4226
E: eschon@rsabstract.com

Corporate Headquarters:

R000671

Riverside Abstract, LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
P: 718.252.4200
F: 718.252.4226
info@rsabstract.com

**From:** Yisroel Schwartz [mailto:yschwartz@blpclaw.com]
**Sent:** Friday, September 19, 2014 1:49 PM
**To:** Shaul C. Greenwald, Esq.; Azi Mindick; Hadassah Abbott; Elliot Schon, Esq.; Mark Pollak
**Subject:** FW: 45 John - Escrow Letter

Guys,

Need attached escrow letter signed ASAP for $10,750,000 wire for John Street

**From:** Michael Podolsky [mpodolsky@gwfglaw.com]
**Sent:** Friday, September 19, 2014 1:45 PM
**To:** Yisroel Schwartz
**Cc:** aalbstein@gwfglaw.com
**Subject:** 45 John - Escrow Letter

Please forward to Riverside and have same signed ASAP.

Michael B. Podolsky, Esq.
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 301-6987 (direct dial)
(212) 221-5700 (main number)
(212) 730-4518 (fax)
mpodolsky@gwfglaw.com

This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY - CLIENT
PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY
LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not
an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that
reading, copying, or distributing this message is prohibited. If you have received this electronic mail message
in error, please reply to the sender and take the steps necessary to delete the message completely from your
computer system.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that
any U.S. federal tax advice contained in this communication (including any attachments) is not intended or
written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue
Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed

R000672

Laurie N. P. Miskowiec

| From: | Shaul C. Greenwald, Esq. <sgreenwald@rsabstract.com> |
|---|---|
| Sent: | Friday, September 19, 2014 3:47 PM |
| To: | Hadassah Abbott; Yisroel Schwartz |
| Subject: | Re: Fed Ref numbers |

H- let yisroel forward to whomever he needs to. Don't do anything else without his request. Perfect

Shaul

Shaul C. Greenwald, Esq.
Chief Executive Officer
Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
T: (718) 252-4200
C: (347) 844-2729
F: (718) 252-4226
E: sgreenwald@rsabstract.com

---

**From:** Hadassah Abbott
**Sent:** Friday, September 19, 2014 04:45 PM
**To:** Yisroel Schwartz <yschwartz@blpclaw.com>
**Cc:** Shaul C. Greenwald, Esq.
**Subject:** Fed Ref numbers

MBO OUTGOING WIRE REF# 20140919B6B7261F001045 TO: Herrick, Feinstein LLP ABA: 0210000        $19,672,687.23
89 BANK: CITIBANK N.A.

MBO OUTGOING WIRE REF# 20140919B6B7261F001059 TO: Crown Mansion LLC-Loan Division AB        $2,827,312.77
A: 026009085 BANK: MEGA

MBO OUTGOING WIRE REF# 20140919B6B7261F001046 TO: Congregation Kahal Minchas Chinuch        $2,000,000.00
ABA: 026013576 BANK: SI

Hadassah Abbott

Riverside Abstract
212 Second Street, Suite 502
Lakewood, NJ 08701
D: (718) 215-5107
O: (718) 252-4200
F: (718) 252-4226
E: habbott@rsabstract.com

**Corporate Headquarters:**
Riverside Abstract, LLC

1



EXHIBIT
Schwartz
20
4-22-15

3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
P: 718.252.4200
F: 718.252.4226
info@rsabstract.com

2

**Laurie N. P. Miskowiec**

| | |
|---|---|
| **From:** | Yisroel Schwartz <yschwartz@blpclaw.com> |
| **Sent:** | Friday, September 19, 2014 5:21 AM |
| **To:** | 'Shaul C. Greenwald, Esq.'; 'Azi Mindick' |
| **Subject:** | RE: 45 John Street/ RANY-16467 |
| **Attachments:** | ISKA KULO PEKADON 1.75M.DOC; Direction Letter - Riverside 1.75M.DOC |

Thanks. Sam asked me to prepare the attached, based on your conversation with him. Please advise.

**From:** Shaul C. Greenwald, Esq. [mailto:sgreenwald@rsabstract.com]
**Sent:** Friday, September 19, 2014 5:53 AM
**To:** Yisroel Schwartz; Mark Pollak; Elliot Schon, Esq.; Azi Mindick; Rivka Cohen; Hadassah Abbott; 'oldenequitiesgroup@gmail.com'
**Subject:** Re: 45 John Street/ RANY-16467

Confirmed. As to the balance, we will discuss prior to sending the full balance back.

Shaul

Shaul C. Greenwald, Esq.
Chief Executive Officer
Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
T: (718) 252-4200
C: (347) 844-2729
F: (718) 252-4226
E: sgreenwald@rsabstract.com

**From:** Yisroel Schwartz [mailto:yschwartz@blpclaw.com]
**Sent:** Friday, September 19, 2014 02:28 AM
**To:** Shaul C. Greenwald, Esq.; Mark Pollak; Elliot Schon, Esq.; Azi Mindick; Rivka Cohen; Hadassah Abbott; oldenequitiesgroup@gmail.com <oldenequitiesgroup@gmail.com>
**Subject:** 45 John Street/ RANY-16467

Riverside team:

We are expecting a wire of approximately $13,000,000 from Purchaser under the PSA, of which you will be directed to disburse approx. $2MM back to Seller (details will be provided). With respect to this balance of funds for this file, the following disbursements need to be made:

1) $_____, (amount TBD) – to fund the difference between the $22,500,000 and the net amount delivered by Feuerstein with respect to Grand, Ryerson, North 8 and Brighton, pursuant to the direction letter for that file.
2) $500,000, to Reliable Abstract, pursuant to the attached wire instructions.
3) $2,332,000 to 3839 Holdings LLC – Shaul, please provide wire instructions.
1) Balance, if any, to Blaivas & Associates, P.C., IOLA Account, pursuant to the following wire instructions:



EXHIBIT
Schwartz
28
6-22-15        26

1

SSHM 10064

JP Morgan Chase Bank
446 Central Avenue
Cedarhurst, NY  11516
Account Name – Blaivas & Associates, P.C. IOLA Account
Routing #021000021
Account #443371872

Kindly acknowledge receipt and confirm we are set for the wires.

Yisroel S. Schwartz, Esq.
**Blaivas & Associates, P.C.**
1430 Broadway, Suite 1603
New York, New York 10018

Telephone- (212) 949-7550
Direct Dial – (646) 776-5803
Facsimile- (646) 349-2042
Email- yschwartz@blpclaw.com

Long Island Office:
335 Central Avenue
Lawrence, New York 11559

This message is intended only for the use of the addressee
and may contain information that is privileged and confidential
by law. If you are not the intended recipient, you are hereby
notified that any review, use, dissemination, or copying of this
communication is strictly prohibited. If you have received this
communication in error, please forward the email back and delete
all copies of the message and attachments.

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the Internal
Revenue Service, we inform you that any U.S. tax advice contained
in this communication (including attachments) is not intended
or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or
applicable provisions of state and local tax law or (ii) promoting,
marketing, or recommending to another party any transaction or
matter addressed herein.

2

SSHM 10065

Archived: Monday, June 08, 2015 7:21:50 PM
From: Hadassah Abbott
Sent: Monday, September 22, 2014 10:53:27 AM
To: Yisroel Schwartz; Mark Pollak; Shaul C. Greenwald, Esq.; Azi Mindick
Cc: Elliot Schon, Esq.; Mark Pollak
Subject: RE: 45 John - Escrow Letter
Importance: Normal

RSO OUTGOING WIRE REF# 201409220SB7291F000130 TO: Image Capital LLC ABA: 021000021 BANK: JPMORGAN CHASE BAN

RSO OUTGOING WIRE REF# 201409220SB7291F000148 TO: Reliable Abstract LLC ABA: 021000021 BANK: JPMORGAN CHASE

Hadassah Abbott

Riverside Abstract
212 Second Street, Suite 502
Lakewood, NJ 08701
D: (718) 215-5107
O: (718) 252-4200
F: (718) 252-4226
E: habbott@riversideabstract.com

Corporate Headquarters:
Riverside Abstract, LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
P: 718.252.4200
F: 718.252.4225
info@riversideabstract.com

From: Yisroel Schwartz [mailto:yschwartz@blpclaw.com]
Sent: Monday, September 22, 2014 10:44 AM
To: Hadassah Abbott; Mark Pollak; Shaul C. Greenwald, Esq.; Azi Mindick
Cc: Elliot Schon, Esq.; Azi Mindick; Mark Pollak
Subject: RE: 45 John - Escrow Letter

Thanks, please circulate the fed ref's once available.

From: Hadassah Abbott [mailto: HAbbott@riversideabstract.com]
Sent: Monday, September 22, 2014 10:43 AM
To: Yisroel Schwartz; Mark Pollak; Shaul C. Greenwald, Esq.; Azi Mindick
Cc: Elliot Schon, Esq.; Azi Mindick; Mark Pollak
Subject: RE: 45 John - Escrow Letter

Confirmed. Both wires were initiated.

Hadassah Abbott

Riverside Abstract
212 Second Street, Suite 502
Lakewood, NJ 08701
D: (718) 215-5107
O: (718) 252-4200
F: (718) 252-4226
E: habbott@riversideabstract.com

Corporate Headquarters:
Riverside Abstract, LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
P: 718.252.4200
F: 718.252.4226
info@riversideabstract.com

From: Yisroel Schwartz [mailto: yschwartz@blpclaw.com]
Sent: Monday, September 22, 2014 9:47 AM
To: Mark Pollak; Shaul C. Greenwald, Esq.; Azi Mindick
Cc: Elliot Schon, Esq.; Azi Mindick; Hadassah Abbott; Mark Pollak
Subject: RE: 45 John - Escrow Letter

Hadassah,
Good morning. Have the wires for Reliable and Blaivas gone out yet?
If not, would greatly appreciate if you could get them out as soon as possible this morning, but please have the Blaivas wire go to the following account:

Chase Bank
ABA # 021000021

credit to: Image Capital LLC
a/c# 995136601



R000647

Please let me know.

Thanks,

Yisroel

From: Yisroel Schwartz
Sent: Friday, September 19, 2014 3:15 PM
To: sgreenwald@riablestract.com; Shaul Greenwald; Adi Mindick
Cc: Elliot Schon, Esq.; Adi Mindick; Hadassah Abbott; Mark Pollak
Subject: RE: 45 John - Escrow Letter

After we take care of the $22,500,000,
The following funds will be left:
$2,829,912.98
In addition, you will have $1,750,842 delivered for the title invoices, which pursuant to the bka, is being funded back to the deal.
From this money, please send $500,000 to Reliable Abstract, please send $2,332,000 to 3839 funding and please send $2,000,000 to Babad. I will forward his wire instructions separately.
The balance of $242,000 should be sent to Blalvas.
You will be getting a separate wire for the contract veneers policy from Alston later today or Monday.
Please confirm.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------
From: "Shaul C. Greenwald, Esq." <sgreenwald@riablestract.com>
Date: 09/19/2014 2:32 PM (GMT-05:00)
To: Yisroel Schwartz <yschwartz@3dpllaw.com>
Cc: "Elliot Schon, Esq." <Elshon@mattstract.com>, Adi Mindick <AMindick@mattstract.com>, Hadassah Abbott <Habbott@mattstract.com>, Mark Pollak <mpollak@mattstract.com>
Subject: Re: 45 John - Escrow Letter

Will do. Mark - this concept is approved. Of course send in clean email.

Shaul

Shaul C. Greenwald, Esq.
Chief Executive Officer
Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
T: (718) 252-4200
C: (347) 864-2729
F: (718) 252-4326
E: sgreenwald@rabstract.com

From: Yisroel Schwartz [mailto:yschwartz@3dpllaw.com]
Sent: Friday, September 19, 2014 02:28 PM
To: Shaul C. Greenwald, Esq.
Cc: Elliot Schon, Esq.; Adi Mindick; Hadassah Abbott; Mark Pollak
Subject: Re: 45 John - Escrow Letter

Shaul,

Pursuant to our conversation, you will be receiving a wire of $9,750,000 from Andy Albsteins office. Upon receipt, please confirm to Feuerstein that you are in receipt of $6,500,000 of borrowers funds so that they may fund the balance.

Once you are in receipt of all funds, please contact me for additional info.

Sent from my iPad

On Sep 19, 2014, at 1:59 PM, "Shaul C. Greenwald, Esq." <sgreenwald@rabstract.com> wrote:

Prior to final funding - please speak w me to approve all

Shaul

Shaul C. Greenwald, Esq.
Chief Executive Officer
Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
T: (718) 252-4200
C: (347) 864-2729
F: (718) 252-4326
E: sgreenwald@rabstract.com

From: Elliot Schon, Esq.
Sent: Friday, September 19, 2014 01:56 PM
To: Yisroel Schwartz <yschwartz@3dpllaw.com>; Shaul C. Greenwald, Esq.; Adi Mindick; Hadassah Abbott; Mark Pollak
Subject: RE: 45 John - Escrow Letter

R000648

Attached

Elliot Schon, Esq.
Counsel

Riverside Abstract
Lexington Towers
212 Second Street, Suite 502
Lakewood, NJ 08701
D: (718) 215-5149
P: (718) 252-4200 ext. 5149
F: (718) 252-4226
E: eschon@risbstract.com

Corporate Headquarters:
Riverside Abstract, LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
P: 718.252.4200
F: 718.252.4226
info@risbstract.com

From: Yisroel Schwartz [mailto:yschwartz@shbalaw.com]
Sent: Friday, September 19, 2014 1:49 PM
To: Shaul C. Greenwald, Esq.; Azi Mindick; Hadassah Abbott; Elliot Schon, Esq.; Mark Pollak
Subject: FW: 45 John - Escrow Letter

Guys,

Need attached escrow letter signed ASAP for $10,750,000 wire for John Street

From: Michael Podolsky [mailto:mpodolsky@gwpclaw.com]
Sent: Friday, September 19, 2014 1:45 PM
To: Yisroel Schwartz
Cc: ggelbstein@gwpclaw.com
Subject: 45 John - Escrow Letter

Please forward to Riverside and have same signed ASAP.

Michael B. Podolsky, Esq.
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 301-6987 (direct dial)
(212) 221-5700 (main number)
(212) 730-4518 (fax)
mpodolsky@gwpclaw.com

This electronic mail message contains CONFIDENTIAL Information which is (a) ATTORNEY   CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please reply to the sender and take the steps necessary to delete the message completely from your computer system.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**Archived:** Monday, June 08, 2015 7:22:17 PM
**From:** Yisroel Schwartz
**Sent:** Friday, September 19, 2014 3:19:35 PM
**To:** Shaul C. Greenwald, Esq.; Mark Pollak; Azi Mindick
**Cc:** Elliot Schon, Esq.; Hadassah Abbott
**Subject:** RE: 45 John - Escrow Letter
**Importance:** Normal

---

Please try to get the babad wire out. It's important

Sent from my Verizon Wireless 4G LTE smartphone

------- Original message -------
From: "Shaul C. Greenwald, Esq." <sgreenwald@rsabstract.com>
Date:09/19/2014 3:17 PM (GMT-05:00)
To: Yisroel Schwartz <yschwartz@blpclaw.com>, Mark Pollak <mpollak@rsabstract.com>, Azi Mindick <AMindick@rsabstract.com>
Cc: "Elliot Schon, Esq." <ESchon@rsabstract.com>, Hadassah Abbott <HAbbott@rsabstract.com>
Subject: Re: 45 John - Escrow Letter

We may not get these out today but will try.

Shaul

Shaul C. Greenwald, Esq.
Chief Executive Officer
Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
T: (718) 252-4200
C: (347) 844-2729
F: (718) 252-4226
E: sgreenwald@rsabstract.com

---

**From:** Yisroel Schwartz [mailto:yschwartz@blpclaw.com]
**Sent:** Friday, September 19, 2014 03:14 PM
**To:** Mark Pollak; Shaul C. Greenwald, Esq.; Azi Mindick
**Cc:** Elliot Schon, Esq.; Azi Mindick; Hadassah Abbott; Mark Pollak
**Subject:** RE: 45 John - Escrow Letter

After we take care of the $22,500,000,
The following funds will be left:
$2,823,912.98
In addition, you will have $1,750,842 delivered for the title invoices, which pursuant to the iska, is being funded back to the deal.
From this money, please send $500,000 to Reliable Abstract, please send $2,332,000 to 3839 funding and please



EXHIBIT
Greenwald
2
7-2-15

R000705

send $2,000,000 to Babad. I will forward his wire instructions separately.
The balance of $242,000 should be sent to Blaivas.
You will be getting a separate wire for the contract veneers policy from Alston later today or Monday.
Please confirm.

Sent from my Verizon Wireless 4G LTE smartphone

------- Original message ---·---
From: "Shaul C. Greenwald, Esq." <sgreenwald@rsabstract.com>
Date:09/19/2014 2:32 PM (GMT-05:00)
To: Yisroel Schwartz <yschwartz@blpclaw.com>
Cc: "Elliot Schon, Esq." <ESchon@rsabstract.com>, Azi Mindick <AMindick@rsabstract.com>, Hadassah Abbott
<HAbbott@rsabstract.com>, Mark Pollak <mpollak@rsabstract.com>
Subject: Re: 45 John - Escrow Letter

Will do. Mark - this concept is approved. Of course send in clean email.

Shaul

Shaul C. Greenwald, Esq.
Chief Executive Officer
Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
T: (718) 252-4200
C: (347) 844-2729
F: (718) 252-4226
E: sgreenwald@rsabstract.com

From: Yisroel Schwartz [mailto:yschwartz@blpclaw.com]
Sent: Friday, September 19, 2014 02:28 PM
To: Shaul C. Greenwald, Esq.
Cc: Elliot Schon, Esq.; Azi Mindick; Hadassah Abbott; Mark Pollak
Subject: Re: 45 John - Escrow Letter

Shaul,

Pursuant to our conversation, you will be receiving a wire of $9,750,000 from Andy Albsteins office. Upon
receipt, please confirm to Feuerstein that you are in receipt of $6,500,000 of Borrowers funds so that they may
fund the balance.

Once you are in receipt of all funds, please contact me for additional info.

Sent from my iPad

On Sep 19, 2014, at 1:59 PM, "Shaul C. Greenwald, Esq." <sgreenwald@rsabstract.com> wrote:

    Prior to final funding - please speak w me to approve all

# EXHIBIT G

## Renatus Closing Transcript

Page 1

1

2    ------------------------------------------x

3    In Re:

4    RENATUS GROUP REAL ESTATE CLOSING

5    ------------------------------------------x

6                    September 18, 2014

7                    5:07 p.m.

8

9             MINUTES OF REAL ESTATE CLOSING

10    held at the offices of Herrick,

11    Feinstein LLP, 2 Park Avenue, New York,

12    New York, before Abner D. Berzon, a

13    Registered Professional Reporter,

14    Certified Realtime Reporter and Notary

15    Public of the State of New York.

16

17

18

19

20

21

22

23

24

25

BLAIVAS_036033

```
 1
 2  A P P E A R A N C E S :
 3
 4
 5  HERRICK, FEINSTEIN LLP
 6  2 Park Avenue
 7  New York, New York 10019
 8     Attorneys for Seller
 9  BY: AVERY S. MEHLMAN, ESQ.
10
11
12
13
14  BLAIVAS & ASSOCIATES, P.C.
15  1430 Broadway, #1603
16  New York, New York 10018
17     Attorneys for Purchasers
18  BY: YISROEL S. SCHWARTZ, ESQ.
19     DAVID FISCHMAN, ESQ.
20
21
22
23
24
25
```

```
 1
 2  A P P E A R A N C E S  (Continued):
 3
 4
 5
 6  A L S O  P R E S E N T :
 7
 8  SELLERS:
 9     KEVIN LEAHEY,
        STEVEN MATRI
10
11  PURCHASERS:
12     SAM SPRIE,
        CHAIM BABAD,
13     CHAIM MILLER
14
15  TITLE CLOSERS:
16     ROBERT GROGON
        ALAN HIRSCH
17
18  A LENDER:
19     AVI SCHECHTER, ESQ.,
           Kriss & Feuerstein LLP
20
21
22  (Also other people outside of closing room.)
23
24
25
```

```
 1          - CLOSING -
 2       MR. MEHLMAN:  My name is Avery
 3  Mehlman.  We are in the law offices of
 4  Herrick Feinstein, 2 Park Avenue.  Date is
 5  September 18th, 2014.  The time is now
 6  5:07.  We're here for the closing with
 7  regard to the transfer of interests in
 8  four properties from the seller, which is
 9  the Renatus Portfolio Company, and the
10  purchaser is Chaim Miller and I think it's
11  Chaim Miller is the purchaser.
12       MR. MILLER:  Chaim Miller,
13  correct.
14       MR. MEHLMAN:  What we're going
15  to do is we're going to tender all the
16  documents that we're obligated to tender.
17  When I say that, I'm representing Renatus
18  Portfolio Company, the seller.  We're
19  going to tender all the documents, execute
20  any other documents that are obligated to
21  be executed under the agreement.  My
22  understanding is is that, due to the late
23  hour, there may be an issue in funding.
24  So all the documents are going to be held
25  in escrow, pending the funding first thing
```

```
 1          - CLOSING -
 2  tomorrow morning before 10:30.
 3       I'll go through all the
 4  documents now, just to make sure that
 5  everything's in order.
 6       MR. SCHECHTER:  Can I interrupt
 7  you for one second?  My name is Avi
 8  Schechter, from Kriss & Feuerstein, LLP.
 9       MR. MEHLMAN:  Why are you here,.
10       MR. SCHECHTER:  I represent the
11  lender, the new lender.  Okay?
12       MR. MEHLMAN:  And what's the
13  issue.
14       MR. SCHECHTER:  We have the
15  funds.
16       MR. MEHLMAN:  Yes?
17       MR. SCHECHTER:  The issue is, as
18  far as we're concerned, we don't have
19  clean title because of this UCC that is
20  coming up.
21       MR. MEHLMAN:  So there's two
22  ways this is going to be handled.  First
23  way is the UCC may be able to get cleared
24  up.  We're working on trying to clear it
25  up.  I think Mr. Feuerstein is trying to
```

2 (Pages 2 - 5)