**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:                                                  Chapter 11

45 JOHN LOFTS, LLC,                                      Case No. 16-12043 (SHL)

                    Debtor.
-------------------------------------------------------------x
45 JOHN LOFTS, LLC,

                    Plaintiff

          v.                                            Adv. No. 17-01179 (SHL)

MERIDIAN CAPITAL GROUP LLC,
CROWN MANSION LLC, BO JIN ZHU,
MEGA INTERNATIONAL COMMERCIAL
BANK, CONGREGATION KAHAL MINCHAS
CHINUCH, CHAIM SCHIYA BABAD,
RELIABLE ABSTRACT CO., LLC,
ABRAHAM MANDEL, TOBY MANDEL,
SILVER GOLD GROUP LLC,
JOSEPH BRUNNER, JOSEPH SEGEL,
DAVID JANKLOWICZ, MORRIS LOWY,
MITCHELL KIRSCHNER, JERRY LOWY,
ISAAC GREENFELD, AND
RENATUS PORTFOLIO COMPANY, LLC,

                    Defendants.
-------------------------------------------------------------x

## <u>MEMORANDUM OF DECISION</u>

**A P P E A R A N C E S :**

**WILK AUSLANDER LLP**
*Counsel for Plaintiff/Debtor*
825 8th Avenue
Suite 2900
New York, NY 10019
By:     Eric J. Snyder, Esq.

**SILVERMAN SHIN & BYRNE PLLC**
*Special Counsel for Plaintiff*
Wall Street Plaza

88 Pine Street, 22nd Floor
New York, New York 10005
By:    Peter R. Silverman, Esq.

**RICHARD L. YELLEN & ASSOCIATES, LLP**
*Counsel for Chaim Babad, Congregation Kahal Minchas Chinuch and Affiliates*
111 Broadway, Suite 1403
New York, NY 10006
By:    Brendan C. Kombol, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the merits of the above-captioned adversary proceeding as against

two defendants: Congregation Kahal Minchas Chinuch (the "Congregation") and Chaim Schiya

Babad ("Mr. Babad") (and, together with the Congregation, the "Babad Defendants").  Plaintiff-

Debtor 45 John Lofts, LLC ("Debtor" or "Plaintiff") seeks to recover as an actual or

constructively fraudulent transfer the sum of $2 million that was wired to the Congregation on

behalf of Mr. Babad (the "Babad Transfer").  In opposing the fraudulent conveyance claims, the

Babad Defendants assert that the transfer cannot be recovered by the Plaintiff because the

transfer was made for fair consideration and while the Plaintiff was solvent.

Trial in this matter took place on March 29-30, 2022.  *See* Transcript of Hearings, dated

Mar. 29, 2019 and Mar. 30, 2019[1] [ECF Nos. 115-116].[2]  At trial, the Court received written

direct testimony from seven witnesses: Chun Peter Dong, Yisroel Schwartz, Jerold Feuerstein,

Shaul Greenwald, Abraham Teitelbaum, Stewart Lee, and Mr. Babad, as well as the exhibits

annexed to the sworn declarations.  *See id.*  Certain of these witnesses also provided additional

---

[1]      Though trial took place over two days and the transcript is divided into two separate documents, the two
documents contain consecutive pagination.  Accordingly, the Court will deem the transcript of hearing to be one
document, referred to hereinafter as "Hr'g Tr.".

[2]      References to the Case Management/Electronic Case Filing ("ECF") docket are to Adv. Pro. No. 17-01179
(SHL) unless otherwise specified.

live testimony at trial, including Chun Peter Dong, Yisroel Schwartz, and Mr. Babad. *See, e.g.*, *id.* at 38:15-81:23 (Chun Peter Dong testimony on cross-examination and redirect). In addition, the parties submitted documentary exhibits. *See, e.g. id.* at 107:4-110:23 (discussion of Plaintiff's supplemental exhibits); 167:18–171:1 (discussion of Plaintiff's exhibits on cross-examination).

Based on the evidentiary record at trial and for the reasons set forth below, the Court concludes that the Debtor-Plaintiff should prevail on its fraudulent transfer claims against the Babad Defendants. This decision constitutes the Court's findings of fact and conclusions of law based on all of the evidence.

## FINDINGS OF FACT

### A. **The Debtor**

The Debtor was formed as a New York limited liability company solely for the purpose of purchasing the real property located at 45 John Street, New York, NY (the "John Property"). Trial Declaration of Chun Peter Dong ¶ 6 [ECF No. 96] ("Dong Decl."). In December 2013, the Debtor entered into a contract to buy the John Property. *Id.* ¶ 11. On February 28, 2014, Chaim Miller ("Mr. Miller") and Chun Peter Dong ("Mr. Dong") entered into an Operating Agreement under which Mr. Dong acquired a 32% membership interest and Mr. Miller acquired a 68% membership interest in the ownership, profits, losses and distributable cash flow of the Debtor. Dong Decl., Exh. A. The John Property was purchased for $60 million in March 2014. Dong Decl. ¶ 9. Forty nine million, five hundred dollars of the purchase price was funded by loans from Madison Realty Capital, a private equity company (the "Madison Loans"). Dong Decl. ¶ 8.[3] The Debtor funded the remaining amount of the purchase price from various sources,

---

[3]    The Madison Loans were in the form of a purchase money mortgage from $39,000,000 by SDF81 John Street I LLC ("SDF1"), and a second and third mortgage from SDF81 45 John Street 2 LLC ("SDF2") for

including a previous deposit, financing from another property that Mr. Miller controlled, a payment from Mr. Dong, and a payment from Mr. Miller.  Dong Decl. ¶ 9, Exh. B.  Mr. Dong's company also provided an additional $1 million to the Debtor for the Debtor to obtain an extension of the "time of the essence" provision for the closing of the contract, which Mr. Dong understood to be a short term loan that would be repaid within the week.  Dong Decl. ¶ 11.

Mr. Miller and Mr. Dong entered into an amendment to the Debtor's Operating Agreement in March 2014, which provided that Mr. Miller and Mr. Dong were the sole member(s) and managing member(s), respectively, of the Debtor.  Dong Decl., Exh. C, Section 3(b).  Simultaneously, Mr. Dong executed a personal guaranty of the Debtor's mortgage debt for the Madison Loans.  Dong Decl. ¶ 14, Exh. D.  At that time, Mr. Miller also executed a conditional guaranty of the Debtor's mortgage debt for the Madison Loans.  Dong Decl. ¶ 14, Exh. E.  In April 2014, Mr. Miller transferred a 41% interest in the Debtor to other investors (the "41% Investors").  Dong Decl. ¶ 7.

**B.**  **The Zhu Buy Out and Transfer of Debtor's Assets**

After the purchase of the John Property by the Debtor, Mr. Miller entered into another real estate deal with different individuals regarding some different properties.  Sam Sprei ("Mr. Sprei"), an affiliate and representative of Mr. Miller, who later became a member of the debtor was involved in this real estate deal.  Dong Decl. ¶ 3 Exh. F.  Specifically, in May 2014, Mr. Miller and Mr. Sprei sought to buy out interests of Bo Jin Zhu ("Mr. Zhu") in four companies that owned property in Brooklyn in exchange for $31 million (the "Zhu Buy Out").[4]  *See* Trial

---

$6,000,000 and $4,5000,000, respectively.  Trial Declaration of Jerold C. Feuerstein ¶ 2, Exh. A [ECF No. 98] ("Feuerstein Decl.).

[4]      Mr. Zhu is also a defendant in this proceeding.  He has defaulted in this action.  *See* Judgment as to Defendants Bo Jin Zhu and Crown Mansion LLC [ECF 114].

Declaration of Yisroel Schwartz ¶ 6, Exh. C [ECF 97] ("Schwartz Decl.").  Under the Zhu Buy Out, Mr. Miller provided a $7 million deposit that was non-refundable if Mr. Miller defaulted on the agreement.  *Id.,* Exh. C.  The Zhu Buy Out contained a "time of the essence" clause for a closing date scheduled for August 11, 2015.  *Id.*  Mr. Miller negotiated an extension of the closing date to September 15, 2014 in exchange for an additional payment of $1.5 million.  *Id.* Despite the additional time, Mr. Miller was still having trouble obtaining sufficient funds to consummate the Zhu Buy Out and so obtained an additional three day extension of the closing date, from September 15, 2014 to September 18, 2014.  *Id.*  ¶ 7.

To raise the additional funds necessary for the Zhu Buy Out, Mr. Miller took several steps.  *Id*. ¶¶ 8, 12.  Of the most relevance to the current dispute, Mr. Miller entered into a Purchase and Sale Agreement to sell the John Property to an entity unrelated to any of the parties in this case.  Schwartz Decl. ¶ 11, Exh. D, Purchase and Sale Agreement ("PSA").  Under the terms of the PSA, the buyer agreed to purchase the John Property and provide a down payment in the amount of $14,330,000.00.  PSA, Section 3.2.1.  Of this down payment, the PSA provided for a payment of $1 million to Meridian Capital,[5] while the remainder was disbursed to Riverside Abstract Company ("Riverside") under a Direction Letter.[6]  Dong Decl. ¶ 26; Schwartz Decl. ¶ 14, Exh. E.  Mr. Miller entered into the PSA without Mr. Dong's knowledge or permission as Managing Member of the Debtor, and in violation of the Debtor's Operating Agreement.  Dong Decl. ¶¶ 5, 15, Exh. F (prohibiting the manager from making any major management decision, including the sale of the John Property, without obtaining written consent of a majority of the members).

---

[5]      Meridian Capital was the broker that arranged the sale of the John Property.  Dong Decl. ¶ 26.

[6]      Riverside is a company that provides various types of title insurance policies as an agent for the underwriters of such policies.  Trial Declaration of Shaul C. Greenwald ¶ 1 [ECF 99] ("Greenwald Decl.").

In addition to the PSA, Mr. Miller raised funds for the Zhu Buy Out by having several of his other entities obtain financing from Madison Realty Capital.[7]  Schwartz Decl. ¶ 12.  Mr. Miller asked Blaivas & Associates, P.C. ("Blaivas") to represent these entities in the Zhu Buy Out and to represent Mr. Miller in the sale of the John Property.  *Id.* ¶¶ 12, 14.

## C.  The Purchase and Sale Agreement and Subsequent Transfers

The closing of the Zhu Buy Out and the execution of the PSA occurred at substantially the same time.[8]  As Mr. Babad testified, "they were selling upstairs and I was downstairs," and the attorney representing the seller in the Zhu Buy Out was running up and down between floors. Hr'g Tr. 141: 15-16, 144:14-24.  The funds from the Zhu Buy Out financing and the proceeds from the PSA down payment were aggregated and distributed by Riverside to a variety of parties as part of the closing of both the Zhu Buy Out and the PSA.  Schwartz Decl., Exh. F.  The funds distributed included: $19,682,687.23 to Herrick Feinstein, $2,827,312.77 to Mega International Commercial  Bank ("Mega"), $500,000 to Reliable Abstract Company, $2 million for the Babad Transfer, and $242,000 to Blaivas.  Schwartz Decl. ¶15, Exh. F; Trial Declaration of Shaul C. Greenwald ¶ 10, Exh. D, E [ECF 99] ("Greenwald  Decl.").  The $2 million of the Babad Transfer was, in fact, transferred to the Congregation by wire on September 19, 2013 at 4:35 PM. Greenwald Decl., Exh. E.

After the sale of the John Property, Mr. Dong commenced an action, both in his individual capacity and derivatively on behalf of the Debtor, seeking to enjoin the transfer of the John Property and to restrain Quick Title Search LLC ("Quick Title") from disbursing the PSA

---

[7]     These entities included 11-45 Ryerson Holdings, LLC, 97 Grand Avenue LCC, and 203-205 North 8th Street Loft LLC.  Schwartz Decl. ¶ 12.

[8]     The Zhu Buy Out closing and execution of the PSA both took place on or about September 18, 2014.  Dong Decl. ¶ 25; Schwartz Decl. ¶ 18, Exh. G

down payment that Mr. Dong believed Quick Title was holding. Dong Decl. ¶ 18. The New York State Court subsequently entered an order temporarily enjoining the transfer of the John Property. *Id.,* Dong Decl. Exh. H. The buyer of the John Property filed bankruptcy in an effort to enforce the sale of the John Property under the PSA. Dong Decl. ¶ 19. A settlement was reached in that bankruptcy under which the John Property buyer assumed the PSA and sold the John Property at auction. Babad Decl., Exh. B. The Debtor filed a voluntary chapter 11 petition on July 19, 2016 [ECF 1, Case No. 16-12043-shl].

**D. Transfers from the Babad Defendants**

In defending the propriety of the Babad Transfer, Mr. Babad offered testimony about his other business dealings with the parties in this case. Mr. Babad testified that, over the course of 2013 and 2014, he made numerous transfers to Ann Hsuing ("Ms. Hsuing"), as loans related to business ventures with Mr. Miller, Mr. Sprei, and Mr. Dong. Declaration of Chaim Babad in Support of Trial ¶ 18 [ECF 104] ("Babad Decl."). Ms. Hsuing was an attorney involved in the purchase of the John Property as well as other investments involving Mr. Miller, Mr. Sprei, and Mr. Dong. Dong Decl. ¶ 3; Babad Decl. ¶ 13. Mr. Babad points to certain of these payments as consideration for the Babad Transfer. *See generally* Post-Trial Memorandum of Law and Proposed Findings of Fact Offered by Defendants Congregation Kahal Minchas Chinuch and Chaim Babad at 3 [ECF 117] ("Defendants' Post-Trial Memo"). Specifically, Mr. Babad testified that he advanced substantial sums to fund the purchase of the John Property, including:

- $750,000 sent to Chatham Abstract on the Debtor's behalf, as reflected in a check of $750,000 dated March 6, 2014, payable to the order of Chatham Abstract from Sullivan 90 Holdings LLC, Babad Decl. ¶ 22, Exh. 1, pg. 4;

- $1 million sent to DNS Foods, Inc. as reflected in a $1,000,000 check dated March 5, 2014, payable to DN Foods, Inc. from Kolel Beth Yechiel Michel Congregation,[9] Babad Decl. ¶ 23, Exh. 1, pg. 5;

- $3,900,000 wire transfer on March 6, 2014 from the Congregation to Ms. Hsuing's escrow account as reflected in a bank statement from Congregation Kahal Minchas Chinuch, Babad Decl. ¶ 25, Exh. 1, pg 6;

- $500,000 sent to Ms. Hsuing, as reflected in a $500,000 check dated March 14, 2014 payable to Anne Hsiung from Kolel Beth Yechiel Michiel Congregation, Babad Decl. ¶ 26, Exh. 1. pg. 7.

*See* Babad Decl. ¶ 21.  The Babad Defendants contend that these four payments (collectively, the "Defense Transfers") constitute a complete defense in this case.  *See generally,* Defendants' Post-Trial Memo.

## CONCLUSIONS OF LAW

### A.  Transfers Made with Intent to Defraud

Plaintiffs seeks to recover the Babad Transfer as an intentional fraudulent conveyance and a constructive fraudulent conveyance under both state and federal law.[10]

#### 1.  Legal Standard

##### a.  Actual Fraudulent Transfers under Federal Law

Section 548(a)(1)(A) of the Bankruptcy Code allows the avoidance of transfers made with "intent to hinder, delay, or defraud any creditor."  11 U.S.C. § 548(a)(1)(A).  This form of fraudulent conveyance is commonly referred to as an "actual fraudulent conveyance" or "actual fraud."  *See Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 477, 479 (Bankr. S.D.N.Y. 2011).  The Plaintiff has the burden of proving actual intent, which must be shown by

---

[9]    Despite the difference in name, Kolel Beth Yechiel Michel is the same entity as the Congregation.  Hr'g Tr. 157: 1-9.

[10]    Plaintiff asserts a total of eight claims against Mr. Babad and the Congregation.  Claims 22 and 24 assert state law claims against Mr. Babad for actual and constructive fraudulent conveyances, and claims 18 and 20 assert the same claims against the Congregation.  Claims 21 and 23 assert claims under federal law against Mr. Babad for actual and constructive fraudulent conveyances, and claims 17 and 19 assert the same claims against the Congregation.  Complaint ¶¶ 168-208 [ECF 1].

clear and convincing evidence. *U.S. v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994); *Geron v. Craig (In re Direct Access Partners, LLC)*, 602 B.R. 495, 540 (Bankr. S.D.N.Y. 2019).

Only the intent of the transferor is relevant to the analysis of whether the transfer was fraudulent. *Novator Credit Mgmt.*, 452 B.R. at 482; *SB Liquidation Trust v. Preferred Bank (In re Syntax Brillian Corp.)*, 573 Fed. Appx. 154, 161 (3rd Cir. 2014). ("The statutory texts are clear and unambiguous: obligations are avoidable if the *debtor* incurred the obligations 'with actual intent to hinder, delay or defraud' the debtor's creditors. Neither the Bankruptcy Code nor Delaware law refers to the intent of the obligee defendant as a factor.") (internal citations omitted) (emphasis in original); *see also Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.*), 2017 U.S. Dist. LEXIS 3039, at *13 (S.D.N.Y. Jan. 6, 2017) ("When considering whether a debtor had an actual intent to hinder, delay, or defraud its creditors, courts focus on the intent of the transferor not on the intent of the transferee."). A court will look at the intent of corporate actors and individuals in instances where a debtor is not an individual. *Id.* at *17 (*citing In re Roco Corp.*, 701 F.2d 978, 984-85 (1st. Cir. 1983)) (finding that a corporate officer's intent may be attributed to a corporation if the officer was in a position to control the corporation's property).

Circumstantial evidence may be used to demonstrate actual fraud. "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citing *Wall St. Assocs. v. Brodsky*, 684 N.Y.S.2d 244, 247 (App. Div. 1st Dep't 1999)). The badges of fraud may include: 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate

relationship between the parties; 3) the retention of possession, benefit, or use of the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; 6) the general chronology of the events and transactions under inquiry; 7) a questionable transfer not in the usual course of business; and 8) the secrecy, haste, or unusualness of the transaction. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005). The presence or absence of any single badge of fraud is not conclusive; rather, the inquiry focuses on what factors are present, as well as the context for the badges of fraud. *Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.)*, 646 B.R. 617, 675 (Bankr. S.D.N.Y. 2022), *leave to appeal denied*, 2023 WL 119445 (S.D.N.Y. Jan. 6, 2023).

### b. Actual Fraudulent Transfers under New York State Law

Like Section 548(a)(1)(A) of the Bankruptcy Code, New York Debtor & Creditor Law ("N.Y. DCL") allows for the recovery of all transfers made with actual fraudulent intent. *See* N.Y. DCL § 276 (repealed 2019).[11] The standard set forth in New York state law regarding actual fraudulent conveyances essentially overlaps with the Bankruptcy Code. *Barnard v Albert (In re Janitorial Close-Out City Corp.)*, 2013 Bankr LEXIS 523, at *14 (Bankr. E.D.N.Y. Feb. 8, 2013).[12]

---

[11]   The Court notes that in December 2019, Article 10 ("Fraudulent Conveyances") of the New York Debtor Creditor Law was repealed and was replaced by the Uniform Voidable Transactions Act. However, the Uniform Voidable Transactions Act only applies to transactions which occurred on or after April 4, 2020. As the transfer in question occurred on September 19, 2014, Greenwald Decl., Exh. E, the Court applies the prior version of the NY DCL. Indeed, the parties' papers refer to the prior version of the N.Y. D.C.L. *See, e.g.* Plaintiff's Post-Trial Brief at 27 [ECF 112]; Defendants' Post-Trial Memo at 10.

[12]   Unlike fraudulent conveyance under federal law, there is an open question regarding whether the intent of the transferee is relevant when determining whether the transfer was fraudulent under the N.Y. D.C.L. *Picard v.*

The party asserting an intentional fraudulent transfer claim must specify 1) the property that was allegedly conveyed; 2) the timing and frequency of those allegedly fraudulent conveyances, and 3) the consideration paid. *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 733 (Bankr. S.D.N.Y. 2008).

### 2. <u>The Babad Transfer Was Made with Intent to Defraud</u>

Plaintiff has established, and the Babad Defendants do not contest, that $2,000,000 was transferred to the Congregation on September 19, 2014, with money that was derived from the down payment under the PSA.   Greenwald Decl., Exh. E; Babad Decl. ¶ 33.  Based on the record before the Court, the Court finds that the Plaintiff has shown by clear and convincing evidence that the Babad Transfer was made with "actual intent to hinder, delay, or defraud."  11 USC § 548(A)(1)(A).

Assessing the intent of Mr. Sprei and Mr. Miller, acting here as officers of the Debtor, is not difficult.  The overwhelming weight of the evidence demonstrates that Mr. Sprei and Mr. Miller had both the motive and opportunity to defraud the Debtors' creditors.  Motive "entail[s] concrete benefits that could be realized by one or more" of the actions alleged, and opportunity "entail[s] the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *see also Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, L.P., (In re Bankr. Est. of Norske*

---

*Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 221 (Bankr. S.D.N.Y. 2011) (collecting cases); c*ompare Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) ("Under the Bankruptcy Code, the plaintiff must establish the actual fraudulent intent of the transferor/debtor; under the NYDCL the plaintiff must establish the actual fraudulent intent of both the transferor and the transferee."), *with  Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 WL 1228866, at *46 (S.D.N.Y. Aug. 30, 2000) ("It is not necessary under DCL § 276 to show fraudulent intent on the part of the transferee.").   To the extent there is an open question, the Court concurs that the "better view" is that only the intent of the transferor is relevant.  *See Direct Access Partners,* 602 B.R. at 539.

*Skogindustrier ASA)*, 633 B.R. 640, 654 (Bankr. S.D.N.Y. 2021).  Mr. Sprei and Mr. Miller entered into the PSA agreement to finance the Zhu-Buy Out.  The PSA down payment on the John Property, together with funds Mr. Miller cobbled together from other sources, was then used to pay a variety of parties at the closings, including the Babad Defendants.  *See* Schwartz Decl. ¶ 15, Exh. F.  Without the benefit of the funds generated by the PSA, Mr. Miller and Mr. Sprei would have forfeited their down payment on the Zhu Buy Out.  Schwartz Decl. Exh. C, F. In using these funds, however, Mr. Miller and Mr. Sprei coopted the property of the Debtor for a use that provided no value to the Debtor and ultimately stripped the Debtor of its only real asset, the John Property.

Not surprisingly then, numerous badges of fraud exist here. Of the eight badges of fraud identified in *Sharp*, five are present here.  They strongly confirm the actual fraud here by Mr. Miller and Mr. Sprei.

Significantly, the execution of the PSA and transfer of the PSA down payment was carried out with an unusual amount of secrecy and great effort was made to conceal the transaction from the Debtor's other members.  [A]ctual fraudulent intent may be inferred from circumstances "including the . . . secrecy, haste, or unusualness of the transaction." *LaMonica v. Tilton (In re TransCare Corp.)*, 2021 WL 4459733, at \*17 (S.D.N.Y. Sept. 29, 2021), *appeal filed*, Case No. 21-2576 (Oct. 13, 2021) (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995)).  Despite the requirements of the Debtor's Operating Agreement, Mr. Miller and Mr. Sprei did not obtain the written consent of Mr. Dong or the other members of the Debtor to enter into the PSA.  Dong Decl. ¶ 16.  Mr. Miller and Mr. Sprei then undertook significant efforts to hide the existence of the transaction.  When Mr. Greenwald recorded the PSA, Mr.

Sprei emailed him that he "didn't want John at [sic] recorded." [13]  Greenwald Decl. ¶ 12, Exh. F.

Mr. Dong only learned of the transaction because the PSA was recorded, apparently against the

wishes of Mr. Miller and Mr. Sprei.  Dong Decl. ¶ 17.  Perhaps most damningly, Mr. Sprei and

Mr. Miller forged documents in an attempt to disguise their actions and the use of the funds from

the PSA down payment for the unrelated Zhu Buy Out transaction.  Mr. Sprei gave Mr. Miller

two letters that appeared to be from Quick Title that stated that Quick Title was holding

$12,453,980 as part of a "1031 Exchange." *Id.* ¶ 17.  These documents were a forgery.  Quick

Title never issued these letters nor did they hold any funds as part of a 1031 Exchange. *See* Trial

Declaration of Abraham Teitelbaum [ECF 100].  This forgery not only underscores the secrecy

of the transaction and Mr. Miller and Mr. Sprei's extensive efforts to cover up the true nature of

the transaction but also constitutes fraud in and of itself. *See Piedra v. Vanover*, 579 N.Y.S.2d

675, 677 (App. Div. 1992) (finding that forgery is a form of fraud).

Several other badges of fraud are also present.  First, Mr. Babad and Mr. Miller had a

close relationship that significantly pre-dated the PSA.  Babad Decl. ¶ 10.  Mr. Babad had

previously invested with Mr. Miller and Mr. Sprei, presumably on a "handshake" basis. *Id.* ¶¶

10, 16-17.  This close link between these parties and their pattern of doing business together is

another badge of fraud that supports a finding that the transfer was fraudulent. *See Sharp Int'l

Corp.*, 403 F.3d at 56.

Furthermore, Mr. Sprei and Mr. Miller retained the benefit of the down payment by using

it to fund the Zhu Buy Out and pay off parties who otherwise were owed money by Mr. Miller

and Mr. Sprei, including the Babad Defendants here.  Schwartz Decl. ¶ 15; *see Kramer v.

Sooklall (In re Singh),* 434 B.R. 298, 312 (Bankr. E.D.N.Y. 2010) (stating that retaining the

---

[13]     Mr. Greenwald is the Chief Executive Office and a Member of Riverside.

benefit and use of the transferred assets is a badge of fraud). Without the benefit of the funds,

Mr. Sprei and Mr. Miller would have defaulted on their obligations under the Zhu Buy Out,

losing their $8,500,000 deposit. Schwartz Decl., Exh. F. And once again, by transferring the

down payment obtained under the PSA, the Debtor lost its only real asset without obtaining any

benefit.

The Babad Defendants do not challenge, or even address, the actual fraud of Mr. Miller

and Mr. Sprei. Indeed, the Court has not been presented with any evidence that the conduct of

Mr. Miller and Mr. Sprei was anything other than fraudulent. Instead, the Babad Defendants

argue that they provided fair consideration for the $2 million Babad Transfer, and that this

consideration is a full defense to all the fraud claims here. *See generally,* Babad Decl.;

Defendants' Post-Trial Memo (arguing that the Defense Transfers are fair consideration and a

complete defense to both the claims for actual fraudulent conveyance and constructive fraudulent

conveyance). Presumably, the Babad Defendants are relying on the "good faith" defense of

Section 548(c) to an otherwise avoidable transfer. That section provides a defense where a

transferee took "for value and in good faith." 11 U.S.C. § 548(c); *Gowan v. Patriot Group, LLC

(In re Dreier LLP)*, 452 B.R. 391, 425-26 (Bankr. S.D.N.Y. 2011).[14] But the Babad Defendants'

invocation of this affirmative defense is flawed for several reasons.

As a threshold matter, the Babad Defendants appears to argue that the Plaintiff has the

burden of proving a lack of fair consideration for the Babad Transfer. *See* Defendants' Post-

Trial Memo at 2 (stating that each of Plaintiff's claims "requires proof that the Defendants

---

[14]     *See* 11 U.S.C. § 548(c) ("Except to the extent that a transfer or obligation voidable under this section is
voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes
for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation
incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for
such transfer or obligation.").

received the Babad Transfer without fair consideration" and that "Plaintiff has woefully failed to prove the elements necessary to prove any of its claims . . . "). But the Babad Defendants are incorrect. The Plaintiff is not required to prove anything on the issue of consideration for its actual fraud claim. "If actual fraud is established, the adequacy of consideration and the solvency of the transferor is immaterial." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp.3d 406, 438 (S.D.N.Y. 2014) (citing *In re Le Café Créme, Ltd.*, 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000)). As for invoking good faith under Section 548(c), "the transferee bears the burden of establishing its good faith under [S]ection 548(c) of the Code as an *affirmative defense* that 'may be raised and proved by the transferee at trial.'" *Patriot Group,* 452 B.R. at 426 (quoting *Picard v. Merkin (Bernard Madoff L. Madoff Inv. Secs. LLC)*, 440 B.R. 243, 256 (Bankr. S.D.N.Y 2010)) (emphasis in the original).

In fact, the Babad Defendants at trial failed to prove both aspects of the good faith defense under Section 548(c). The initial prong of a establishing a defense under section 548(c) requires a determination of whether the Babad Defendants took "in good faith." Good faith requires a subjective, three step inquiry to determine whether the transferee was on inquiry notice of the potential fraud. *Picard v. Citibank (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 191 (2d Cir. 2021), *cert. denied,* 212 L. Ed. 2d 217 (2022). These three factors are: 1) what the defendant knew; 2) whether the facts known by the transferee put the transferee on notice of the fraudulent purpose behind a transaction; and 3) whether diligent inquiry by the transferee would have uncovered the fraudulent purpose of the transfer. *Id.* at 191-192. Though there has been some disagreement as to the extent of the transferee's duty of inquiry, many courts, including courts of this district, have held that the "mere absence of a diligent investigation in the face of unusual circumstances is enough to negate 'good faith'—regardless

of whether a further investigation would have revealed anything." *Direct Access Partners,* 602 B.R. at 551; *see also In re World Vision Ent., Inc.*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000) ("The mere failure to make inquiry in the face of unusual circumstances [ ] is sufficient to preclude a good faith defense").

The Babad Defendants spent little time on the issue of good faith at trial. Similarly, the Defendants' Post-Trial Memo focuses on the issue of equivalent value for the transfer and says little on the issue of good faith. But an examination of the trial record reveals that the Babad Defendants have failed to establish good faith. Turning to the first prong of the inquiry notice test, the facts are inconclusive. While counsel spends some time trying to explain the significance of the $2 million figure, *see* Defendants' Post-Trial Memo. at 3-4, Mr. Babad's actual testimony does not specify his knowledge about the exact sources of the funds for the $2 million transfer. The Defendants' failure to provide evidence of Mr. Babad's knowledge undercuts this affirmative defense.

As to the second prong of good faith, the evidence demonstrates that the Babad Defendants should have been on inquiry notice. The evidence shows that Mr. Babad had an ongoing relationship with the Debtor's principals and had previously conducted business with them, often based on "handshake" deals. Babad Decl. ¶¶ 10, 16, 17. The evidence further establishes that there were many different transactions involving Mr. Babad and Mr. Miller— beyond those here— where the Babad Defendants sent money to various accounts for these deals.[15] And despite being present at the Zhu Buy Out closing, *see* Hr'g Tr. 140:25–141:21, Mr.

---

[15]    While the Babad Defendants claim to have been involved in the purchase of the John Property, Mr. Babad was also investing in the properties being acquired by Mr. Miller under the Zhu Buy Out. *See, e.g.* Hr'g Tr. 137:24–138:15) (Mr. Babad testifying that he invested in the Zhu Buy Out properties); Hr'g Tr. 147: 10-17 (Mr. Babad testifying that he expected to be a partner in the properties purchased in the Zhu Buy Out).

Babad's understanding of what occurred was hazy at best.  Mr. Babad appears to have been aware that other deals were implicated in the closing of the Zhu Buy Out, testifying "I just know that they had a fight between–that for some reason they sold off pieces which they [owned] to the Chinese group . . . . " Hr'g Tr. 145:21-23.  But Mr. Babad also testified that "[i]t could be that maybe the reason I came over there is that they were selling 45." Hr'g Tr. 150:23-24.  Given Mr. Babad's murky understanding of the transactions in play at the time of these simultaneous closings and his history of handshake deals with Mr. Miller, Mr. Babad should have been on inquiry notice about the source of these funds.  As such, it is impossible to conclude that the Babad Defendants have satisfied their burden to demonstrate the good faith aspect of a Section 548(c) affirmative defense.

As for the other aspect of the Section 548(c) defense, the Babad Defendants also have not established that the transfer was for value.  When asserting a Section 548(c) defense, the burden is on the transferee to show that the transfer was for value.  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 693 (Bankr. S.D.N.Y. 2019) (citing *In re Bayou Grp., LLC*, 439 B.R. 284, 308 (S.D.N.Y. 2010)).  To satisfy this prong, the Babad Defendants must show that equivalent value was received by the Debtor.  The crux of the Babad Defendants' argument is that the four Defense Transfers were the consideration for the $2,000,000 received from the Debtor.  Babad Decl. ¶¶ 14-15, 20-29.  More specifically, Mr. Babad asserts that these funds were paid to Ms. Hsuing, whom Mr. Babad understood to be the Debtor's attorney, into a "special escrow account used only for these investments." Babad Decl. ¶ 27.  The Babad Defendants further assert that these funds were used to purchase the John Property by the Debtor, and they point to the testimony of Peter Dong that the money for the purchase of the John Property came from Ms. Hsuing's account.  Defendants' Post-Trial Memo at 3; Hr'g Tr. 68:8-13.

But while the Babad Defendants unquestionably transmitted large amounts of money to various parties in connection with a variety of transactions and deals, the Babad Defendants have not met their burdening of establishing that value was provided to the Debtor.  In particular, the Court does not find Mr. Babad's testimony to be credible that "the entirety of the 45 John funds used to initially acquire the [John] Property came from these funds . . ." Babad Decl. ¶ 29.  His contention is not supported by the weight of the credible evidence, particularly given the timing of all these events.  As a starting point, it is undisputed that the Debtor purchased the John Property on March 4, 2014.  *See* Dong Decl. ¶ 9, Exh. B.  For the Defense Transfers to be used for the purchase of the John Property, therefore, the Defense Transfers would need to be made on or before March 4, 2014.  But they were not.  One transfer occurred on March 5, 2014, two occurred on March 6, 2014, and one occurred on March 14, 2014.  Babad Decl. ¶¶ 22, 23, 25, 26; Exh. 1 pp. 4-7.  As all four of the Defense Transfers were made after the purchase of the 45 John Property, it is impossible to conclude that they were used to purchase the 45 John Property.

There are other problems with the theory of the Babad Defendants.  For one, none of the Defense Transfers were made to the Debtor or even to its managers or members. Instead, the monies were sent to separate parties, including Ms. Hsuing and Mr. Dong. While Mr. Babad may have believed that Ms. Hsuing represented the Debtor, the exhibits attached to Mr. Babad's own Declaration demonstrate that this was not a reasonable assumption.  Annexed as exhibit 1 to Mr. Babad's declaration are copies of nine checks or documentation of wire transfers totaling $10,150,000.  Babad Decl.; Exh. 1.  Five of these payments were payable to Ms. Hsuing.  The evidence demonstrates that Mr. Babad made payments to Ms. Hsuing's escrow account for a variety of different projects.  Indeed, Mr. Babad testified that "I was told that Hsuing had established a special escrow account for her dealings with investments relating to Dong, Miller,

and Sprei, and that funds paid to that account would be held in trust and applied to the ventures."
Babad Decl. ¶ 14. The fact that Mr. Babad refers to investments and ventures in the plural
underscores the fact that the purchase of the John Property was only one of several ventures in
which Mr. Babad, Mr. Miller, and Mr. Sprei participated. For example, check number 18127
dated December 23, 2013 and payable to "Anne Hsuing Attorney" in the amount of $1 million
relates to Mr. Babad's contribution to a different project involving Mr. Miller and Mr. Sprei. *See*
Plaintiff's Cross A, Exh. B at 2 [ECF 111].

The evidence also demonstrates that one of the Defense Transfers did not even come
from the Babad Defendants. Plaintiff presented highly convincing proof that, at the time the
Defense Transfer check from Sullivan 90 Holdings LLC was written, Mr. Babad was not the
owner and manager of Sullivan 90 Holdings LLC. Hr'g Tr. 178:10-182:13; Babad Decl. Exh. 1.
As Mr. Miller, not Mr. Babad, owned and controlled Sullivan 90 Holdings LLC, Mr. Babad has
not established that either he or the Congregation provided value to the Debtor by conveying
funds from this account.

The Babad Defendants attempt to overcome these deficiencies by raising questions about
Ms. Hsuing's role in the Debtor's transaction. The Babad Defendants assert that Ms. Hsuing was
counsel for the Debtor and responsible for the monies paid to her on the Debtor's behalf, and that
Ms. Hsuing's failure to properly account for the funds in her escrow account constitutes a
violation of NY Rule of Professional Conduct 1.15(c) and (d). *See generally* Defendant's Post-
Trial Memo. At trial, the Babad Defendants' counsel put significant emphasis on the role Ms.
Hsuing played on behalf of the Debtor and whether funds used for the purchase of the property
flowed through her escrow account. *See, e.g.* Hr'g Tr. 58:4–59:16; 68:5-13; 95:16-23. But the
Court credits Mr. Dong's testimony that Ms. Hsuing represented him in an individual capacity

19

only for the purchase of the John Property. Hr'g Tr. 45:13-15. Mr. Dong's testimony on this point dovetails with the testimony of Yisroel Schwartz, who testified that he and his firm, Blaivas, represented the Debtor in purchasing the John Property. Schwartz Decl. ¶ 3. Mr. Schwartz further testified that he understood that Ms. Hsuing represented Mr. Dong. *Id.*[16]

The Babad Defendants also complain that Ms. Hsuing violated the rules concerning the record keeping of the escrow accounts and that Plaintiff failed to call her as a witness. Defendants' Post-Trial Memo at 4-5. But this argument once again misapprehends the burdens of the parties in this case. Once actual fraud is shown, the Plaintiff is not required to show the lack of fair consideration because it is not an element of its claim. *New Trend Apparel,* 8 F. Supp. 3d at 438. Rather, the burden is on the party asserting a defense of good faith under Section 548(c) to prove the elements of the defense. The Babad Defendants have not done so. At best, the Court concludes that there may have been questions about the role of Ms. Hsuing but such questions only confirm the need for the Babad Defendants to inquire about the transfer at issue here.[17]

Having established that the transfers were made with actual intent to defraud, and in light of the Babad Defendants' failure to meet their burden to establish an affirmative defense under

---

[16] While Mr. Schwartz did testify that Ms. Hsuing acted as the attorney for the Debtor on certain matters, Hr'g Tr. 93:13-14, the evidence does not support the assertion that Ms. Hsuing represented the Debtor at the closing of the John Property.

[17] Finally, the Defendants make an argument that the consideration provided by the Babad Defendants is proven by the fact that there was a $2 million shortfall in funds needed to close on the John Property. Defendants' Post-Trial Memo at 3. But the Court disagrees. The record does not support a finding that the purchasers of the John Property had a $2 million shortfall of funds at closing. In fact, the law firm that represented SDF1 and SDF2, who were the secured lenders who financed the purchase of the property, confirmed that on the closing date the secured lender had all funds necessary to close on the property, including $5,650,000 in its escrow account. Feuerstein Decl. ¶ 4, Exh. B.

Section 548(c), Plaintiff has met its burden on claims eighteen, twenty, twenty two, and twenty four.

**B. Constructively Fraudulent Transfers**

For many of the same reasons set forth above, the Court also finds that the Plaintiff has demonstrated that the $2 million transfer here satisfies the requirements for a constructive fraudulent transfer.

### 1. Legal Standard

To establish liability for constructive fraudulent conveyance under federal law, two elements are necessary: 1) a transfer of property without receipt of reasonably equivalent value; and 2) the debtor was insolvent at the time of the transfer or the transfer left the debtor insolvent or with unreasonably small capital or incurred debts beyond the transferor's ability to pay. *See* Section 548(a)(1)(B); *see also Schneider v. Barnard,* 508 B.R. 533, 547–48 (E.D.N.Y. 2014)*; Graham v Serafis (In re Vill. Red Rest. Corp.)*, 2021 Bankr LEXIS 2377, at *22 (Bankr. S.D.N.Y. Aug. 31, 2021). Under the Bankruptcy Code, constructive fraudulent conveyance must be proven by a preponderance of the evidence. *Patriot Group,* 452 B.R. at 436.

The N.Y. DCL, like Section 548(a)(1)(B) of the Bankruptcy Code, allows for recovery of a constructive fraudulent transfer where actual fraudulent intent is absent or cannot be proven. *See Am. Federated Title Corp. v. GFI Mgmt. Servs.*, 126 F. Supp. 3d 388, 400-01 (S.D.N.Y. 2015). Under the N.Y. D.C.L., constructive fraudulent conveyance must be proven by a preponderance of the evidence. *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 610 (S.D.N.Y. 2018), *aff'd*, 776 F. App'x 16 (2d Cir. 2019). Like federal law, New York requires that two elements are present; the transfer must be without consideration, and the debtor must either be left insolvent, left undercapitalized as a business venture, or in a position where the transferor incur debts

beyond the transferor's ability to pay on maturity. *See* N.Y. DCL §§ 273–275 (repealed 2019);

*Aluminum Supply Co. v. Camelio*, 223 N.Y.S.2d 26, 28-29 (Sup. Ct. Monroe Cty. 1962). Under

New York law, fair consideration requires showing both an equivalent exchange of value and

that the asset transferred is received in good faith. *HBE Leasing Corp. v. Frank*, 61 F.3d

1054,1057–58 (2d Cir. 1995).

### 2. The Babad Transfer Was Constructively Fraudulent

#### a. The Transfer Lacked Consideration

For a constructive conveyance claim, the Plaintiff holds the burden of proving that the

transfer was made without fair consideration. *Jalbert v. Flom (In re BICOM NY, LLC)*, 633 B.R.

25, 41-42 (Bankr. S.D.N.Y. 2021). The Court concludes that the Plaintiff has satisfied its burden

on this point. As discussed *supra*, the evidence does not establish that the Debtor received

anything of value in exchange for the $2 million dollar transfer.

#### b. The Change in the Debtor's Financial Condition

The Court also finds that the Plaintiff has demonstrated that the Babad Transfer, which

was made in conjunction with transfers of the remainder of the Debtors' assets, left the Debtor

with "unreasonably small capital." 11 U.S.C. §548(a)(1)(B)(ii)(I); N.Y. D.C.L. § 274 (repealed

2019). "This test denotes a financial condition short of actual insolvency and 'is aimed at

transfers that leave the transferor technically solvent but doomed to fail.'" *Direct Access*

*Partners,* 602 B.R. at 536 (quoting *Tese-Milner v. Edidin & Assocs.*, 490 B.R. 84, 98 (Bankr.

S.D.N.Y. 2013)). A debtor has unreasonably small capital if insolvency is "inevitable in the

reasonably foreseeable future." *Id.* (citing *Adelphia Recovery Trust v. FPL Grp., Inc. (In re*

*Adelphia Communs. Corp.)*, 652 F. App'x 19, 22 (2d Cir. 2016)). Stated another way, courts

look to whether, at the time of the transfer, the company

was able to generate sufficient profits or capital to sustain operations over a reasonable period of time [and] have considered the reality of the debtor's financial condition leading up to the transfer, looking to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue, as well as the debtor's present and prospective debts, and whether the retained assets are sufficiently liquid to enable the debtor to pay such debts as they become due.

*Adelphia Recovery Trust v. FPL Group, Inc.* (*In re Adelphia Commc'ns Corp.*), 512 B.R. 447, 495–96 (Bankr. S.D.N.Y. 2014), *as corrected* (Sept. 10, 2014) (internal quotations omitted).

Here, the PSA resulted in the sale of the Debtor's sole asset and any potential income that could be generated from that asset. There is nothing in the record showing that the Debtor was left with any capital at all, let alone sufficient capital, once the PSA down payment was diverted by Mr. Miller, including the $2 million that went to the Babad Defendants. Indeed, while the mortgages on the John Property themselves appear to have been satisfied under the sale, *see* PSA ¶ 3, the PSA itself provided for additional expenses that the Debtor could not meet. *See id.* ¶ 6 (requiring the Debtor to pay sales taxes for the remainder of the fiscal year in which the sale occurred); ¶ 24 (requiring the Debtor to pay a management fee from the time of the execution of the agreement until the consummation of the agreement); ¶ 25 (requiring the Debtor to return the down payment in the event the sale was not consummated); ¶ 26 (requiring the Debtor to pay certain expenses associated with the property). This record supports a finding that the Debtor was left without working capital, ability to generate income, or a capital cushion with which to meet these obligations. Indeed, the Court takes judicial notice of the fact that the Debtors' bankruptcy petition lists no assets of any kind save the instant action to avoid the transfers made by Mr. Miller and Mr. Sprei. *See* ECF 1, Case No. 16-12043. [18] This is unsurprising given the

---

[18] It is well settled that courts are empowered to take judicial notice of public filings. *See Teamsters Nat'l Freight Indus. Negotiating Comm. the Int'l Bhd. of Teamsters, and its Affiliated Local Unions v. Howard's Express, Inc (In re Howard's Exp., Inc.)*, 151 F. App'x 46, 48 (2d Cir. 2005).

fact that that the Debtor was formed solely to own and operate the John Property, which was sold

under the PSA.  Dong Decl. ¶ 6.  Once the John Property was sold and the funds generated by

the sale dissipated, the Debtor could no longer be considered a going concern.  The actions of

Mr. Miller and Mr. Sprei caused the Debtor to both lose the liquid capital associated with the

sale and the asset itself.  With the sale of the John Property and the PSA down payment having

been siphoned away by Mr. Miller and Mr. Sprei, including the $2 million Babad Transfer, the

Debtor's insolvency was clearly inevitable.[19]  Having determined both that the transfer lacked

consideration and that the Debtor was left with unreasonably small capital, the Court also

determines that the Plaintiff has prevailed on its constructive fraud claims.

### C. Prejudgment Interest

In its Complaint and post-trial briefing, the Plaintiff makes a request for prejudgment

interest.  Complaint p. 75; *see also* Plaintiff's Post Trial Brief at 33-34.  Neither 11 USC § 548

nor the N.Y. D.C.L. specifically provide for an award for prejudgment interest.  However,

discretionary awards of prejudgment interest are permissible under federal law in certain

circumstances.  *Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-

CIO*, 955 F.2d 831, 833 (2d Cir. 1992).   An award of prejudgment interest "should be a function

of (i) the need to fully compensate the wronged party for actual damages suffered, (ii)

considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the

statute involved, and/or (iv) such other general principles as are deemed relevant by the court."

*Id.*at 833-34.  Accordingly, an award of prejudgment interest must not result in a windfall to the

plaintiff nor is such an award appropriate when a defendant acted innocently and without reason

---

[19]      Having concluded that the Debtor was left with unreasonably small capital, the Court need not determine
whether the Debtor was rendered technically insolvent as a result of the Babad Transfer, an issue the parties have
vigorously disputed.  *See* Plaintiff's Post-Trial Brief at 21-24 [ECF 112]; Defendants' Post-Trial Memo at 6-8, 12-
14.

to know of the wrongfulness of his actions. *Id.* at 834. Within the Court's discretion, however, prejudgment interest should be awarded absent a sound reason to deny it. *McHale v. Boulder Capital LLC (In re 1031 Tax Grp., LLC)*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010). Here, Plaintiff was deprived of the value of its property when the John Property was sold and the proceeds of the down payment were fraudulently conveyed. An award of prejudgment interest is warranted here to compensate the Debtor for the loss of the value of the transfer. Without the fraudulent conveyance, the Debtor would have either been able to continue to operate or, at the very least, pay its creditors.

As no federal prejudgment interest rates exists, the Court has discretion in selecting the interest rate to be applied in calculating prejudgment interest. *In re 1031 Tax Grp.,* 439 B.R. at 88. The Court must also determine the date at which interest begins to accrue. *See id.* at 89 (finding that there is some authority to support the accrual of interest beginning at the time of a fraudulent conveyance, while other courts find that interest begins to accrue at the commencement of the adversary proceeding).

As there is no governing contract or other guidepost here, the Court finds that the prime rate in effect at the time of the transaction is an appropriate rate. The prime rate "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Till v. SCS Credit Corp.,* 541 U.S. 465, 479, (2004). Plaintiff cites to the New York State statutory interest rate found at N.Y. C.P.L.R § 5004. *See, e.g. Geltzer v. Artists Marketing Corp. (In re Cassandra Grp.)*, 338 B.R. 583, 599–600 (Bankr. S.D.N.Y. 2006) (utilizing New York's interest rate, finding that New York state courts award prejudgment interest for a claim of tortious conduct, including fraudulent conveyance). The

Court concludes, however, that the prime rate will more accurately reflect the opportunity cost of the funds lost to the Debtor. *See In re 1031 Tax Grp., LLC*, 439 B.R. at 90–91; *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 624 B.R. 55, 65–66 (Bankr. S.D.N.Y. 2020). In determining the date from which interest should accrue on the judgment, the Court sees no reason to depart from the vast majority of cases that find that interest begin to accrue on the date the adversary proceeding is commenced. *See Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 526–27 (Bankr. D. Conn. 1998); *In re Cassandra Grp.*, 338 B.R. at 600; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 624 B.R. at 66.

## CONCLUSION

For all of the reasons discussed above, the Court finds that the Plaintiffs are entitled to judgment on all claims asserted against Mr. Babad and the Congregation. Plaintiff is directed to settle an order on five days' notice consistent with this memorandum of decision. The proposed order must be submitted by filing a notice of the proposed order on the docket, with a copy of the proposed order attached as an exhibit to the notice. Additionally, the proposed order shall include a calculation of its damages and prejudgment interest accrued up to the date of this memorandum of decision.

Dated:  White Plains, New York
          April 14, 2023

                                                          */s/ Sean H. Lane*
                                                          UNITED STATES BANKRUPTCY JUDGE